Filed 3/6/20

**CERTIFIED FOR PARTIAL PUBLICATION\***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT\*

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JAVIER RUBEN RODRIGUEZ GARCIA,<br><br>    Defendant and Appellant. | H043870<br>(Santa Clara County<br> Super. Ct. No. C1247403) |
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>DEANGELO JOSEPH AUSTIN,<br><br>    Defendant and Appellant. | H044073<br>(Santa Clara County<br> Super. Ct. No. C1247403) |

    Appellants Javier Ruben Rodriguez Garcia and Deangelo Joseph Austin appeal from judgments entered after a jury found them guilty of first degree murder and other crimes related to a home invasion robbery.

    Between their two appeals, which we have considered together for oral argument and disposition, Garcia and Austin raise 26 issues. Stated broadly, Garcia and Austin

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I(D), II, III, and IV.

challenge the sufficiency of the evidence presented at trial, certain evidentiary rulings and jury instructions, the constitutionality of one of the crimes of conviction, the effectiveness of their defense counsel, and aspects of their sentences.

We find no reversible error for Garcia's conviction. Nevertheless, we vacate Garcia's sentence because the one-year prior prison term enhancement imposed on him must be stricken under currently applicable law. Hence, we remand Garcia's case for resentencing. We also remand his case pursuant to *People v. Franklin* (2016) 63 Cal.4th 261, for a determination by the trial court whether Garcia was afforded sufficient opportunity to make a record for his eventual youth offender parole hearing.

For Austin, we vacate the special circumstance finding and sentence and remand his case to the trial court so that the People may elect whether to retry Austin on the special circumstance allegation. At Austin's resentencing, the trial court shall strike the 10-year gang enhancement imposed under Penal Code section 186.22, subdivision (b)(1)(C) and must decide whether it will exercise its discretion to strike the prior conviction enhancements under Penal Code section 667, subdivision (a). We reject all of Austin's other claims of error.

## FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In September 2014, the Santa Clara County District Attorney filed an information charging Garcia and Austin with six counts related to the November 2012 home invasion robbery of Raveesh K. and Harinder K. and the murder of Raveesh.[1]

Specifically, count 1 alleged that, on or about November 30, 2012, Garcia and Austin killed Raveesh with malice aforethought (Pen. Code, § 187)[2] while engaged in the

---

[1] To protect the victims' privacy, we here refer to them by their first names and the first initial of their last name and, in the rest of the opinion, by their first names only. (Cal. Rules of Court, rule 8.90(b)(4).)

[2] Unspecified statutory references are to the Penal Code.

2

commission of a robbery (§ 190.2, subd. (a)(17)).  Count 2 alleged robbery of an inhabited place while acting in concert (§§ 211, 213, subd. (a)(1)(A)).  Count 3 alleged an assault on Harinder with a deadly weapon (§ 245, subd. (a)(1)).  Count 4 alleged criminal threats on Harinder (§ 422).  Counts 5 and 6 alleged false imprisonment of Raveesh and Harinder, respectively (§§ 236, 237).  All counts included gang allegations for Garcia and Austin (§ 186.22, subd. (b)(1)(A)).  In addition, the information alleged that Garcia had a prior felony conviction under Health and Safety Code section 11351 (§ 667.5, subd. (b)), and Austin had a prior strike conviction (§§ 667, subd. (b)–(i), 1170.12) and a prior serious felony conviction (§ 667, subd. (a)) for violating sections 459 and 460, subdivision (a).

The trial began on April 18, 2016.  The trial court empaneled a single jury to hear evidence regarding both defendants.

On June 7, 2016, the jury found Garcia guilty of first degree murder, robbery, misdemeanor battery (§ 242) as a lesser included offense of assault with a deadly weapon,[3] making criminal threats, and both counts of false imprisonment.  The jury deadlocked on the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17), and found not true the gang allegation attendant to the murder charge.[4]  The jury also found not true the gang allegation regarding the battery conviction and deadlocked on the gang allegations regarding the remaining counts.[5]  The trial court separately found Garcia's prior felony conviction allegation true.

---

[3] Under the elements test, simple battery (§ 242) is not a lesser included offense of assault with a deadly weapon (§ 245, subd. (a)(1)).  (*In re Robert G.* (1982) 31 Cal.3d 437, 439–441; *People v. Jones* (1981) 119 Cal.App.3d 749, 754.)  However, Garcia does not challenge his conviction for battery as a lesser included offense, and we therefore do not further address it.

[4] We note that the minute order for June 7, 2016, incorrectly states that the jury found true the gang allegation for count 1.  In fact, the jury found the allegation to be not true.  In our disposition we order the minute order corrected.

[5] The record does not indicate that the trial court took any further action with respect to the allegations on which the jury deadlocked.

That same day, the jury found Austin guilty of first degree murder, robbery, assault with a deadly weapon, making criminal threats, and both counts of false imprisonment. The jury also found true the robbery-murder special circumstance allegation under section 190.2, subdivision (a)(17), and the gang allegations as to all counts. In addition, the trial court separately found Austin's prior strike conviction and prior serious felony conviction allegations true.

The trial court sentenced Garcia to 25 years to life for his first degree murder conviction on count 1, which was imposed consecutive to nine years for the robbery conviction on count 2, eight months consecutively for each conviction for criminal threats and false imprisonment on counts 4, 5, and 6, and one year for the prior felony conviction enhancement, for a total term of 37 years to life in prison. The trial court also imposed various fines and fees.

The trial court sentenced Austin consecutively to indeterminate terms of life without the possibility of parole for the first degree murder conviction with special circumstances on count 1 and 30 years to life for the robbery conviction on count 2, and determinate terms of eight years for the assault with a deadly weapon conviction on count 3, and one year and four months for each of the criminal threats and false imprisonment convictions on counts 4, 5, and 6. The court imposed a term of five years for the gang allegation in count 3, one year and eight months for the gang allegation in count 4, and one year and four months for the gang allegations in counts 5 and 6. The trial court also imposed a five-year term pursuant to section 667, subdivision (a), for Austin's determinate sentence and five-year terms for the prior conviction on each of the indeterminate terms. The trial court stayed the term of the gang allegation on count 1. The total determinate term was 36 years and four months, consecutive to the indeterminate terms of 30 years to life and life without the possibility of parole. The trial court also imposed various fines and fees.

4

B. *The Evidence Presented at Trial*

1. The Prosecution Evidence

Katrina Fritz is Austin's older sister.[6] Fritz worked as a prostitute and met Raveesh around 1999, when she was 19 years old and Raveesh became a customer of hers. Between 1999 and 2011, Fritz visited Raveesh over 100 times at his home in Monte Sereno, which he shared with his ex-wife Harinder.[7] Raveesh compensated Fritz well for sex and companionship, giving her hundreds of thousands of dollars and three cars over the years. Fritz had brought Austin to Harinder and Raveesh's house about two or three times between approximately 2003 and 2008. Fritz was familiar with the layout of the house and knew that Harinder and Raveesh typically left the doors unlocked. Fritz last saw Raveesh about one year before the robbery.

Shortly after Thanksgiving in 2012, Austin called Fritz and asked her if she was still involved with Raveesh and whether he had money and jewelry at the house. Austin said that he was thinking of going there, which Fritz understood to mean Austin was contemplating robbery. Fritz told Austin not to commit the robbery, but Austin said something "like, [c]ome on, it's okay." Fritz also offered to call or visit Raveesh to get him out of the house, but Austin told her not to do so because Raveesh would suspect she was involved, given the lack of recent contact.

---

[6] The district attorney charged Fritz with murder and robbery for her involvement in the crime against Harinder and Raveesh. In February 2014, during the preliminary hearing, Fritz agreed to be interviewed by the police. Later that year, Fritz entered into a plea agreement with the district attorney. Fritz pleaded guilty to robbery and false imprisonment and admitted that she committed the crimes for the benefit of a criminal street gang, with a maximum sentence of 17 years. The district attorney agreed to dismiss the murder charge against Fritz in exchange for her cooperation and testimony. In addition to testifying at the trial of Garcia and Austin, Fritz testified at the trial of Marcellous Drummer, who was tried separately for the crimes against Harinder and Raveesh and whose appeal we previously decided. (See *People v. Drummer* (June 15, 2017, H041826) [nonpub. opn.].)

[7] Harinder and Raveesh divorced in 2010. At the time of the crimes, Harinder was living at the Monte Sereno house and Raveesh was staying there in a guest room.

5

Later in November 2012, Austin called Fritz from Monte Sereno and asked for directions to Harinder and Raveesh's house. When Austin arrived at the house, he told Fritz that he saw a lot of cars. Cell phone records confirmed that Austin's phone was in the vicinity of Harinder and Raveesh's house in the early afternoon of November 29, 2012.

Later that day, Austin called Fritz again and asked for a drawing of the home's layout. Fritz and Austin arranged to meet in north Oakland. They met in the midafternoon, and Fritz gave Austin a map of the residence. Marcellous Drummer was with Austin, and Fritz saw a black man inside the car (Fritz's BMW X5) that Austin had driven to the meeting. Fritz explained the map to Austin and Drummer, who were both excited, and they discussed gold and money. When Fritz asked Austin who was going with him to commit the crime, Austin said "his partner from West Oakland." Austin described the partner as "This nigger from Ghost Town." Fritz was surprised by this statement because she did not know that Austin had any friends in Ghost Town. During the meeting, Fritz told Austin and Drummer to be careful. Drummer responded, "I got this," and Austin said, "Sis, you know I know what I'm doing."

After leaving Austin and Drummer, Fritz drove to a hotel in San Francisco to meet with a customer. Fritz planned to borrow a hotel room rented by Summer Sawyer, who was dating Austin at the time. As Fritz was entering an elevator at the hotel she saw Austin, Drummer, and a third man step out. Fritz did not get a good look at their faces, but she observed that the third man was a black male who was shorter than Austin. Fritz did not speak with them, and she could not say whether the third man was Garcia.

Later that day, after 10:00 p.m., Austin called Fritz and told her he was "on his way out there" to Harinder and Raveesh's house. Austin called again later and said he was at the house and was watching Raveesh, who had been drinking alcohol. Austin said he was about to enter the house. Fritz told Austin not to do too much, to be careful, and to stop calling her phone. Cell phone records showed that, at approximately 12:03 a.m.

6

on November 30, 2012, Austin made a one-minute-and-seven-second call to Fritz from the vicinity of Harinder and Raveesh's house.

On November 29, 2012, Harinder went to bed around 10:00 p.m. After Harinder had fallen asleep, she awoke to a knock on her master bedroom door and someone entering the room. The intruder was Austin.[8] Austin got onto the bed with an illuminated cell phone in his hand. Harinder screamed for Raveesh, and Austin hit her in the face with something hard, cutting her lip. Austin directed Harinder to stop screaming and told her to march to the kitchen if she wanted Raveesh. Harinder testified that no one threatened her during the incident.[9] Austin gave her a piece of laundry to wipe the blood from her face.

Harinder walked to the kitchen with Austin following her. In the kitchen, Harinder saw Raveesh's back and the shadow of a hand on his shirt trying to push him down. Raveesh's hands were tied, and he was struggling to free himself. He was standing, and Harinder saw his desperation and heard him say "Please help me." Harinder had also told the police shortly after the crime that she saw people beating Raveesh. When the men were putting Raveesh down to the floor, Harinder told them not to tie him up. She told them that Raveesh was a heart patient and would die. The men did not respond to her. She eventually saw Raveesh—who was a large man—go down to the floor, face down.

Someone wrapped tape over Harinder's eyes and mouth and tied her hands. They asked her to get down on the floor and then bound her legs with a blanket. Harinder had told the police that when she twice moved her hands, someone hit her, once on her leg

---

[8] Harinder identified Austin at trial and had previously identified him in a photographic lineup less than a month after the crime.

[9] A police detective, however, testified that Harinder had told him the person on her bed said that he was going to shoot her. Harinder also had told the detective that, at another time, the intruders said they would "kill her" and told her to keep quiet if she wanted to live.

and once on her hands. At one point, someone tried to remove gold bangles from her wrist; it hurt, so Harinder took the bangles off herself and handed them over. Two men asked her where the safe and money was, and Harinder told them the money, jewelry, and other valuables were in the master bedroom. After about an hour or two, Harinder told a man who was sitting in a chair beside her that Raveesh had not moved. The man got up, said he would look at Raveesh, and then came back and told her not to worry and that they would call 911 if needed. Based on the voices she heard, Harinder was not sure whether the man who stayed beside her was the same person who struck her face. She heard the voices of two or three different people roaming around the house.

Sometime later, a man told Harinder that they would be leaving soon and that she should not move. Eventually Harinder freed her legs, got up, and looked for a phone. She found one and called 911. All other phones in the house had been disconnected by the perpetrators. Harinder asked for help and said that she believed Raveesh was dead. Harinder had told the police that she shook Raveesh before and after she called 911.[10]

The police arrived at Harinder and Raveesh's house around 1:42 a.m. on November 30. They found Raveesh lying face down, cold to the touch, and unresponsive in the family room adjacent to the kitchen. His hands and legs were bound together, hogtied. Raveesh's face was masked with a distinctive mustache-patterned duct tape. A police officer testified that the "tape had been wrapped around [Raveesh's] head several times covering his mouth and almost up to his nasal passage." The officer "tried to remove the tape from around his mouth" in an effort to "clear the airway," and he rolled Raveesh over on his back. Harinder asked the police to show her Raveesh, and she saw that "they had already turned him over" and there "was so much mask on him that even his nose, everything was masked. His whole face was masked." An empty cardboard

---

[10] Harinder testified at trial that she "never touched" Raveesh before the police arrived.

tape roll and a pair of tan pants with a piece of the duct tape on them that matched the duct tape on Raveesh's face were found in the family room.

The interior of the large house had been ransacked, but there were no signs of forced entry. Jewelry, money, coins, and cameras were missing. A number of latex gloves were found in the kitchen sink.[11] Other latex gloves were found in the kitchen cabinets and drawers. Police also discovered another latex glove and an empty latex glove box on an embankment alongside a road adjacent to the house's fence.

The morning after the crime, Fritz heard a television news report about a home invasion homicide in Monte Sereno. This news scared Fritz, and she called Sawyer in an effort to reach Austin. Austin was sleeping, but he called Fritz back later. The two arranged to meet for brunch at a restaurant in Berkeley. Austin arrived at the restaurant with Drummer and Sawyer. Fritz asked Drummer what had happened, and he said, "Shit went bad." While they were sitting at a table, Austin gave Fritz $2,000.

After their meal, in the restaurant's parking lot Fritz asked Drummer and Austin what happened. Austin said that "shit went crazy" and that "somebody" was hitting Raveesh and Raveesh tried to fight back. Austin said that Harinder was "screaming, saying that, whatever [Raveesh] owes, I'll pay it." Drummer said that he had not done anything and had just sat there "watching them." Austin acknowledged knowing Raveesh was dead.

When Fritz asked if Austin and Drummer had left anything at the house that could tie them to the crime, Austin responded that they had gotten rid of everything, including gloves, clothes, and a crowbar. Austin told Fritz that if anything happened, they would confess, and Fritz would not have to go to jail. Fritz asked what they had done with the stolen goods, and Austin said that they had pawned them at a pawnshop in San Francisco.

---

[11] Harinder testified that the latex gloves in the sink did not belong to her.

Austin denied using Fritz's BMW to commit the crime and said he had taken "the other dude's car."

On a later date, Austin gave Fritz $40,000 to hide for him. At some point after giving Fritz this money, Austin called Fritz and asked her to check whether the name "Javier Garcia" was listed on Santa Clara County's online inmate locator. This was the first time Fritz had heard Garcia's name. Fritz told Austin that the inmate locator indicated Garcia was in custody for murder. Fritz asked Austin, "Does this have anything to do with that thing?" and Austin said, "Yes." On another day, Fritz met Austin and Drummer at an auto detail shop and they laughed about "random people" being arrested for the crime.[12]

Forensic pathologist Michelle Jorden performed an autopsy on Raveesh's body. Dr. Jorden concluded that the manner of Raveesh's death was homicide and that the cause of his death was probable asphyxia due to suffocation by the duct tape over his mouth. Dr. Jorden also found several contributory conditions to the cause of death, including sleep apnea, deviated nasal septum, coronary atherosclerosis, and hypertensive cardiovascular disease. Dr. Jorden observed duct tape wrapped around Raveesh's head three times "at the level of the eyes, including portions of the eyes." When Dr. Jorden observed Raveesh's body, there was no tape at or near Raveesh's nose or mouth. There was a dangling portion of duct tape along one side of his body. Dr. Jorden swabbed the duct tape that was wrapped around Raveesh's head to preserve any trace evidence.

---

[12] Lukis A. was arrested and charged for the crime based on DNA found in fingernail clippings collected from Raveesh. The charges were later dismissed when law enforcement determined that he was in the hospital at the time of the incident and could not have been present at the crime scene. Emergency medical personnel who had attended to Raveesh at the crime scene had treated Lukis hours earlier.
In addition, Raven D. was arrested in connection with the crime. Raven was a prostitute whom Fritz knew through Raveesh. The record suggests her case may have been dismissed.

Dr. Jorden observed fabric binding Raveesh's ankles and wrists. Dr. Jorden explained that Raveesh had an enlarged, "very, very bad heart." Because enlarged hearts require more oxygen, the tape over Raveesh's mouth, his obstructed nasal passages, and the physiological stress and terror of the crime would have placed additional stress on Raveesh's diseased heart. Dr. Jorden observed petechial hemorrhages in Raveesh's eyelids, which are indicative of asphyxia or heart attack, and petechial hemorrhages in his distal trachea and bronchi, suggesting suffocation. Dr. Jorden also determined that Raveesh had been struck at least three times on his head based on three blunt-force-trauma injuries to his scalp and skull. One of the head injuries was a patterned bruise to Raveesh's right temple, suggesting he had been struck by an object. In addition, Raveesh had several lacerations and abrasions on his face; a bruise on his inner left arm; an abrasion on his abdomen; and a hemorrhage in his neck muscle.

During the investigation of the crime, Santa Clara County criminalist Tahnee Mehmet received 67 items of evidence for analysis. The police department requested DNA analysis of 20 evidence items (including the multiple latex gloves as one item); 13 of the 20 items were analyzed for DNA. Mehmet determined that Garcia was a possible contributor to the major component of the DNA mixtures found on 4 of the 21 gloves collected from Harinder and Raveesh's kitchen sink. Specifically, Mehmet concluded that Garcia was a possible contributor to the DNA mixtures detected on the exterior of the fourth, ninth, seventeenth, and twenty-first gloves recovered from the sink.[13] Mehmet also found a DNA mixture of at least two individuals on the exterior of a glove found in a kitchen cabinet and determined that Garcia was a possible contributor to that mixture.

---

[13] As to the fourth glove, the mixture contained DNA from at least three individuals, including Raveesh. Regarding the three other gloves, Mehmet's analysis revealed that the mixtures on the ninth and seventeenth gloves contained DNA from at least three individuals, and the mixture on the twenty-first glove contained DNA from at least four individuals.

11

Mehmet detected a DNA mixture of at least two individuals on the piece of tape found on the tan pants recovered from the family room. Mehmet determined that Austin was the source of the major DNA profile found on the tape, and that Raveesh was a possible contributor to the minor DNA profile. Mehmet concluded that Austin was also the source of the major DNA profile in a mixture swabbed from the edge of a duct tape roll, which Mehmet described as "an empty cardboard tape roll with a small piece of tape still adhering." Raveesh and Harinder were possible contributors to this mixture as well. In addition, Austin and Raveesh were possible contributors to the major DNA component of a mixture that included at least three people swabbed from the inner area of the tape roll. Reddish brown stains on the tape roll tested presumptively but not conclusively for blood.

Mehmet did not provide specific testimony of any DNA analysis she conducted on the tape recovered from Raveesh's body, including the tape found on his head. Mehmet tested areas of the duct tape she thought it was likely someone had touched.

Mehmet determined that Drummer was a possible contributor to the DNA mixture of at least four individuals found in swabs taken from Raveesh's right hand. Raveesh and Harinder contributed to this mixture as well. In addition, Mehmet developed a DNA profile for Garcia's cousin, Eddiebo Rodriguez. Mehmet did not detect Rodriguez's DNA on any of the analyzed evidence items.

Mehmet said that, other than those items about which she specifically testified, she did not find any DNA evidence on the items that she analyzed that matched the known profiles of the approximately 20 people for which she tested, other than DNA associated with the victims.

Garcia was arrested for this crime in Oakland on December 27, 2012. At the time, Garcia was in the company of Rodriguez and another person. Garcia told the police that he had never been to Monte Sereno or the Los Gatos area and had never seen Harinder or Raveesh. During his police interview, Garcia said that he did not know the case was "so

12

serious" and that the officers had "said people were dying," but the officers had not previously mentioned that anyone had died.

Austin was arrested in Sacramento on December 29, 2012. At the time of his arrest he was driving a car that had been rented by Fritz.

Cell phone records revealed that, from November 25, 2012, through December 7, 2012, there were a total of 84 calls and nine texts between Austin's phone and Garcia's phone. There were also a total of 74 contacts between Austin's phone and another phone associated with Garcia from November 25, 2012, through December 8, 2012. Between December 8 and December 27, 2012, Garcia's phone was in contact 23 times with a phone associated with Austin.

More specifically, from around the time of the crime, the phone records revealed: Between 5:13 a.m. on November 29 to 8:05 p.m. on November 30, 2012, there were 10 calls between Austin's phone and Garcia's phone, 20 calls between Austin's phone and Fritz's phone, and 12 calls between Austin's phone and Sitteruiet T.'s phone.[14] Between 8:05 p.m. on November 30 and 4:14 p.m. on December 1, 2012, there were nine calls between Austin's phone and Garcia's phone, six calls between Austin's phone and Sitteruiet T.'s phone, and none between Austin's phone and Fritz's phone.

Cellular phone expert Jim Cook reviewed the cell phone information that had been collected and determined that Austin's phone and Garcia's phone were in the vicinity of Oakland until after 9:00 p.m. on November 29, 2012. Garcia's and Austin's phones then traveled south toward the crime scene. Garcia's phone and Austin's phone were in the vicinity of Harinder and Raveesh's house around and after midnight on November 30. Garcia's phone called Austin's phone at 12:44 a.m. on November 30, and both phones connected to cell towers Cook would have expected them to, had the phones been at

---

[14] Sitteruiet T. is Garcia's cousin.

Harinder and Raveesh's house.[15]  The next activity on Garcia's phone was at 5:34 a.m., when it was in the area of the Francisco Bay Inn in San Francisco.  Austin's phone also was in the vicinity of the Francisco Bay Inn from 2:32 a.m. to 8:39 a.m. on November 30, 2012.

Oakland police officer Daniel Bruce testified as an expert on Oakland's criminal street gangs.[16]  Bruce opined that Austin and Drummer were members of the ENT gang at the time of the charged crime.[17]  In addition, Bruce opined that ENT had engaged in a pattern of criminal activity.  Bruce identified certified court records showing convictions of two alleged ENT members, Ronny Flenaugh and Gregory Jefferson.[18]  In response to a hypothetical based on the facts of the charged crime, Bruce opined that the depicted robbery would be typical of how a criminal street gang would conduct a home invasion robbery.  In addition, Bruce opined that that acts were done for the benefit of, at the direction of, or in association with a criminal street gang.[19]

### 2. The Defense Evidence

Garcia testified in his own defense.  Garcia was 25 years old at the time of trial. He was raised in Oakland and had lived in several neighborhoods including Ghost Town. Garcia denied any gang affiliation or that "Ghost Town" is a gang.  Garcia admitted that

---

[15] Drummer's cell phone was also in the vicinity of the crime scene at the time of the incident.

[16] Another Oakland police officer, Roberto Garcia, testified as a gang expert and opined that defendant Garcia was a member of the Ghost Town gang.  Because the jury did not find any gang allegations against Garcia to be true, we do not describe the gang evidence relating to him.

[17] Bruce also testified that Garcia was a member of the ENT gang and Rodriguez was a member of both the Ghost Town gang and the ENT gang.  Bruce explained that Ghost Town is aligned with ENT and it is possible to be a member of two gangs.

[18] Flenaugh's first name also appears in the trial record as "Ronnie."

[19] We describe Bruce's testimony in more detail when discussing Austin's challenges to the alleged gang enhancements, *post*.

he had gone to prison in 2010 for selling drugs and that he was supervised by a probation officer until the end of October 2012.[20]

Garcia testified that Rodriguez had introduced him to Austin about three months before the charged crime and that they had friends in common. Garcia talked with Austin two or three times a week and used drugs and played video games with him. Garcia did not know Fritz or Drummer prior to their prosecution for this crime. Garcia denied committing any residential burglaries with Rodriguez, Austin, or any of Austin's friends. Garcia said he had never been to Monte Sereno or Los Gatos, and he denied committing the charged crime.

In November 2012, Garcia was selling and using drugs and living at the house of Marquez Slaton, whom he knew as Gwiizy. Garcia used latex gloves to package the drugs he sold because he did not want to test positive for drugs. Garcia would throw the gloves away if they ripped, but he would sometimes return used gloves to the box, so he could reuse them.

On November 29, 2012, Garcia was at Gwiizy's house when Rodriguez arrived around 8:00 or 9:00 p.m. "talking about wanting to use some stuff." Rodriguez stayed at Gwiizy's house for approximately 10-15 minutes before leaving with a "bipper" (a type of hole puncher), Garcia's cell phone, and an open box of latex gloves that was similar to the box found by police outside of Harinder and Raveesh's residence. Rodriguez had borrowed the bipper before, and it was not unusual for him to borrow or take Garcia's phone. Rodriguez said that his own phone "was messing up that day," but he did not say whether his phone was working or not.[21] Rodriguez did not tell Garcia how long he wanted to keep Garcia's phone.

---

[20] On cross-examination, Garcia said he had pleaded guilty to the drug offense but he denied committing it, explaining that he took the blame for someone else.
[21] Cell phone records indicated that, on November 29, 2012, Garcia's phone called Rodriguez's phone at 9:32 p.m. (for 41 seconds) and 9:38 p.m. (for 112 seconds).

Garcia next saw Rodriguez the following day. Rodriguez gave Garcia his phone back but did not tell Garcia what he had done the previous night. Garcia first learned of the crime when he overheard Rodriguez talking about it around a week or so before Garcia's arrest on December 27. Garcia testified that Rodriguez had died on January 11, 2013. Prior to Rodriguez's death, Garcia had sought to have Rodriguez speak with Garcia's defense counsel about the case and Garcia's cell phone.

Austin also testified in his own defense. Austin admitted that he was one of the people who robbed Harinder and Raveesh. He said he wanted to get money for his family and that he came up with the idea to rob them. But Austin denied that he wanted anyone to die. He acknowledged that Fritz had told him Raveesh was old and had asked him to be careful and not to hurt Raveesh. However, Fritz had not mentioned anything about Raveesh's medical conditions. Austin gave Fritz his "word" that he was not going to hurt anyone. He did not think Raveesh would resist; he thought the robbery would be an "easy situation." Austin claimed that he "specifically told people that it was no need [*sic*] for no gun or no knife." He was unaware whether any of his coperpetrators had killed people before. He also did not know for sure if the others were armed, but he saw no weapons before, during, or after the robbery.

Austin refused to identify the individuals who had participated in the robbery with him, and he claimed not to recall who was there. But he acknowledged there were multiple males involved in the crime.

Austin admitted to watching Raveesh "swigging at the alcohol" from a position outside the house. Austin denied that he supplied the duct tape used on Harinder and Raveesh. He admitted, however, that he grabbed the duct tape from the car, "because it was forgotten," and then handed it over to a coperpetrator knowing it would be used to bind and gag Raveesh. When asked if he put on gloves before or after he retrieved the duct tape, Austin said, "This was before I got the duct tape. No. After. I mean after." Austin went to the home's master bedroom upon entry and was surprised to find Harinder

16

there. Austin admitted that he hit Harinder (but only with his fist) and wanted her to stop screaming, but he denied threatening to kill Harinder.

Austin said that when he brought Harinder to the family room, he told the others to be careful with her. He also saw individuals restraining and trying to tape Raveesh, who was yelling and fighting and "struggling back." Austin denied hearing Harinder say anything about Raveesh having a medical condition, weak heart, or difficulty breathing. In addition, Austin denied applying duct tape or any restraints on Raveesh or Harinder, and he said he did not direct or suggest how they should be restrained. Austin left the family room and went back to the master bedroom where he thought he would find a safe. He claimed he only ransacked the master bedroom area of the house.

Austin returned to the family room area near the end of the incident. He saw that Raveesh was dead and that Harinder was moving around, crying, and in bad shape. Austin said he was at the house for 40 minutes. He left the house and returned to his hotel room at the Francisco Bay Inn after midnight. He acknowledged meeting with Fritz at the restaurant later that day, and he corroborated much of Fritz's testimony, including confirming his many statements to her, giving her money, pawning the stolen goods, and asking her to search the online inmate locater for Garcia's name. Austin said that he had "never hung out with" Garcia and Drummer at the same time.

In addition to testifying about his participation in the charged crime, Austin testified about his involvement with the ENT gang, which he formed when he was 20 years old as a memorial to friends who had died. When Austin created ENT, he did not consider it to be a gang. Austin denied committing any crimes at the direction of someone associated with ENT or directing others to commit crimes for his benefit as a founder of ENT. Austin said he committed crimes for his own benefit and that of his family.[22]

_____

[22] We set forth additional details from Austin's testimony regarding his gang activity when discussing Austin's challenges to the gang enhancements, *post*.

17

Austin admitted that he had been convicted of residential burglary in 2011 and sentenced to state prison. He also acknowledged having been convicted of being a felon in possession of a firearm in 2012. He was released from prison in August 2012. He testified that he had participated in other residential burglaries in the past.

## DISCUSSION

In their briefs, Austin and Garcia raise 12 and 14 issues, respectively. Below, we address their claims under four general topic headings: (1) insufficient evidence; (2) instructional error; (3) Garcia's due process and confrontation clause claims; and (4) sentencing error.[23]

## I. CLAIMS RELATED TO INSUFFICIENT EVIDENCE

In this section, we address Austin's challenges to the felony murder special circumstance finding and the gang enhancements. As to Garcia, we examine a variety of claims he makes related to recent modifications to the felony murder rule and the natural and probable consequences doctrines effected by Senate Bill No. 1437 (2017-2018 Reg. Sess.) (Sen. Bill No. 1437) (Stats. 2018, ch. 1015), and arguments Garcia advances related to accomplice testimony.

A. *Austin's Challenges to the Robbery-Murder Special Circumstance Finding*

Austin does not challenge his culpability for first degree murder. Instead, he contends that he was erroneously found guilty of special circumstance murder under section 190.2. Section 190.2 sets forth a series of special circumstances that, when found to be true for a defendant convicted of first degree murder, impose a minimum sentence of life without parole and a potential sentence of death. Section 190.2, subdivision (a)(17)(A) (section 190.2(a)(17)(A)) defines as a felony murder special circumstance

---

[23] We note that Garcia and Austin contend that, if this court finds they forfeited certain appellate claims of error, then, alternatively, defense counsel provided ineffective assistance by failing to make the necessary objections in the trial court. Because we do not resolve any specified appellate claims based on forfeiture, we need not address appellants' claims of ineffective assistance of counsel.

when "[t]he murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit . . . [¶] [r]obbery in violation of Section 211 or 212.5." The jury found true this allegation in connection with Austin's conviction for murder. Austin challenges this finding on factual and legal grounds.

Specifically, Austin contends that the evidence was insufficient to prove that the special circumstance was true on the theory that he either personally killed Raveesh by taping him or was a major participant in the robbery who acted with reckless indifference to human life.

Austin claims legal error in the jury instructions that applied to the prosecution's contention that Austin was liable as the "actual killer." Austin contends that the prosecutor's argument that the definition of "actual killer" extends to anyone who commits an act in the chain of events leading to a death was an erroneous statement of the law under section 190.2, subdivision (b) because it rested on a legally invalid theory of special circumstance liability, and the trial court erred in failing to instruct the jury on the correct meaning of actual killer. Austin also argues that the instructions given to the jury on the special circumstance should have included CALCRIM No. 240 regarding causation. Finally, Austin contends that trial court erred by instructing with CALCRIM No. 730 because the jury would have found no basis in the evidence to conclude that Austin was the actual killer.

### 1. Legal and Factual Background

Section 190.2, the special circumstance statute, distinguishes between an "actual killer" and a "person, [who is] not the actual killer." (Compare §§ 190.2, subd. (b) and 190.2, subds. (c) & (d).) Section 190.2, subdivision (b) (section 190.2(b)) does not define "actual killer" but states that "unless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an actual killer . . . need not have had any intent to kill at the time of the commission of the offense." The

19

California Supreme Court has stated, "when the defendant is the actual killer, neither intent to kill nor reckless indifference to life is a constitutionally required element of the felony-murder special circumstance." (*People v. Jackson* (2016) 1 Cal.5th 269, 347.)

With respect to a person who is not an actual killer, section 190.2 requires either that the person had the intent to kill (§ 190.2, subd. (c)), or acted with reckless indifference to human life and was a major participant in the underlying felony (§ 190.2, subd. (d) (section 190.2(d)). These provisions—which apply when the person is not the actual killer—extend to any individual who "aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission" of either the murder or the felony that results in death. (§ 190.2, subds. (c) & (d).) Section 190.2(d) "was added to existing capital sentencing law in 1990 as a result of the passage of the initiative measure Proposition 115, which, in relevant part, eliminated the former, judicially imposed requirement that a jury find intent to kill in order to sustain a felony-murder special-circumstance allegation against a defendant who was not the actual killer." (*People v. Estrada* (1995) 11 Cal.4th 568, 575 (*Estrada*).)

The prosecutor told the jury here that there was no evidence of an intent to kill Raveesh. But the prosecutor argued that the jury could find the special circumstance true either on the theory that Austin was an actual killer under section 190.2(b) or, alternatively, that Austin was a major participant in the robbery who had acted with reckless indifference to human life under section 190.2(d).

For the "actual killer" special circumstance under section 190.2(b), the trial court instructed the jurors with CALCRIM No. 730 (instruction No. 730).[24] This instruction required the People to prove that Austin had committed robbery and that he "did an act that caused the death of another person." For the "major participant" theory under

---

[24] Although instruction No. 730 does not use the phrase "actual killer," the parties' arguments are premised on the assumption that this instruction subsumes the requirements of sections 190.2(a)(17)(A) and 190.2(b).

section 190.2(d), the trial court gave the additional instruction CALCRIM No. 703, which told the jurors in part: "If you decide that a defendant is guilty of first degree murder *but was not the actual killer*, then, when you consider the special circumstance, you must also decide whether the defendant acted either with intent to kill or with reckless indifference to human life."  (Italics added.)

We first examine Austin's contention that there was insufficient evidence of the special circumstance finding under either of the prosecution's theories—i.e., that Austin was the "actual killer" or was a "major participant" in the robbery who had acted with reckless indifference to human life.

## 2.  Sufficiency of the Evidence Claims

"[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be . . . to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  (*Jackson v. Virginia* (1979) 443 U.S. 307, 318.)  " 'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' "  (*People v. Powell* (2018) 5 Cal.5th 921, 944.)  A reviewing court "presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)  "An appellate court may not substitute its judgment for that of the jury.  If the circumstances reasonably justify the jury's findings, the reviewing court may not reverse the judgment merely because it believes that the circumstances might also support a contrary finding."  (*People v. Ceja* (1993) 4 Cal.4th 1134, 1139 (*Ceja*).)  We do not reweigh the evidence or resolve conflicts in the testimony when determining its legal sufficiency.  (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)  Rather, before we can set aside a judgment of conviction for insufficiency of the

evidence, "it must clearly appear that upon no hypothesis whatever is there sufficient evidence to support [the jury's finding]." (*People v. Rehmeyer* (1993) 19 Cal.App.4th 1758, 1765.)

>                a. Actual Killer

We first examine whether there was substantial evidence that Austin was the "actual killer" of Raveesh. In the context of the facts of this case (and as discussed further below in our examination of Austin's claims of legal error), for Austin to have been the "actual killer," the record must contain substantial evidence from which the jury could reasonably have concluded beyond a reasonable doubt that Austin himself placed tape on Raveesh's face, resulting in Raveesh's asphyxiation.

Having reviewed the record and presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, we conclude that there was sufficient evidence from which a reasonable juror could find that Austin was an actual killer of Raveesh. The DNA evidence suggested that Austin participated in taping Raveesh. In particular, Austin's DNA was found on a piece of duct tape located on the tan pants in the family room; the duct tape was the same kind that had been used on Raveesh's mouth; and Austin's DNA was found on an empty duct tape roll that included a brownish stain that presumptively tested positive for blood. There is direct evidence, therefore, that Austin personally handled the roll of duct tape from which the tape placed over Raveesh's face was taken.[25]

DNA analyst Mehmet testified that she tested the areas of the duct tape that she thought someone had touched. Mehmet testified about all DNA evidence (other than DNA from the victims) that she was able to find on the evidence. From her testimony,

---

[25] In arguing the sufficiency of the evidence that Austin participated in the taping of Raveesh, the prosecutor contrasted the evidence for Austin with that for Garcia. Speaking of Garcia, the prosecutor stated, "[t]here's no evidence that he's the one that taped."

the jury could infer that Mehmet did not find any DNA associated with any of the perpetrators on any duct tape taken from Raveesh's face, even though one or more of the perpetrators must have placed the tape there. The jury could infer that the person or people who put the duct tape on Raveesh's face (which caused his death) were wearing gloves. Austin himself told the jury that he put gloves on during the course of the robbery and after he initially retrieved the duct tape from the car.

Moreover, there is significant circumstantial evidence from which a reasonable jury could infer that Austin personally participated in the actions of placing the tape on Raveesh's face. Austin was in the kitchen/family room area when Raveesh was being put down and before his mouth was taped. It is undisputed that Austin played the central role in planning the robbery, and he told the jury that he retrieved from the car the duct tape used to commit the crimes. Harinder, the only surviving eyewitness who testified about the taping of Raveesh (other than Austin himself), was unable to identify the people who were binding Raveesh, in part because the perpetrators also wrapped tape over her eyes and mouth and tied her hands. This act ensured that no eyewitness who was not a party to the crime could identify who was taping up Raveesh.

While Austin's DNA was not found on the tape over Raveesh's face, the prosecutor argued that the jury could reasonably infer from the DNA on the tape on the tan pants that Austin first taped Raveesh's legs, before putting gloves on. There also was significant evidence that all the perpetrators, including Austin, used gloves during the robbery, to which the jury could reasonable ascribe the lack of DNA evidence from Austin on Raveesh's body. It is true Austin denied having taped Raveesh's face, but the jury was entitled to disbelieve Austin on this point, as it clearly did with respect to other parts of his testimony.

In sum, Austin's central role in the crime, his personal handling of the roll of duct tape used to cover Raveesh's face, the absence of DNA evidence on the tape on Raveesh's face from any of the other perpetrators, and Austin's presence in the

23

kitchen/family room area before Raveesh was taped, provide substantial evidence from which a reasonable jury could conclude beyond a reasonable doubt that Austin himself placed tape on Raveesh's mouth, resulting in Raveesh's asphyxiation.[26]

### b. Major Participant

At trial, Austin conceded that he was a major participant in the crime but disputed that he acted with reckless indifference to human life under section 190.2(d).[27] On appeal, Austin argues that the evidence was insufficient to prove reckless indifference, principally because he did not actually kill or intend to kill, no deadly weapons were used in the robbery, he did not know about Raveesh's inability to breathe through his nose, he was not present when Harinder mentioned that Raveesh was a heart patient or when Raveesh was struggling to breathe, he did not want anyone to get hurt or die, and he thought the robbery would be an easy one.

Reckless indifference to human life "requires the defendant be 'subjectively aware that his or her participation in the felony involved a grave risk of death.' " (*People v. Mil* (2012) 53 Cal.4th 400, 417, italics omitted.) Recklessness "encompasses both subjective and objective elements. The subjective element is the defendant's conscious disregard of risks known to him or her. But recklessness is not determined merely by reference to a defendant's subjective feeling that he or she is engaging in risky activities. Rather, recklessness is also determined by an objective standard, namely what a 'law-abiding person would observe in the actor's situation.' " (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*), [quoting Model Pen. Code, § 2.02, subd. (2)(c)].)

---

[26] Because we find that there was sufficient evidence presented to find that Austin was an actual killer, we reject Austin's argument that instructing the jury with instruction No. 730 was improper because there was no evidence that Austin actually killed Raveesh.
[27] In his motion for new trial, Austin argued insufficiency of the evidence for this element of the special circumstance. The trial court denied the motion.

24

In *Clark*, the California Supreme Court set forth a nonexclusive list of factors to consider when determining whether reckless indifference to human life has been proved.[28] (*Clark*, *supra*, 63 Cal.4th at pp. 614–621.) Generally, the greater the defendant's participation in the felony murder, the more likely he or she acted with reckless indifference to human life. (*Id*. at p. 615.) With the parameters of reckless indifference in mind, we decide whether the prosecution presented substantial evidence to support a finding that Austin had the requisite mental state.

By his own admission, Austin conceived the idea to rob Harinder and Raveesh and planned the crime. Austin knew Raveesh was older, and he saw Raveesh (who was overweight) drinking alcohol before invading the home. Austin rejected Fritz's offer to lure Raveesh out of the house so that he would not be present during the robbery for fear Raveesh would suspect Fritz of involvement in the crime. Austin thus consciously chose to commit the robbery at a time Raveesh would likely be home, and he proceeded to enter the house at a time he knew Raveesh was home and had been drinking alcohol.

Austin retrieved the duct tape from the car after it had been left behind inadvertently and, in his account, he provided the tape to an accomplice knowing it would be used to bind and gag Raveesh. Austin saw Raveesh being bound and beaten as he fought back. Although Austin denied hearing Harinder say that Raveesh was a heart patient and would die, and he denied participating in the taping, the jury could have disbelieved him on these points. Austin's DNA was found on the duct tape roll and on the duct tape on the tan pants in the family room.

Presence at the scene of the murder is a particularly important aspect of the reckless indifference inquiry. (*Clark*, *supra*, 63 Cal.4th at p. 619.) The jury could have

---

[28] The factors include: (1) the defendant's knowledge of weapons and use of a weapon; (2) the defendant's presence at the scene of the crime and failure to aid the victim; (3) the duration of the felony; (4) the defendant's knowledge of a cohort's likelihood of killing; and (5) the defendant's efforts to minimize risk of violence during the felony. (*Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

reasonably concluded that Austin was in the kitchen/family room area of the house, the site of the murder, for a time after he brought Harinder there. The jury could also have reasonably concluded that he played a role in the taping or, at least, was present when Raveesh was being put down on the floor and taped, despite Harinder's caution about his medical condition. In addition, Austin admitted hitting Harinder to keep her quiet, showing his willingness to use violence on the occupants of the house. Harinder had to receive stitches to the wound Austin inflicted on her lip. The hospital had a plastic surgeon do the stitching because of the extent of the injury and the amount the wound had bled before Harinder was taken to the hospital. Harinder also told the police that Austin threatened to shoot her.

Austin and his accomplices were in the house for at least 40 minutes—possibly longer—and Austin did not restrain the actions of his accomplices or check on the condition of his victims as he went about ransacking the house. As part of the crime, the defendants disconnected the phones in the house to prevent the residents from calling for help. The jury could have inferred that Austin, the mastermind of the robbery, planned this detail.

These facts constitute substantial evidence of Austin's reckless indifference. A law-abiding person in Austin's position would have perceived that beating, binding, and gagging Raveesh with duct tape created a grave danger to his life, and Austin knowingly and actively participated in this prolonged robbery in disregard of that risk. Viewing the entire record in the light most favorable to the judgment, we conclude that the evidence is sufficient to support the jury's finding that Austin was a major participant who acted with reckless indifference to human life. (See *In re Loza* (2017) 10 Cal.App.5th 38, 51–54; *People v. Gonzalez* (2016) 246 Cal.App.4th 1358, 1385–1386; *People v. Medina* (2016) 245 Cal.App.4th 778, 791–793; cf. *Clark*, *supra*, 63 Cal.4th at pp. 618–623.)

Having rejected Austin's factual challenges to the special circumstance finding, we turn now to his claims of legal error.

26

### 3. Legal Error in CALCRIM No. 730

In his closing argument, the prosecutor argued that the jury could find the robbery-murder special circumstance for Austin as an actual killer because Austin did an act that caused the death of another person by giving the duct tape, "the instrumentality of death," to a coperpetrator. The prosecutor suggested in the alternative Austin was an actual killer because the DNA evidence showed that he personally participated in the taping of Raveesh, directly resulting in Raveesh's death.

Austin's defense counsel did not object to the prosecutor's arguments on the actual killer theory. However, defense counsel argued to the jury in closing argument that Austin could not be found liable as the actual killer—that is, one who did an act that caused the death of the another—based solely on giving of duct tape to a coperpetrator. In rebuttal, the prosecutor reiterated that Austin could be found guilty of special circumstance murder under instruction No. 730 as an actual killer because he "did an act that caused the death of another person either by handing over the tape [to someone] who used the tape or by taping it himself."

The jury instructions given by the court in instruction No. 730 read in relevant part:

> **"CALCRIM No. 730. Special Circumstances: Murder in Commission of Felony (Pen. Code, § 190.2(a)(17))**
>
> "Each defendant is charged with the special circumstance of murder committed while engaged in the commission of robbery in violation of Penal Code section 190.2(a)(17).
>
> "To prove that this special circumstance is true, the People must prove that:
>
> "1. The defendant committed or aided and abetted, or was a member of a conspiracy to commit robbery.
>
> "2. The defendant intended to commit, or intended to aid and abet the perpetrator in committing, or intended that one or more of the members of the conspiracy commit robbery.

27

"AND

"3. The defendant did an act that caused the death of another person.
[¶] . . . [¶]

"The defendant must have intended to commit or aided and abetted or been a member of a conspiracy to commit the felony of robbery before or at the time of the acting causing the death.

"In addition, in order for this special circumstance to be true, the People must prove that the defendant intended to commit robbery independent of the killing. If you find that the defendant only intended to commit murder and the commission of robbery was merely part of or incidental to the commission of that murder, then the special circumstance has not been proved."

Austin contends that the prosecution's theory that merely providing duct tape to another person can make one an "actual killer" is legally insufficient because section 190.2(b), when used with the special circumstance of section 190.2(a)(17)(A), requires that the actual killer personally kill the victim. Austin further argues that instruction No. 730—which required only that the "defendant did an act that caused the death of another person"—failed to properly limit the special circumstance liability to a defendant who actually killed and erased the difference between liability for first degree felony murder and the special circumstance. We agree and conclude that, under the facts of this case, only the person (or people) who placed the duct tape on Raveesh's mouth were actual killers under section 190.2(b).[29]

---

[29] Austin also contends that instruction No. 730 should have included the causation definition set out in CALCRIM No. 240, which includes a discussion of proximate cause. Austin's jury did receive the language contained in CALCRIM No. 240 in CALCRIM No. 540C, which defined causation in the context of first degree felony murder when "another person did the act that resulted in the death." CALCRIM No. 540C stated "An act causes death if the death is the direct, natural, and probable consequence of the act and the death would not have happened without the act. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider

28

### a. An "Actual Killer" Must Have "Personally Killed" the Victim

Although section 190.2(b) does not define the phrase "actual killer," the California Supreme Court has used the term "personally killed" when describing liability of an "actual killer" for the felony murder special circumstance under section 190.2.  For example, the Supreme Court has stated, "[a] felony-murder special circumstance is established even absent intent to kill, premeditation, or deliberation, if there is proof beyond a reasonable doubt that the defendant personally killed the victim in the commission or attempted commission of, and in furtherance of, one of the felonies enumerated in subdivision (a)(17) of section 190.2."  (*People v. Jennings* (1988) 46 Cal.3d 963, 979 (*Jennings*); see also *People v. Taylor* (2010) 48 Cal.4th 574, 661 (*Taylor*) [stating when a defendant is charged with a felony murder special circumstance, the prosecution need not prove "intent to kill or reckless indifference to life" as a required element of the special circumstance so long as "the defendant is the actual killer" of the victim]; *People v. Belmontes* (1988) 45 Cal.3d 744, 794 ["The United States Supreme Court has made clear that felony murderers who *personally* killed may properly be subject to the death penalty in conformance with the Eighth Amendment . . . even where no intent to kill is shown."], overruled on other grounds in *People v. Cortez* (2016) 63 Cal.4th 101.)

---

all the circumstances established by the evidence."  This language is identical to that in CALCRIM No. 240, and the jury must necessarily have considered causation to convict Austin of robbery felony-murder.

Under the felony murder instructions, the jury had to find that Austin either caused the death (under CALCRIM No. 540A) or intentionally committed or intentionally aided and abetted or conspired to commit a robbery whose commission was a substantial factor in causing the death (under CALCRIM No. 540C).  Austin does not challenge his first degree murder conviction.

In addition, Austin's argument that there was legal error for failing to instruct on proximate cause fails because, as we explain below, proximately causing the death of another does not fall within the actual killer prong of section 190.2(b).  For these reasons, we reject Austin's argument that his jury should have been separately instructed with CALCRIM No. 240 on the special circumstance allegation.

In addition, in another context, the California Supreme Court has explained that "[p]roximately causing and personally inflicting harm are two different things." (*People v. Bland* (2002) 28 Cal.4th 313, 336; *id*. at pp. 337–338 ["If defendant did not fire the bullets that hit the victims, he did not personally inflict, but he may have proximately caused, the harm." (Italics omitted.)]. The Courts of Appeal have agreed. (See e.g., *People v. Rodriguez* (1999) 69 Cal.App.4th 341, 347–348 ["To 'personally inflict' an injury is to directly cause an injury, not just to proximately cause it. The instruction was wrong because it allowed the jury to find against [defendant] if the . . . injury was a 'direct, natural and probable consequence' of [defendant's] action, even if [defendant] did not personally inflict the injury."]; *People v. Slough* (2017) 11 Cal.App.5th 419, 423 [" ' "[T]he meaning of the statutory requirement that the defendant *personally inflict* the injury does not differ from its nonlegal meaning. Commonly understood, the phrase 'personally inflicts' means that someone 'in person' [citation], that is, directly and not through an intermediary, 'cause[s] something (damaging or painful) to be endured' [citation]." [Citation.]' "].)

The California Supreme Court has also distinguished the concept of "actual killer" under section 190.2(b) from an aider and abettor under section 190.2(d). For example, it has stated "[s]ection 190.2(d) was designed to codify the holding of *Tison v. Arizona* (1987) 481 U.S. 137 [(*Tison*)] . . ., which articulates the constitutional limits on executing felony murderers who did not personally kill." (*People v. Banks* (2015) 61 Cal.4th 788, 794 (*Banks*).) In *Banks*, the California Supreme Court declared "the standards we articulate, although developed in death penalty cases, apply equally to cases like this one involving statutory eligibility under section 190.2(d) for life imprisonment without parole." (*Id*. at p. 804; see also *Estrada*, *supra*, 11 Cal.4th at pp. 575–576.)

Describing the *Tison* standard codified by section 190.2(d), the California Supreme Court declared, "[w]ith respect to conduct, *Tison* and *Enmund* [*v. Florida* (1982) 458 U.S. 782] establish that a defendant's personal involvement must be

30

substantial, greater than the actions of an *ordinary aider and abettor* to an ordinary felony murder." (*Banks, supra*, 61 Cal.4th at p. 802, italics added; see also *Estrada, supra*, 11 Cal.4th at p. 575 [noting that section 190.2(d) was added after elimination of the former "intent to kill [requirement] in order to sustain a felony-murder special-circumstance allegation against a defendant who was not the actual killer"].)

The clear import of these cases and the statutory scheme set out in section 190.2 is that the meaning of "actual killer" under section 190.2(b) is literal. The actual killer is the person who personally kills the victim, whether by shooting, stabbing, or—in this case—taping his mouth closed, resulting in death by asphyxiation.

In arguing that section 190.2(b) does not require that the "actual killer" be the person who personally kills but rather one who proximately causes a death, the Attorney General relies on *People v. Pock* (1993) 19 Cal.App.4th 1263 (*Pock*). In that case, the evidence showed that the defendant shot the victim in the upper chest and in the stomach. One of the other coperpetrators also fired shots, one of which hit the victim in the left shoulder. (*Id*. at p. 1270.) The subsequent investigation did not determine the order in which the shots were fired. The deputy medical examiner stated the wound to the chest would have been "more rapidly fatal," and the other gunshot wounds contributed to the death. (*Id*. at p. 1271.)

Given the multiple concurrent bullet wounds and the lack of clarity over which shot was fatal, the trial court in *Pock* had instructed the jury that " '[t]he term actual killer is defined as follows: Any person whose conduct proximately causes the death of another is an actual killer.' " (*Pock, supra*, 19 Cal.App.4th at pp. 1272–1273.) The trial court also instructed with CALJIC No. 3.41 regarding concurrent causes. (*Pock*, at p. 1273.) In rejecting Pock's challenge to the giving of CALJIC No. 3.41, the Court of Appeal concluded that, "even to the extent that there was some doubt as to whether appellant fired the actual fatal shot, the jury was properly instructed that, as under a

31

vicarious liability theory, if appellant was substantial factor [*sic*] in the death of [the victim], he would be liable as an actual killer." (*Pock*, at p. 1275.)

Although we have serious doubts that the trial court's jury instruction on proximate cause upheld by the Court of Appeal in *Pock* accurately states the law with respect to the definition of an actual killer as used in section 190.2(b), *Pock* does not stand for the proposition that Austin should be considered an actual killer based on the act of handing a roll of duct tape to another person. The evidence in *Pock* established that the defendant actually shot the victim and its "unique facts" involve multiple concurrent causes. (*Pock*, *supra*, 19 Cal.App.4th at p. 1274.) Here, by contrast, the prosecutor argued—as does the Attorney General on appeal—that actual infliction of harm to the victim is not necessary to find Austin to be an actual killer. *Pock* does not stretch this far, and the broad language cited by the Attorney General from *Pock* is clearly dicta.[30]

_____

[30] The Attorney General also cites *People v. Mejia* (2012) 211 Cal.App.4th 586, 603, 612–613 (*Mejia*), but includes only an explanatory parenthetical that a "defendant who commits [a] 'provocative act[,]' the natural and probable consequence of which is the use of deadly force, can be held liable for special circumstances murder." *Mejia* addressed the question "whether the gang murder special circumstance can apply where liability for first degree murder attaches based upon the theory of provocative act murder." (*Id*. at p. 610.) The court concluded, "based upon the interplay between the language of section 190.2, subdivision (a)(22), and the theory underlying provocative act murder as set forth in [*People v. Cervantes* (2001) 26 Cal.4th 860] and [*People v. Concha* (2009) 47 Cal.4th 653], that the special circumstance applies in the immediate context." (*Id*. at p. 612.) The court analyzed section 190.2, subdivision (a)(22) and subdivision (c), both of which include an intent to kill requirement. (*Id*. at pp. 612–613.) *Mejia* is therefore inapposite because it does not address whether a defendant can be found liable for a special circumstance even when he or she does not harbor an intent to kill. In Austin's case, the prosecution conceded that there was no evidence of an intent to kill Raveesh; thus, Austin's liability for special circumstance murder depended on him being the actual killer under section 190.2(b) or a major participant who acted with reckless indifference to human life under section 190.2(d). The Attorney General also cites a number of other cases, including a civil torts case (*Morris v. De La Torre* (2005) 36 Cal.4th 260), which are clearly inapplicable to the question here.

The Attorney General calls our attention to two other cases upholding murder convictions in cases in which the defendant and his coperpetrators fired bullets at the victim, and it was not clear which bullet killed the victim. (*People v. Sanchez* (2001) 26 Cal.4th 834 (*Sanchez*); *People v. Cornejo* (2016) 3 Cal.App.5th 36 (*Cornejo*).) Like *Pock*, these cases (which do not discuss section 190.2 at all), are inapposite because they involve concurrent causes—that is causes that were "operative at the time of the death and acted with another cause to produce the death." (*Sanchez*, at p. 847; see also *Cornejo*, at p. 61.) The prosecution's theory here, by contrast, was not that Austin did an act concurrently with a coperpetrator but instead that Austin first did something (i.e., provide the tape) and then another person *subsequently* did an act that caused the death.

The Attorney General cites no case holding that a person who hands a murder weapon to another person but who does not directly inflict any harm on the victim qualifies as an "actual killer" under section 190.2(b). Our independent research has likewise not found any such authority. While handing the murder weapon to the person who actually kills the victim might result in liability under sections 190.2(c) or 190.2(d), it does not qualify as an act of an actual killer under section 190.2(b). (See, e.g., *In re Ramirez* (2019) 32 Cal.App.5th 384, 404 [examining whether the defendant's act of supplying the guns that were ultimately used in the attempted robbery was sufficient to support a finding under section 190.2(d)].)

Austin's defense counsel did not object to the prosecutor's argument that the jury could find that Austin was an actual killer based on his handing the tape to someone else or request an instruction clarifying the term "actual killer." While recognizing that his defense counsel did not make a timely objection, Austin argues against forfeiture,

33

contending that the instructions were legally insufficient and therefore affected his substantial rights under section 1259.**31**

We agree with Austin that he has not forfeited his claim of legal error. "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.) "But that rule does not apply when . . . the trial court gives an instruction that is an incorrect statement of the law." (*People v. Hudson* (2006) 38 Cal.4th 1002, 1012 (*Hudson*); see also *People v. Guiton* (1993) 4 Cal.4th 1116, 1131 ["Trial courts have the duty to screen out invalid theories of conviction, either by appropriate instruction or by not presenting them to the jury in the first place."]; § 1259.)

" 'The rules governing a trial court's obligation to give jury instructions without request by either party are well established. "Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case." [Citations.] That obligation comes into play when a statutory term "does not have a plain, unambiguous meaning," has a "particular and restricted meaning" [citation], or has a technical meaning peculiar to the law or an area of law [citation].' [Citation.] 'A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning.' " (*Hudson*, *supra*, 38 Cal.4th at p. 1012, italics omitted.) "We consider the challenged instruction in the context of the instructions and record as a whole to ascertain whether there is a reasonable likelihood the jury impermissibly applied the instruction." (*People v. Rivera* (2019) 7 Cal.5th 306, 329 (*Rivera*).)

---

**31** Penal Code section 1259 provides in part: "The appellate court may also review any instruction given, refused or modified, even though no objection was made thereto in the lower court, if the substantial rights of the defendant were affected thereby."

As we have explained above, the meaning of actual killer is " ' "particular and restricted" ' " (*Hudson*, *supra*, 38 Cal.4th at p. 1012), and its application must be literal. The jury should have been instructed that it could find true the special circumstance under sections 190.2(a)(17)(A) and 190.2(b) only if the prosecution proved beyond a reasonable doubt that Austin "personally killed" Raveesh. (See *Jennings*, *supra*, 46 Cal.3d at p. 979; *Banks*, *supra*, 61 Cal.4th at p. 794.) Instead, the jury was instructed only that the prosecution must prove that Austin "did an act that caused the death of another person."

The instruction as worded allowed the jury to find the special circumstance true if it determined that Austin "caused" Raveesh's death even if it did not find beyond a reasonable doubt that Austin participated in the taping of Raveesh's face. Indeed, the prosecutor made this very argument when he said of instruction No. 730 that the jury could "find the special circumstance true, that [Austin] did an act that caused the death of another person. At the minimum, at his minimizing level of his guilt, he gave the duct tape which was the instrumentality of death."

The prosecutor's argument was consistent with the jury instruction given by the court but was inconsistent with the law under sections 190.2(a)(17)(A) and 190.2(b). Therefore, the language of instruction No. 730 given to Austin's jury was wrong because it allowed the jury to consider Austin's special circumstance liability based on a theory contrary to law, and constituted legal error.[32]

---

[32] The wording of the pattern instruction CALCRIM No. 730 and the bench notes that reference the sua sponte duty to instruct with CALCRIM No. 240 "[i]f the facts raise an issue whether the homicidal act caused the death" (Bench Notes to CALCRIM No. 730 (2019) p. 464) may have contributed to the legal error here. It is unclear what authority the bench notes rely on for this proposition. In any event, bench notes are not authority for legal principles. (See *People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7 [recognizing that jury instructions and accompanying bench notes are not law].) As we have explained, we do not see a basis for applying section 190.2(b), which extends only to a person who personally kills, to a person who only proximately caused the death. The

b. Prejudice

We have concluded above that the special circumstance was submitted to Austin's jury on a legally invalid theory—that is, that the jury could find true the special circumstance allegation if it concluded that Austin did an act that "caused" Raveesh's death (by handing the duct tape to a coperpetrator) even if Austin did not personally kill him. [33] As further described above, there was substantial evidence presented to the jury that Austin was a major participant in the robbery who acted with reckless indifference to human life (§ 190.2, subd. (d)), and Austin does not challenge the separate instruction given on that theory of liability for the special circumstance. Therefore, the special circumstance question was also submitted to the jury on a valid theory.

When a jury receives both a valid and an invalid legal theory—that is, where there is alternative-theory error—we apply the harmless error test drawn from *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*People v. Aledamat* (2019) 8 Cal.5th 1, 3, 7, fn. 3 (*Aledamat*).) Under this standard, we "must reverse the conviction unless, after examining the entire cause, including the evidence, and considering all relevant

Advisory Committee on Criminal Jury Instructions may wish to consider revisions to the language of CALCRIM No. 730 to clarify the concept of an actual killer for cases falling under section 190.2(b) that do not involve an intent to kill, as with section 190.2(a)(17).

[33] We note that we have concluded the trial court erred by providing an instruction that was inadequate, as a matter of law, because it permitted the jury to find Austin liable for the special circumstance based on a non-personal, indirect killing. Stated differently, because the jurors were not provided a proper definition of actual killer, they reasonably could have concluded under the instructions that Austin was an actual killer based on general causation principles. This amounts to legal error, rather than factual error. Further, the prosecutor's theory here was not "incorrect only because the evidence does not support it." (*People v. Aledamat* (2019) 8 Cal.5th 1, 7.) Instead, the prosecutor's theory failed to come within the special circumstance as properly defined. The jury here would have had no reason to know this given the instructions and prosecutor's arguments. Thus, the theory presented to the jury was a legally invalid theory, not a factually invalid theory that "involves a mistake about a fact that the 'jury is fully equipped to detect' [citation] or a theory that 'while legally correct, has no application to the facts of the case.' " (*Rivera*, *supra*, 7 Cal.5th at p. 329.)

circumstances, [we] determine[ ] the error was harmless beyond a reasonable doubt." (*Id.* at p. 13.)

We cannot determine the legal error here was harmless beyond a reasonable doubt. The prosecutor expressly relied upon the invalid legal theory. The prosecutor argued to the jury that Austin "did an act that caused the death of another person either by handing over the tape who used the tape [*sic*] or by taping it himself." The wording of the jury instruction allowed for the prosecutor's erroneous interpretation. The instruction failed to inform the jury that, in order for it to find true the special circumstance if it did not believe that Austin was a major participant who acted with reckless indifference to human life under section 190.2(d), then it must find beyond a reasonable doubt that Austin personally killed Raveesh.

In light of the instructions and the prosecutor's argument, we conclude there is a reasonable likelihood that the jury understood the actual killer theory in a legally impermissible manner. (See *People v. Canizales* (2019) 7 Cal.5th 591, 614–615 [concluding that the trial court's error in instructing on the factually unsupported kill zone theory, combined with the lack of any clear definition of the theory in the jury instruction and the prosecutor's misleading argument, could reasonably have led the jury to find liability based on a legally inaccurate version of the kill zone theory].)

Furthermore, handing the duct tape to a coperpetrator would not—by itself— establish that Austin subjectively acted with awareness of a grave risk of death, as required by section 190.2(d). This circumstance distinguishes Austin's case from *Aledamat*, where the Supreme Court concluded that if the jury applied a common understanding to the undefined term "inherently deadly," "it would necessarily find the box cutter deadly in the colloquial sense of the term—i.e., readily capable of inflicting deadly harm—and that defendant used it as a weapon." (*Aledamat*, *supra*, 8 Cal.5th at p. 15.)

For these reasons, we cannot conclude beyond a reasonable doubt that the jury finding on the special circumstance rested on a legally valid theory. We therefore reverse the special circumstance finding, vacate Austin's sentence of life without the possibility of parole, and remand to the trial court for the People to determine whether to retry Austin on the section 190.2 special circumstance allegation.

B. *Austin's Challenges to the Gang Enhancements*

The jury found true with respect to each count of conviction that Austin had committed the crimes "for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members" under section 186.22, subdivision (b). Austin argues that the evidence introduced by the People in support of these enhancements violated his Sixth Amendment right to confront the witnesses against him and his Fourteenth Amendment right to due process and, therefore, they must be set aside. Austin also argues that insufficient evidence supports the jury's true findings.

1. Factual Background

Many of Austin's contentions relate to the timing of various pieces of evidence. As described above, Austin was charged with crimes alleged to have been committed on or about November 30, 2012. Austin was arrested for those crimes on December 29, 2012.

The People's theory at trial with respect to the gang allegations was that Austin was a member of the Oakland-based gang ENT; Austin committed the crime with other gang members because they would refuse to cooperate with the police in any subsequent investigation; and the crime benefitted the gang by bringing money and prestige to the gang. In his closing argument, the prosecutor emphasized that Austin's own testimony proved many of the elements of the gang allegations. Austin's theory at trial was that he committed the crime for his personal benefit and not in association with ENT. Austin emphasized that the prior offenses characterized as predicate offenses by the People's

38

gang expert did not include gang charges, and there was no evidence introduced of Austin displaying gang signs. Austin's participation in music videos referencing guns and money reflected rap culture rather than his membership in a criminal street gang.

The two primary trial witnesses who provided testimony relevant to the gang allegations against Austin were the prosecution's gang expert, Daniel Bruce, and Austin himself.[34]

a. Testimony of the Gang Expert

Bruce was an officer with the Oakland Police Department assigned to the gang unit and testified as an expert in Oakland criminal street gangs. Bruce was raised in Oakland. He had been "working with gangs" during his nine years with the Oakland Police Department. Bruce moved to the gang unit in 2013; prior to that time, he had served as a patrol officer and on a "crime reduction team," targeting gangs, among other criminal activities. Bruce had worked on "[e]asily a thousand" gang-related crimes and had participated in "[h]undreds" of gang-related arrests. Bruce had interviewed "[h]undreds" of people about "gang topics," including perpetrators and victims of gang crimes.

Bruce testified that gang members primarily identify themselves with tattoos, social media postings, and hand signs. Bruce stated that one of the "main activities" of gang members is making music videos in which they talk about their gang and putting them on social media. "It's modern-day graffiti." Gangs use social media to recruit new gang members. Tattoos are often a sign of gang association. Bruce has had no experience with a person having a tattoo with the name of a gang where that person is not a member or an associate of that gang.

---

[34] Officer Roberto Garcia also testified as an expert in Oakland criminal street gangs. However, his testimony related to Ghost Town, a gang allied with ENT, and his testimony is not relevant to Austin's appeal of the gang findings.

For gang members, there is a benefit to committing a crime with another gang member. "Just like any other profession, when you do a job, you would want someone who has the same level of experience to do that job with you. You know that the job is going to get done right. And you know that, at least in gang culture after the fact, that that person is going to be less likely to snitch." Oakland gangs do not allow their members to snitch on each other.

In the gang unit, Bruce focused primarily on four gangs, one of which was ENT. He had spoken with about 20 people who have told him they are members of ENT. ENT's main rival among Oakland gangs is the Case gang. ENT is one of the top two gangs in Oakland in terms of the number of murders associated with it. ENT members commonly use the words "Stubby" and "ENT" and dollar signs as tattoos. "ENT" is an acronym that stands for the first initials of names or monikers of three men who had died. ENT has a hand sign associated with it.

Bruce first became familiar with ENT in 2011, when the "name came into usage." When Bruce first started hearing about ENT, it included about a dozen members, including Austin, Sean Hampton, and Ronny Flenaugh, among others.[35] Bruce conducted investigations into crimes committed by or against ENT members in 2011. ENT claimed a particular territory of Oakland in 2011 and 2012. Prior to 2011, Bruce worked on cases involving individuals "before they were ENT." Between 2010 and 2013, Bruce investigated "dozens of crimes related to ENT." Bruce conducted a wiretap investigation of ENT in 2013 during which he investigated 50 crimes in August alone. Bruce has arrested ENT members. He had been involved in investigation of crimes committed by ENT in cities "[a]ll over the Bay Area."

Bruce had known Austin since 2008. Austin's nickname is "Sunny D." Austin has tattoos that say "Stubby" and "ENT." Bruce had spoken to Austin at least 20 times,

---

[35] Defense counsel did not object to Bruce's testimony that Austin, Hampton, and Flenaugh were longtime members of ENT.

although Austin had never discussed ENT with Bruce. Almost every time Bruce saw Austin, Austin was with people that Bruce believed were associated with ENT.

Bruce testified that there are over a hundred people in ENT, and some of them are in custody. "A large percentage of the core group of original ENT members are in custody," and "[a] lot" of the original 12 members are dead. Bruce also testified, without objection from defense counsel, about information he learned in 2013 with respect to the ENT wiretap, particularly involving its rivalry with the Case gang.[36] Bruce included Austin as a target in the 2013 wiretap investigation, even though Austin was already in custody on this case by then, because Austin was one of the "founding members and original higher-ranking persons" in ENT, and other members might communicate with him. Bruce believed that the homicide charge against Austin elevated his status in ENT because it would result in increased respect among its members.

ENT recruits new members using social media. In their social media postings, ENT portrays an image of "wealth, high-end luxury vehicles, high-end clothing, high-end jewelry, and the flashing of large amounts of currency." ENT posts videos to YouTube.

Bruce testified about two publicly accessible music videos involving ENT that he located on YouTube. The first was for a song called "Money is the Plan." Bruce identified the people in the video but did not mention Austin's name. The song featured in the Money is the Plan video references ENT, "Stubby," large amounts of money,

---

[36] Although Austin contends he sufficiently objected in motions in limine to admission of the gang testimony under *Crawford v. Washington* (2004) 541 U.S. 36 to preserve a standing objection to Bruce's testimony, the trial court in response to the defense's motion stated, "I do not intend to make advance rulings with regard to the experts . . . [¶] I'm confident that [the prosecutor] is well aware of the evidentiary limitations that go along with *Crawford* and will act accordingly in proving the predicates." The trial court cautioned, "So any other objections as to foundation or lack of qualifications, certainly, you'll be able to voir dire any expert you choose to, and I'll take those objections at the time." Based on the trial court's ruling, it was incumbent on defense counsel to articulate specific objections to Bruce's testimony rather than rely on general pretrial motions to exclude his testimony.

drugs, and guns. One of the individuals in the video references "duct tape." Bruce testified "[b]ased on my experience with the gang and their pattern of criminal activity, I know that duct tape is [a] common tool used during home invasion burglaries, residential burglaries that the gang is known for committing." The lyrics also include the phrase, "Free Nardy," a reference to an ENT gang member incarcerated for the attempted murder of a police officer. The video appeared to have been posted in November 2012, although Bruce believed it had originally been posted by someone else. It was not clear when the video was first posted.

The second video was of a song, "Real Stubby ENT." Bruce relied on the video in forming his conclusion that ENT is a criminal street gang. Austin is in the video; he shows his tattoos that say "Stubby" and "ENT" and states that "he's ENT" "for his dead homies who are resting in peace." The lyrics of "Real Stubby ENT" reference large amounts of money, guns, and driving foreign cars. The opening image of the video features a Range Rover, a type of vehicle Bruce associated with ENT. Austin drove a BMW that had a number of bullet holes in it. Bruce testified that Hampton, whom Bruce had previously identified as a founding member of ENT, is also in the "Real Stubby ENT" video.

Bruce had viewed a phone-recorded video that shows Austin talking on the phone with another person about a recent shooting and about the relationship between ENT and the Case gang. In the video, Austin states that no Case gang members have ever been in foreign cars or had nice cars, while ENT members have nice cars. Austin told the person on the phone that "he's lucky that it wasn't them who shot him because they would have continued to shoot him guaranteeing his death rather than just wounding him." Defense counsel did not object to this testimony, and the actual video was not introduced into evidence or played for the jury. The video was likely made in late November or early December 2012.

Bruce was familiar with Jamarco Jackson, a high-ranking member of ENT whose nickname was "Arco." Jackson had done a drawing that was confiscated from him while he was in custody in Alameda County and which was introduced into evidence without objection. The bottom of the drawing says, "By ENT Arco." The drawing depicts the ENT hand sign, and the word "Case" with a line drawn through it. The drawing includes the phrase "Free my brudders." ENT members sometimes referred to each other as "brudders." The drawing has a list of names, including "Sunny D" and "Ronny Flenaugh." The drawing includes drawings of guns, bullets, dollar signs, and the BMW, Mercedes, and Lexus logos. To the right of the word "Stubby," the drawing has the phrase, "[n]o warning shots," which to Bruce signified ENT's "propensity to violence." The drawing has headstones with the names of dead ENT members on them. The drawing is not dated and had been confiscated from Jackson approximately two months prior to Austin's trial. Bruce believed the drawing was done "long after" Austin and Garcia were arrested.

Bruce's opinion was that ENT is a gang that has engaged, either collectively or individually, in a pattern of criminal activity. He formed that opinion based on the 2013 wiretap investigation. He also had that opinion prior to 2013.

Bruce believed Austin was a member of and an active participant in the ENT street gang on November 29 and 30, 2012, based on personal contacts with Austin, Bruce's investigation of crimes associated with ENT, music videos that Bruce has reviewed in which Austin sings about ENT, and the cell phone video described above. Bruce believed that Austin was still a member of ENT at the time of Austin's trial. Some of Bruce's information was "[c]larified with police reports." Bruce had not received any police reports "in this case detailing the facts of the case we're here on today." Defense counsel did not ask Bruce to clarify which aspects of his testimony depended on police reports authored by other officers.

43

Bruce was familiar with Marcellous Drummer based only on Bruce's research into the ENT gang; Bruce had never met Drummer. Records associated with Drummer's Facebook and Instagram accounts were introduced through Bruce without objection. Bruce identified one of the photos on Drummer's Facebook account as Ronny Flenaugh holding a large bag of US currency. The words "Stubby ENT" appear on a birthday cake in one of the photos. One of the pages of Drummer's Instagram account features a photo of Drummer and text that reads, "Free my brother, Sunny ENT G for real." There was a photo of Austin in Drummer's Instagram account. Defense counsel did not object to any of this testimony.

Bruce opined that Drummer was a member of the ENT criminal street gang on November 29, 2012. His opinion was based on "those social media postings where [Drummer] is making comments referring to ENT," and posting photographs of dead and current ENT members. Bruce also based his opinion on the fact that Drummer had been stopped in a car with other ENT members, although this incident did not result in any charges, and Bruce did not participate in the car stop.[37] Bruce was not able to say whether Drummer was an "active participant" in ENT, "just based purely on [Bruce's] lack of knowledge on his history, criminal history."

Bruce was familiar with Ronny Flenaugh. The prosecutor asked, "Are you familiar with an offense from June 3rd of 2012 in the City of Oakland that was a robbery." Bruce, answered, "[y]es." Through Bruce, the prosecutor then introduced a certified record of a prior conviction of Flenaugh. In response to the prosecutor's question, "does this certified prior conviction reflect a conviction for the robbery in June 3rd of 2012 we talked about?" Bruce answered, "Yes." When asked to describe his personal involvement in that case, Bruce stated that he saw a description of the car

---

[37] The jury heard from another witness, Oakland Police Officer William Bergeron, that, on February 10, 2011, Bergeron had stopped a car in east Oakland that was driven by Austin, and Drummer was in the car.

involved on the police department's e-mail system. Bruce was familiar with the car described in the e-mail, and he knew the car was associated with Flenaugh. Bruce had no other involvement in the case leading to Flenaugh's robbery conviction.

Bruce was familiar with Gregory Jefferson. Bruce was familiar with an incident on January 18, 2012, involving Jefferson and two handguns because Bruce participated in Jefferson's arrest that day. Jefferson was charged with possession of a firearm in a public place, and the prosecution introduced a certified conviction record for Jefferson from that incident. Bruce's opinion was that Jefferson was a member of ENT on January 18, 2012, based on "prior contacts, prior long-term investigations where Mr. Jefferson was one of the targets, social media postings, and observations," all of which Bruce had personally done.

The prosecutor posed a detailed hypothetical to Bruce closely modeled on the facts of the crime involved here. Based on that hypothetical, Bruce opined that the crimes were done for the benefit of, at the direction of, or in association with a criminal street gang.

b. Testimony of Austin

Austin testified in his own defense. He planned and participated in the robbery of Harinder and Raveesh's residence in order to get money for himself and his son. Austin used the money from the robbery for Christmas presents and housing; he did not use any to benefit ENT.

Austin had known Officer Bruce since 2008. Austin had known Drummer since 2005 and was friends with him. Austin's nickname was "Sunny D" because of his light-colored skin and the first letter of his first name, Deangelo.

Austin founded ENT when he was 20 years old as a memorial for his best friends who had died. His friends, for whom ENT was a memorial, were violent people involved in criminal activity. Austin testified, "ENT's a gang. I mean, but ENT's a gang because based on the younger people make it–the younger people that's younger than me, really

45

make it a gang. But, me, myself, I didn't, I didn't look at it as a gang when it formed. I told you how I looked at it. It was more of a memorial for my brothers. From there, I guess it ran off to the younger people. They just ran with it like that. And at this point in time, in 2016, I definitely consider ENT a gang."

About a dozen people previously associated with ENT are now dead. Austin equated ENT's fight with the Case gang to the battle between Norteños and Sureños. Austin agreed that there are "ENT people who would shoot people," and Austin had friends in ENT who "shoot." When Austin was in ENT in 2012, there were more than three people in the group, they had a common name, and some of the people in the group committed crimes. Austin agreed that some people in ENT in 2012 were illegally in possession of firearms, and in 2011 some people in ENT committed residential burglaries.

Austin committed two residential burglaries in 2009. In one of the burglaries, the victim was an Indian man. Austin was convicted of residential burglary in 2011. Austin was convicted of being a felon in possession of a firearm in 2012. Austin was released from prison in August 2012. Between August and November 2012, Austin made $20,000 through criminal activity. Austin denied the prosecutor's suggestion that Austin had made this money through burglaries; instead, Austin testified it came from his work as a pimp.

Austin got the ENT tattoo when he was in prison so that he could "keep up with the rest of the prisoners." Austin did not do the video to promote ENT. Singing about having sex with lots of women, money, drugs, and ENT is "part of rap culture." "ENT" was his group's "rap name." Austin stated, "The ENT image is just a rap name like Cash Money Records or Death Row. It's just a rap title as far as that was going to be our record label." Austin liked nice things, "like any rapper would." The image of ENT the gang is "just a bunch of people hanging out and being a gang," in foreign cars and having money. As to the phone call captured on the video that Bruce had testified about, Austin

46

was "basically roasting" the other person on the phone because they were in a dispute "over a girl."

Although Austin admitted his involvement in the Monte Sereno robbery, he would not testify about the names of the others involved because he "live[s] by the code of the Oakland streets in general."

### c. Testimony of Other Witnesses

Erin Lunsford was the lead detective on the robbery case. Lunsford observed tattoos on Austin that read "ENT" and "Stubby." Lunsford observed tattoos on Drummer that read "ENT" and "MOET." "MOET" stands for "money over everything."

### 2. General Legal Principles

Examination of Austin's contentions with respect to the gang enhancements requires consideration of the interaction among the statutory elements of the gang enhancement and the dictates of the confrontation clause, particularly the United States Supreme Court's decision in *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*) and the California Supreme Court's decision in *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*).

### a. Elements of the Gang Enhancement

"Penal Code section 186.22, also known as the Street Terrorism Enforcement and Prevention Act (the STEP Act or Act), was enacted in 1988 . . . . The Act imposes various punishments on individuals who commit gang-related crimes—including a sentencing enhancement on those who commit felonies 'for the benefit of, at the direction of, or in association with *any criminal street gang*.' " (*People v. Prunty* (2015) 62 Cal.4th 59, 66–67 (*Prunty*).)

"The STEP Act defines a 'criminal street gang' as an 'ongoing organization, association, or group.' (§ 186.22(f).) That 'group' must have 'three or more persons,' and its 'primary activities' must consist of certain crimes. (*Ibid*.) The same 'group' must also have 'a common name or common identifying sign or symbol,' and its members

47

must be proven to have engaged in a 'pattern of criminal activity' by committing predicate offenses.  (*Ibid*.)"  (*Prunty*, *supra*, 62 Cal.4th at p. 71.)

"The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes be one of the group's 'chief' or 'principal' occupations."  (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 (*Sengpadychith*).)  The trier of fact may consider "the circumstances of the present or charged offense in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes."  (*Ibid*.)  Expert testimony can serve as the basis of sufficient proof of the gang's primary activities.  (*Id*. at p. 324.)

Under the STEP Act, a " 'pattern of criminal gang activity' means that gang members have, within a certain time frame, committed or attempted to commit 'two or more' of specified criminal offenses (so-called 'predicate offenses').  (Pen. Code, § 186.22, subd. (e).)"  (*People v. Gardeley* (1996) 14 Cal.4th 605, disapproved of on other grounds by *Sanchez*, *supra*, 63 Cal.4th at p. 686, fn. 13.)  The predicate offenses need not themselves be "gang related."  (*Gardeley*, at p. 621.)  It is not clear whether the predicate offenses must be committed by gang members.  (Compare *People v. Augborne* (2002) 104 Cal.App.4th 362, 375 with *Prunty*, *supra*, 62 Cal.4th at p. 76.)

The prosecutor may prove the STEP Act's "requisite 'pattern of criminal gang activity' by evidence of 'two or more' predicate offenses committed 'on separate occasions' or by evidence of such offenses committed 'by two or more persons' on the same occasion."  (*People v. Loeun* (1997) 17 Cal.4th 1, 10 (*Loeun*).)  If the prosecution wishes to prove the predicate offenses by showing their commission "on a single occasion by 'two or more persons,' it can . . . rely on evidence of the defendant's commission of the charged offense and the contemporaneous commission of a second predicate offense by a fellow gang member."  (*Ibid*.)  In addition, the predicates "need not consist of evidence that different Penal Code provisions were violated."  (*Id*. at p. 10, fn. 4.)  However, "[c]rimes occurring after the charged offense cannot serve as predicate

offenses to prove a pattern of criminal gang activity." (*People v. Duran* (2002) 97 Cal.App.4th 1448, 1458 (*Duran*).)

b. Confrontation Clause

In *Crawford*, the United States Supreme Court overruled decades of confrontation clause jurisprudence and held that the prosecution may not admit at trial previously made "testimonial statements" of a witness unless that witness testifies at the trial or the witness "[is] unavailable to testify, and the defendant . . . had a prior opportunity for cross-examination." (*Crawford*, *supra*, 541 U.S. at pp. 53–54.)

Following *Crawford*, the California Supreme Court in *Sanchez* held that, when any expert relates to the jury case-specific, out-of-court statements and treats the content of those statements as true to support the expert's opinion, the statements are hearsay and must either fall within a hearsay exception or be independently proven by competent evidence. (*Sanchez*, *supra*, 63 Cal.4th at pp. 684–686.) Further, if the case is one in which a prosecution expert seeks to relate testimonial hearsay, there is a violation of the confrontation clause unless the witness testifies at trial or is unavailable and the defendant had a prior opportunity to cross-examine the witness. (*Id.* at p. 686.)

Under *Sanchez*, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception? If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is testimonial hearsay." (*Sanchez*, *supra*, 63 Cal.4th at p. 680.) "Whether a statement is testimonial turns on ' "whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the conversation was to 'creat[e] an out-of-court substitute for trial testimony.' " ' " (*People v. Armstrong* (2019) 6 Cal.5th 735, 790.)

49

*Sanchez* also reinterpreted the hearsay rules under California law applicable to expert testimony. The court reiterated that an expert may testify about "background information regarding his knowledge and expertise and premises generally accepted in his field." (*Sanchez*, *supra*, 63 Cal.4th at p. 685.) However, an expert may not "relate as true case-specific facts asserted in hearsay statements, unless they are independently proven by competent evidence or are covered by a hearsay exception." (*Id*. at p. 686.) Austin's trial occurred a few weeks before the California Supreme Court issued its decision in *Sanchez*.

"Since *Sanchez*, California appellate courts have held that expert testimony about 'the general attributes of the . . . gang, such as the gang's culture, the importance placed on reputation and guns, . . . the gang's rivals and claimed turf, the use of monikers and identifying symbols, and the like, [are] permissible as expert background testimony.' " (*People v. Anthony* (2019) 32 Cal.App.5th 1102, 1138 (*Anthony*).) A gang expert may testify about the history and founding of a particular gang, even if the sources of the information are hearsay. (*People v. Vega-Robles* (2017) 9 Cal.App.5th 382 (*Vega-Robles*).) Such admissible background testimony includes testimony about the "primary activities" of a criminal street gang within the meaning of the STEP Act. (*People v. Meraz* (2016) 6 Cal.App.5th 1162, 1175 (*Meraz*).) By contrast, an expert may not relate case-specific testimonial hearsay, such as information contained in police reports authored by other officers. (*Sanchez*, *supra*, 63 Cal.4th at pp. 694–695; *People v. Malik* (2017) 16 Cal.App.5th 587, 598.)

A gang expert who has personal knowledge of the facts and is subject to cross-examination at trial may testify to facts contained in documents that would otherwise be considered testimonial hearsay, such as field identification cards. (*Meraz*, *supra*, 6 Cal.App.5th at p. 1176.) Testimony by an officer about personal observations made by that officer, such as of an individual's tattoos, location, companions, or clothing,

are not hearsay and thus do not run afoul of the confrontation clause. (*People v. Iraheta* (2017) 14 Cal.App.5th 1228, 1248.)

Where an appellant has failed to make a timely objection to the expert's testimony, resulting in a lack of clarity over whether the witness testified from personal observations, an appellant may be unable to carry his or her burden on appeal of affirmatively showing error. Where the record is unclear about the basis of a witness's testimony, and the appellant did not seek at trial to develop the record, reviewing courts will not presume a violation of the confrontation clause. (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1139–1140.)

Bearing in mind these legal principles, we turn to Austin's specific contentions about the gang evidence elicited at his trial.

### 3. Evidence of Predicate Crimes

Austin argues that the evidence of the predicate crimes violated both his rights under the confrontation and due process clauses. We first consider his claims with respect to the Sixth Amendment.

#### a. Confrontation Clause Claims

Austin maintains that the evidence related to the predicate crimes committed by Ronny Flenaugh and Gregory Jefferson violated his rights under the confrontation clause.[38] Specifically, Austin argues that admission of Flenaugh's and Jefferson's

---

[38] Although the prosecution at trial introduced evidence of the prior convictions of two other individuals as predicates supporting the gang enhancements, those individuals were alleged to be members of the Ghost Town gang. As the prosecution's theory at trial was that Austin was a member of ENT rather than Ghost Town, the Attorney General does not rely on that evidence in arguing sufficient evidence supported the jury's finding on the gang enhancements. In his reply brief, Austin accepts the Attorney General's limitation and advances arguments only as to the evidence relating to Flenaugh and Jefferson. We similarly limit our analysis of convictions of individuals who were not involved in the instant offense to Flenaugh and Jefferson. (See *Prunty*, *supra*, 62 Cal.4th at p. 76 ["[A]s the STEP Act defines a criminal street gang as one whose members

51

records of prior convictions violated the Sixth Amendment, as interpreted in *Kirby v. United States* (1899) 174 U.S. 47 (*Kirby*), and the gang expert relied on testimonial hearsay when testifying that Flenaugh and Jefferson were members of ENT. Alternatively, Austin argues that the evidence was insufficient to support the conclusion that Flenaugh and Jefferson were ENT members. The Attorney General counters that *Kirby* held that admission of the fact of a prior conviction does not violate the confrontation clause, Bruce's testimony was sufficiently specific based on his personal investigation of Flenaugh and Jefferson, and sufficient evidence supported the jury's verdict on the gang enhancement.

We apply de novo review to Austin's claim that his rights under the confrontation clause were violated.[39] (*People v. Giron-Chamul* (2016) 245 Cal.App.4th 932, 964 (*Giron-Chamul*).) When reviewing whether substantial evidence supports the gang enhancement, "We review the entire record in search of reasonable and credible evidence of solid value, viewing all the evidence in the light most favorable to the prosecution, and drawing all reasonable inferences in favor of the jury's findings. [Citations.] We cannot, however, go beyond reasonable inferences into the realm of speculation, conjecture, surmise, or guesswork." (*People v. Perez* (2017) 18 Cal.App.5th 598, 607.) "Before a verdict may be set aside for insufficiency of the evidence, a party must demonstrate ' "that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction]." [Citations.]' The same standard of review applies to section 186.22

---

engage in a pattern of criminal gang activity, it is axiomatic that those who commit the predicate acts must belong to the same gang that the defendant acts to benefit."].)

[39] Although Austin did not object to the records of conviction for the prior offenses committed by Flenaugh and Jefferson citing *Kirby,* Austin did generally object to the admission of evidence related to the predicate crimes under the confrontation clause. The Attorney General does not argue that Austin forfeited this issue, and we deem the general confrontation clause objections made by Austin in the trial court sufficient to preserve this issue for appellate review.

gang enhancements." (*In re Alexander L.* (2007) 149 Cal.App.4th 605, 610 (*Alexander L.*), citation omitted.)

We first consider Austin's contention that admission of the records of conviction for the prior offenses committed by Flenaugh and Jefferson violated the confrontation clause under the principle announced in *Kirby*, *supra*, 174 U.S. 47.

### i. Austin's *Kirby* Claim

Joe Kirby was convicted of possession of property stolen from the United States. (*Kirby*, *supra*, 174 U.S. at pp. 48–49.) The prosecution's theory at Kirby's trial was that three other individuals had stolen 5,486 postage stamps from a United States post office in Highmore, South Dakota. (*Id*. at p. 49.) Two days later, Kirby unlawfully possessed in Sioux Falls the stamps stolen from the Highmore post office. (*Ibid*.) Prior to Kirby's trial, three other individuals had been convicted of the theft of the stamps. At Kirby's trial, the prosecution's only evidence that the stamps Kirby possessed had been stolen from the United States was the conviction records for the three other people, admitted into evidence over Kirby's objection. (*Id*. at pp. 49–50, 53–54.)

The United States Supreme Court held that the admission of the three prior convictions to prove that the property Kirby possessed belonged to the United States violated Kirby's rights under the Sixth Amendment. (*Kirby*, *supra*, 174 U.S. at pp. 54–55.) The court stated, "One of the fundamental guaranties of life and liberty is found in the sixth amendment of the constitution of the United States, which provides that 'in all criminal prosecutions the accused shall . . . be confronted with the witnesses against him.' Instead of confronting Kirby with witnesses to establish the vital fact that the property alleged to have been received by him had been stolen from the United States, he was confronted only with the record of another criminal prosecution, with which he had no connection, and the evidence in which was not given in his presence. . . . But a fact which can be primarily established only by witnesses cannot be proved against an accused, charged with a different offense, for which he may be convicted without

reference to the principal offender, except by witnesses who confront him at the trial, upon whom he can look while being tried, whom he is entitled to cross-examine, and whose testimony he may impeach in every mode authorized by the established rules governing the trial or conduct of criminal cases." (*Id.* at p. 55.)

The Supreme Court clarified that, if the statute under which Kirby was convicted had only required proof of prior conviction of the principal, "the record of the trial of the former would be evidence in the prosecution against the receiver to show that the principal felon had been convicted; for a fact of that nature could only be established by a record." (*Kirby*, *supra*, 174 U.S. at p. 54.) However, the prosecution could not prove an "essential fact" of a subsequent crime solely through evidence of another person's prior conviction. (*Ibid.*) "The record of the conviction of the principals could not . . . be used to establish, against the alleged receiver, charged with the commission of another and substantive crime, the essential fact that the property alleged to have been feloniously received by him was actually stolen from the United States." (*Ibid.*)

Relying on *Kirby*, subsequent courts have found violations of the confrontation clause in the use of a prior conviction to show that an individual "in fact committed the crime of which he was convicted" (*United States v. Causevic* (8th Cir. 2011) 636 F.3d 998, 1002), and in the admission of third-party convictions to prove the existence of a gang. (*State v. Jefferson* (2017) 302 Ga. 435, 441–442 [807 S.E.2d 387, 392–393].)

Although *Kirby* dates from 1899, the United States Supreme Court has continued to rely on the decision in its modern confrontation clause cases. (See, e.g., *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 314; *Davis v. Washington* (2006) 547 U.S. 813, 825.) The Attorney General does not question *Kirby*'s continuing validity.

In defending the trial court's admission of the records of convictions for Flenaugh and Jefferson, the Attorney General maintains that *Kirby* holds that a record of prior conviction is properly admitted to show the fact of a prior conviction, and court records are not testimonial hearsay. Although he does not state the point explicitly, the Attorney

54

General appears to contend that the conviction records of Flenaugh and Jefferson were admitted only to prove the fact of their prior convictions.

Applying *Sanchez*'s "two-step" process, we first consider whether admission of the records constituted case-specific hearsay. (*Sanchez, supra*, 63 Cal.4th at p. 680.) Austin concedes that the conviction records of Flenaugh and Jefferson were admissible under Evidence Code section 452.5, subdivision (b)(1), which states "An official record of conviction certified in accordance with subdivision (a) of Section 1530, or an electronically digitized copy thereof, is admissible under Section 1280[40] to prove the commission, attempted commission, or solicitation of a criminal offense, prior conviction, service of a prison term, or other act, condition, or event recorded by the record." California courts have interpreted this provision as "creat[ing] a hearsay exception allowing admission of qualifying court records to prove not only the fact of conviction, but also that the offense reflected in the record occurred." (*Duran, supra*, 97 Cal.App.4th at p. 1460.)

Turning to the issue of whether certified conviction records are testimonial, a number of California courts have concluded that they are not. Reviewing a set of documents prepared pursuant to section 969b,[41] one court stated, "Although they may ultimately be used in criminal proceedings, as the documents were here, they are not

---

[40] Evidence Code section 1280 in turn provides, "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered in any civil or criminal proceeding to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) The writing was made at or near the time of the act, condition, or event. [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

[41] That statute provides in relevant part, "For the purpose of establishing prima facie evidence of the fact that a person being tried for a crime or public offense under the laws of this State has been convicted of an act punishable by imprisonment in a state prison, county jail or city jail of this State, and has served a term therefor in any penal institution . . . when such records or copies thereof have been certified by the official custodian of such records, may be introduced as such evidence." (§ 969b.)

prepared for the purpose of providing evidence in criminal trials or for determining whether criminal charges should issue. Therefore, these records are beyond the scope of *Crawford*, and the court properly admitted them and considered them for the statutory purposes." (*People v. Taulton* (2005) 129 Cal.App.4th 1218, 1225; see also *Meraz, supra*, 6 Cal.App.5th at p. 1176, fn. 10.)

We are not persuaded that all records of prior criminal convictions are immune from confrontation clause challenge. Instead, whether admission of such records violates the confrontation clause as interpreted in *Kirby* depends on the fact the prosecution seeks to prove with the document. To the extent that the prosecution offers a record of conviction solely to show the fact of the prior conviction, admission of that document is consistent with *Kirby* and does not violate the confrontation clause. But *Kirby* also holds that the use of a record of a prior conviction to prove any fact other than the fact of conviction violates the Sixth Amendment. In the words of modern jurisprudence, records of convictions used to prove facts other than the fact of conviction itself *are* testimonial. In *Kirby*, for example, the record of prior conviction would have been properly admitted to prove the fact of the prior conviction but not to prove that the stamps Kirby possessed were the property of the United States. (*Kirby, supra*, 174 U.S. at p. 54.)

In Austin's case, the prosecution offered the records of Flenaugh's and Jefferson's convictions as "predicates" in fulfillment of the Act's requirement that the prosecution prove that the relevant gang members have engaged in a " 'pattern of criminal gang activity.' " (§ 186.22, subd. (e).) The Act defines that phrase as "the commission of, attempted commission of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the following offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." (*Ibid.*) If the prosecution

56

offered a record of a prior conviction solely to prove that individual had suffered a "conviction" of that offense, then such a record would not be testimonial under *Kirby*.

However, the STEP Act also requires that the prosecution prove the date of commission of the predicate crime. "The statute contains two timing requirements for the offenses used to establish a 'pattern of gang activity': the last crime must have occurred within three years of a prior crime, and at least one of the offenses must have occurred after the effective date of the statute." (*People v. Godinez* (1993) 17 Cal.App.4th 1363, 1368 (*Godinez*).) In Austin's trial, the only competent evidence proving the date of commission of Flenaugh's predicate offense was a copy of the complaint from his case.

Use of this complaint from Flenaugh's prior conviction to prove the date on which Flenaugh committed the offense plainly violates *Kirby*'s proscription of the use of the records of prior convictions to prove any fact other than the fact of the prior conviction. The date of the commission of a crime is a fact that "can be primarily established only by witnesses." (See *Kirby*, *supra*, 174 U.S. at p. 55.) The prosecution elicited no other testimony to prove the offense date of Flenaugh's crime. Although the prosecutor orally asked Bruce whether the crime had occurred on June 3, 2012, and Bruce answered affirmatively, Bruce also testified that he had had no involvement in Flenaugh's case. Therefore Bruce must have relied on testimonial hearsay (in the form of documents created by the police or prosecution) to answer the prosecutor's question. We conclude that, pursuant to *Kirby*, admission of Flenaugh's complaint from his prior conviction to prove the date on which Flenaugh committed the crime violated Austin's rights under the confrontation clause. We consider below whether Austin suffered prejudice from this violation.

As to the conviction for Jefferson, we conclude there was no violation of Austin's confrontation rights. Bruce testified that he personally participated in Jefferson's arrest that led to his conviction, the conviction records of which were introduced into evidence. Those conviction records show a conviction for carrying a loaded firearm, in violation of

section 25850, subdivision (c)(2). (See § 186.22, subd. (e)(33) [listing a violation of section 25850 as a qualifying predicate offense].) A reasonable juror could infer from Bruce's testimony that Jefferson committed the offense immediately prior to his arrest and Bruce was, therefore, a percipient witness to the crime. The conviction records confirm that the date of offense of the crime was January 18, 2012—the same date Bruce had testified that he participated in Jefferson's arrest. The fact of conviction for this offense, as reflected in the relevant exhibit received into evidence, is not testimonial under *Kirby*.[42] Therefore, admission of the evidence of the predicate crime committed by Jefferson did not violate the confrontation clause.

ii. Expert's Testimony of Gang Membership

Austin argues that Bruce's testimony that Flenaugh and Jefferson were gang members violated the confrontation clause. Austin also contends that Bruce's testimony was vague and did not constitute sufficient evidence in support of the gang enhancement.

We have already concluded that admission of the evidence related to Flenaugh's prior crime violated the confrontation clause. We therefore will not further consider Austin's claims with respect to Bruce's testimony about Flenaugh.

Turning to Bruce's testimony about Jefferson, we find no confrontation clause violation. Bruce's testimony—although vague—was sufficiently specific as to its basis to provide sufficient evidence supporting the jury's finding on the gang enhancement.

Bruce testified that it was his opinion that Jefferson is a member of ENT based on "prior contacts, prior long-term investigations where Mr. Jefferson was one of the targets, social media postings, and observations on the street." Bruce did not testify that Jefferson was in any of the videos or social media accounts related to ENT that were introduced into evidence. Austin did not mention Jefferson in his testimony. No other witness mentioned Jefferson.

---

[42] Austin does not otherwise object to the content of the exhibit admitted into evidence, much of which goes beyond the fact of Jefferson's prior conviction.

58

On the other hand, Bruce was personally familiar with Jefferson. Bruce testified that ENT previously had a subset called Money Team, and both Austin and Jefferson were members of Money Team when it was in existence. Bruce also testified that Jefferson was a member of ENT when he committed the predicate crime in January 2012. Jefferson was one of the targets of Bruce's ENT wiretap in 2013.

Reviewing courts that have found a gang expert's factual assertions insufficient have faulted the expert's lack of personal knowledge of the individual or group about whom the assertion is made or a lack of specificity about the basis of the expert's knowledge. (See, e.g., *In re Nathaniel C.* (1991) 228 Cal.App.3d 990, 1003; *Alexander L.*, *supra*, 149 Cal.App.4th at p. 612.) Although Bruce's testimony was not particularly specific, he did state that he had personally conducted the investigations and observations he referenced. A reasonable juror could also infer from the rest of Bruce's testimony that Bruce was knowledgeable about ENT, a gang he had known about and investigated since its inception. "The credibility and weight of the expert testimony was for the jury to determine, and it is not up to us to reevaluate it." (*People v. Flores* (2006) 144 Cal.App.4th 625, 633.) Drawing all reasonable inferences in favor of the jury's finding, we determine that Bruce's testimony constituted substantial evidence that Jefferson was a member of ENT.

### b. Due Process Claims

Austin contends that Bruce's testimony about the predicate offenses violated his right to due process because Bruce referenced facts learned in his 2013 investigation of ENT, conducted after Austin's commission of the crimes in this case. The Attorney General counters that Bruce's testimony about crimes committed by ENT members prior to November 29, 2012, was sufficient to support the jury's finding on the gang enhancement.

"Due process entitles a defendant to notice," and the "[u]se of acts occurring after a defendant's commission of charged offenses to establish the existence of a 'pattern of

criminal gang activity' within the meaning of section 186.22, subdivision (c) deprives the defendant of notice, in advance of his conduct, that his acts will fall within the proscription of section 186.22." (*Godinez*, *supra*, 17 Cal.App.4th at p. 1369; see also *Duran*, *supra*, 97 Cal.App.4th at p. 1458 ["Crimes occurring after the charged offense cannot serve as predicate offenses to prove a pattern of criminal gang activity."].) Although they may not occur later, predicate offenses may be committed contemporaneously with the charged offense. (*Loeun*, *supra*, 17 Cal.4th at pp. 10–11.)

It is true that Bruce testified generally about the ENT wiretap investigation he conducted in 2013. However, Bruce's testimony also contained numerous references to his investigation of ENT crimes and interactions with ENT members in 2011 and 2012. For example, Bruce conducted investigations into crimes committed by or against ENT members in 2011. Bruce testified that ENT claimed a particular territory of Oakland in 2011 and 2012. Between 2010 and 2013, Bruce investigated "dozens of crimes related to ENT." Bruce testified that Jefferson committed the predicate crime for which the prosecution introduced the record of conviction on January 18, 2012. We reject Austin's claim that his right to due process was violated by Bruce's references to investigations that occurred in 2013 after Austin committed the crimes at issue here and conclude that the record provides substantial evidence of ENT members' commission of predicate offenses prior to November 29, 2012.

### 4. Evidence of Primary Activities

Austin similarly argues that the evidence heard by the jury relating to the primary activities of ENT violated his due process rights because Bruce's testimony was not limited to the activities of ENT before Austin's commission of the robbery on November 29, 2012. The Attorney General does not address Austin's argument with respect to primary activities.

60

a. Factual Background

Bruce had the following interchange with the prosecutor on the subject of ENT's primary activities.

"Q. What in your opinion is ENT's primary activities?

"A. The primary being at the moment of ENT [*sic*] is committing burglaries and home invasions as well as robberies and shootings or murders.

"Q. And when you say, 'burglaries,' are they specific types?

"A. Typically, ENT was known for doing burglaries of Asian and East Indian homes.

"Q. Those would be residential burglaries. Correct?

"A. Correct."

Defense counsel did not object to this testimony. Bruce also testified that ENT is "known for" committing residential burglaries. The jury saw the ENT video in which one of the singers references duct tape, which Bruce testified was a reference to residential burglaries.

With respect to the primary activities requirement, the jury was instructed that "A criminal street gang is any ongoing organization, association, or group of three or more persons, whether formal or informal: . . . [¶] That has, as one or more of its primary activities, the commission of Residential Burglaries, Robberies, Auto Burglaries, Assaults with Firearms and Murders . . . [¶] In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the group."[43]

b. Analysis

Austin argues that, just as the predicate crimes fulfilling the pattern of criminal activity prong of the gang enhancement may not have been committed after the charged

---

[43] Austin does not argue any error in this instruction.

61

offense, so too the evidence of the primary crimes must be drawn from activities contemporaneous with or before the charged crime. Although Austin cites no case for this proposition, we agree with Austin that there is nothing in the text of the STEP Act provision relating to primary activities that suggests that acts the gang committed *after* the charged offense can themselves satisfy the primary crimes element of the enhancement. A similar rule applies to the predicate offenses. (See *Duran*, *supra*, 97 Cal.App.4th at p. 1458.)

Although we accept Austin's legal point, we disagree with his factual conclusion. Expert testimony can provide substantial evidence of a gang's primary activities, as can evidence that "the group's members consistently and repeatedly have committed criminal activity listed in the gang statute." (*Sengpadychith*, *supra*, 26 Cal.4th at p. 324.) Although Bruce's testimony was not specific about the timeframe of his conclusion that ENT's primary activities were burglaries and shootings, among other crimes, defense counsel did not object to this testimony or seek clarification of Bruce's testimony. An appellant must affirmatively demonstrate error. (See *People v. Giordano* (2007) 42 Cal.4th 644, 666.)

In addition, the jury heard other evidence beyond Bruce's testimony from which it could infer ENT's primary activities. For example, Austin testified that, in 2011, members of ENT committed residential burglaries and, in 2012, members of ENT illegally possessed firearms. Austin admitted that he had previously committed residential burglaries (although in 2009 and therefore prior to the formation of ENT). Austin acknowledged that he made $20,000 from criminal activity in the three months after he was released from prison in 2012. Based on Austin's admissions of having committed prior burglaries, a reasonable juror could infer that Austin got that money from burglaries, rather than by pimping, as Austin had testified. The jury heard about Austin's phone conversation in which Austin told the other person he was lucky that "they" were not the ones to shoot the other person because, if they had, he would be dead.

The jury heard about Jefferson's conviction in 2012 for carrying a firearm in a public place. The jury was also entitled to consider the charged offense, which included a residential burglary. Therefore, Austin cannot show prejudice from defense counsel's failure to object to the basis of Bruce's conclusions about ENT's primary activities.

The record contains substantial evidence that ENT's "primary activities" on November 29, 2012, were the commission of residential burglaries and assaults with a firearm, thus fulfilling the requirements of the STEP Act. (See § 186.22, subd. (e)(1) & (11).) Austin has not persuaded us that his due process rights were violated by the evidence the prosecution elicited to support the primary activities element of the gang enhancement.

### 5. Evidence of ENT as a Criminal Street Gang

Austin argues that Bruce's testimony that ENT was a criminal street gang violated his Sixth Amendment rights because Bruce's opinion was based on testimonial hearsay in the form of booking statements and on investigations performed by others. The Attorney General counters that Austin has no standing for his claim about booking statements, and Austin has not shown that Bruce relied on testimonial hearsay in forming his opinion that ENT is a gang.

With respect to booking statements, Bruce testified that the two jails in Alameda County house members of the same gang together. Bruce had participated in the booking process in these jails and had heard others ask questions of inmates about gang membership. Bruce knew that ENT is one of the groups whose members would be housed together in these jails. In response to the prosecutor's question, "Does that it any way form your opinion about whether you believe ENT is [a] gang?," Bruce responded, "It does." Austin contends that this evidence violated his rights under the confrontation clause.

We agree with the Attorney General that Austin has no standing to raise potential violations of others' privilege against self-incrimination. (*People v. Leon* (2016) 243

63

Cal.App.4th 1003, 1016.)  Although Austin may retain a due process right to assert a violation of his right to a fair trial through the admission of improperly obtained statements (*ibid*.), we find no such violation here.

The evidence to which Austin objects amounts to an assertion that the Alameda County jails house ENT members together.  Given the overwhelming evidence that ENT was a criminal street gang at the time Austin committed the crimes in this case— including Austin's own admission that ENT is a gang—any due process or confrontation clause error implicated by this limited testimony is harmless beyond a reasonable doubt. (See *Chapman*, *supra*, 386 U.S. at p. 24.)

Austin also contends that Bruce's opinion that ENT was a gang in November 2012 impermissibly relied on testimonial hearsay based on surveillance of ENT gang members, information derived from the 2013 wiretap investigation, and field identification cards that Bruce created for his contacts with Austin.  Austin, however, does not demonstrate that in rendering his opinion Bruce relied on information secured by others.

A gang expert may testify about case-specific facts that he has personal knowledge of without violating the confrontation clause.  (*Vega-Robles*, *supra*, 9 Cal.App.5th at p. 413.)  Bruce personally conducted much of the investigation into ENT.  Austin does not point to any particular statement made by Bruce that relied on testimonial hearsay. We will not infer an error under the confrontation clause where the basis and extent of Bruce's knowledge are unclear because defense counsel did not seek clarification through cross-examination.  (*Anthony*, *supra*, 32 Cal.App.5th at pp. 1139–1140.)  We conclude that Austin has not demonstrated any violation of his confrontation clause or due process rights arising from Bruce's testimony that ENT is a criminal street gang.  In any event, Austin cannot show any prejudice from defense counsel's failure to object to the basis of Bruce's conclusion.  Austin's own testimony contained all of the elements from which the jury could infer that ENT met the definition of a criminal street gang.

6. Prejudice

Austin contends that, given the "large volume" of evidence admitted in violation of the confrontation and due process clauses, the "State cannot show the gang enhancement true findings were not attributable to the errors." As described above, we have not found a large volume of evidence erroneously admitted. Instead, we have concluded only that admission of Flenaugh's record of conviction to prove the date on which Flenaugh committed the prior offense violated the confrontation clause. We now consider whether Austin was prejudiced by that error.

We review violations of the confrontation clause for harmless error using the *Chapman* standard. (*People v. Amezcua and Flores* (2019) 6 Cal.5th 886, 912.) "A violation of the Sixth Amendment's confrontation right requires reversal of the judgment against a criminal defendant unless the prosecution can show beyond a reasonable doubt that the error did not contribute to the verdict obtained." (*People v. Pettie* (2017) 16 Cal.App.5th 23, 64.) " ' " 'To say that an error did not contribute to the ensuing verdict is . . . to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record.' " ' " (*People v. Pearson* (2013) 56 Cal.4th 393, 463.)

In considering whether the People proved beyond a reasonable doubt ENT's pattern of criminal activity, the jury was not limited to the predicate crimes introduced through Bruce, the prosecution's gang expert. (See *People v. Lara* (2017) 9 Cal.App.5th 296, 332.) The jury also could have considered the commission of the charged offense by Drummer if sufficient evidence supports a conclusion that Drummer committed a predicate crime. We conclude there was sufficient evidence.

A reasonable juror could conclude beyond a reasonable doubt that Drummer was a member of ENT based on his tattoo "ENT." In addition, Drummer's social media accounts contained references to ENT and at least one photo of ENT member Ronny Flenaugh. The jury heard from Fritz that Drummer was present for the planning of the

65

robbery charged in the current offense; Drummer asked whether the house had gold in it; Drummer told Fritz the following day that "shit went bad," referring to the death of Raveesh; and Drummer and Austin "got rid of everything" connected to the robbery. The jury could therefore conclude beyond a reasonable doubt that Drummer had committed a robbery simultaneously with Austin's commission of the charged offense. Drummer's commission of the offense of robbery could serve as one of the two predicate offenses required by the STEP Act.[44] (See *Loeun*, *supra*, 17 Cal.4th at p. 10; § 186.22, subd. (e)(2).) With respect to the second predicate, we have already determined that Jefferson's conviction for carrying a loaded firearm was properly admitted as a predicate offense, and Austin has not argued that that conviction did not occur. Austin himself admitted that, in 2012, members of ENT illegally possessed firearms.

In addition to Drummer's commission of robbery, Austin's own commission of robbery could serve as a predicate offense.[45] (*People v. Ochoa* (2017) 7 Cal.App.5th 575, 584–586; *Loeun*, *supra*, 17 Cal.4th at p. 10.) The jury heard substantial evidence that Austin was a member of ENT. Austin had "ENT" and "Stubby" tattooed on his body. Austin founded ENT. A drawing created by a current ENT member stated "Free my brudders" and included "Sunny D" (Austin's nickname) in the list of names. The gang expert frequently saw Austin with other members of ENT, and the prosecution introduced into evidence photos and videos of Austin with other ENT members.

---

[44] Austin's jury was instructed in relevant part that "A pattern of criminal gang activity, as used here, means: [¶] 1. The commission of, or conviction of, any combination of two or more of the following crimes, or two or more occurrences of one or more of the following crimes: Robbery, Carrying a Concealed Firearm, CArrying [*sic*] a Loaded Firearm, Carjacking, Auto Burglary." It is not clear from the record why the jury was not also instructed that burglary of a home could also serve as a predicate offense.

[45] Although Austin argues that his own conduct cannot serve as a predicate offense because the jury instruction on predicate offenses did not require the jury to find that the predicate crimes were committed by gang members, given the overwhelming evidence that Austin was a member of ENT, any instructional error on this point was harmless beyond a reasonable doubt.

Although Austin denied that he was a member of ENT when ENT was a criminal street gang, the jury was entitled to, and clearly did, reject Austin's testimony on this point when it found the gang allegations true.

Further supporting the jury's conclusion that ENT was a criminal street gang, Austin admitted that, when he was in ENT in 2012, there were more than three people in ENT, ENT had a common name, and some of the people in the group committed crimes. Austin likened the rivalry between ENT and the Case gang to the rivalry between the Norteños and Sureños.

In sum, the record contains significant evidence that ENT was a criminal street gang in November 2012, including substantial evidence related to predicate crimes. The confrontation clause error in admitting the Flenaugh conviction records to prove the date of Flenaugh's offense was harmless beyond a reasonable doubt.

We therefore reject all of Austin's contentions that the jury's findings on the gang enhancements must be set aside either due to violations of the confrontation or due process clauses or because of insufficient evidence.

C. *Garcia's Claims Regarding Senate Bill No. 1437*

Garcia claims that recent modifications to the felony murder and the natural and probable consequences doctrines effected by Sen. Bill No. 1437 apply to his case. Garcia contends that the jury instructions regarding felony murder were therefore deficient, and that the evidence was insufficient to establish his guilt for murder under the modified law.

1. Procedural Background

After appellate briefing in this case was complete, the Governor signed Sen. Bill No. 1437, which went into effect on January 1, 2019. Sen. Bill No. 1437 amended section 189 to provide that a defendant who was not the actual killer or did not have an intent to kill is not liable for felony murder unless he or she "was a major participant in the underlying felony and acted with reckless indifference to human life, as described in

67

subdivision (d) of Section 190.2." (§ 189, subd. (e)(3); Stats. 2018, ch. 1015, § 3, p. 6675.)

We granted Garcia permission to file supplemental briefing on Sen. Bill No. 1437. Garcia argued for relief from his murder conviction under Sen. Bill No. 1437 on the grounds of instructional error and insufficient evidence, because the prosecution's theory of his guilt relied on the felony murder rule.[46] The Attorney General countered that Garcia can only seek relief under Sen. Bill No. 1437 by first petitioning the trial court under the process set out in section 1170.95. That section allows those "convicted of felony murder or murder under a natural and probable consequences theory . . . [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts." (§ 1170.95, subd. (a).) Alternatively, the Attorney General argued that substantial evidence supported a finding that Garcia was the actual killer, aided and abetted the actual killer, or was a major participant in the robbery and acted with reckless indifference to human life.

On our own motion and pursuant to *People v. Martinez* (2019) 31 Cal.App.5th 719, 729 (*Martinez*), we stayed this appeal and remanded Garcia's case to the trial court for the limited purpose of conducting proceedings necessary to address any petition filed by Garcia under section 1170.95. We directed Garcia to notify this court whether he either had filed a petition in the trial court or had elected not to file such a petition and to proceed with his appeal. Garcia subsequently filed a notice of his election to proceed with his appeal, and we therefore vacated our stay and reinstated Garcia's appeal.

---

[46] The trial court instructed the jury on felony murder with CALCRIM No. 540A (which addresses situations where the defendant allegedly committed the fatal act), and CALCRIM No. 540C (which addresses situations where a person other than the defendant committed the act that resulted in the death).

68

## 2. Analysis

Garcia argues that *Martinez* was wrongly decided and that we should consider his instructional and insufficiency claims in this appeal. We disagree.

Although Sen. Bill No. 1437 might mitigate Garcia's criminal liability, it does not support reversal of his murder conviction on direct appeal where Garcia has elected to forego filing a section 1170.95 petition. As the *Martinez* court explained, when the Legislature creates a procedure, such as that contained in section 1170.95, permitting criminal defendants who have already been convicted to apply to reduce their criminal liability, such convicted persons must follow the statutory procedure. If they choose not to do so, on appeal we will not grant relief of a conviction otherwise valid under the prior law. (*Martinez*, *supra*, 31 Cal.App.5th at pp. 724–729; accord *Anthony*, *supra*, 32 Cal.App.5th at pp. 1147–1158; see also *People v. Munoz* (2019) 39 Cal.App.5th 738, 749–753; *People v. Lopez* (2019) 38 Cal.App.5th 1087, 1113–1115; *In re R.G.* (2019) 35 Cal.App.5th 141, 151.) Garcia must therefore file a section 1170.95 petition in the sentencing court to obtain any ameliorative benefits under Sen. Bill No. 1437, and he has not done so. We therefore do not address the merits of any of Garcia's claims under Sen. Bill No. 1437.

### D. *Garcia's Challenges to the Accomplice Instruction and Evidence*

Garcia raises two claims related to Austin's testimony based on his contention that Austin was his accomplice. First, Garcia argues that the trial court neglected its sua sponte duty to instruct the jury that Austin was an accomplice as a matter of law whose incriminating testimony required corroboration and should be viewed with caution. Second, Garcia contends that there was insufficient corroboration of Austin's testimony. Because of overlap in the analyses of these claims, we address them together.

The trial court instructed the jury that Fritz (Austin's sister) was an accomplice as a matter of law using CALCRIM No. 335. The court did not instruct that Austin, too, was an accomplice as a matter of law, or that accomplice testimony must be corroborated

when there is a dispute whether a witness is an accomplice (CALCRIM No. 334). None of the parties objected to the accomplice instruction or requested modifications to it.

Section 1111 provides: "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof. [¶] An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given."

The parties dispute whether the trial court had a sua sponte duty to instruct that Austin was an accomplice. Garcia argues that *People v. Avila* (2006) 38 Cal.4th 491 (*Avila*) and *People v. Terry* (1970) 2 Cal.3d 362, overruled on another point in *People v. Carpenter* (1997) 15 Cal.4th 312, 381–382, required the trial court to include Austin in the accomplice testimony instruction (CALCRIM No. 335). In *Avila*, the Supreme Court explained that, "generally, instructions on accomplice testimony must be given on the court's own motion only when the accomplice witness is called by the prosecution or when a defendant, in testifying, implicates his codefendant while confessing his own guilt." (*Avila*, at p. 562.)

The Attorney General responds that, under *People v. Box* (2003) 23 Cal.4th 1153 and *People v. Hill* (1967) 66 Cal.2d 536, the trial court was not obligated to instruct the jury concerning Austin's testimony absent a request from Garcia. The Attorney General reasons that, since Austin did not shift blame to Garcia and Garcia denied his own guilt, it is inappropriate to require an accomplice instruction because it could be construed as imputing Austin's guilt to Garcia.

We need not decide whether the trial court erred by failing to instruct the jury regarding Austin's testimony because Garcia cannot demonstrate prejudice for any such error. Even if there was a sua sponte obligation to instruct on accomplice testimony, the

70

failure to so instruct is harmless if there is sufficient corroborating evidence connecting Garcia to the commission of the crimes. (*People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 303 (*Gonzales and Soliz*).)

"To corroborate the testimony of an accomplice, the prosecution must present 'independent evidence,' that is, evidence that 'tends to connect the defendant with the crime charged' without aid or assistance from the accomplice's testimony." (*Avila*, *supra*, 38 Cal.4th at pp. 562–563.) "Corroborating evidence is sufficient if it tends to implicate the defendant and thus relates to some act or fact that is an element of the crime." (*Id.* at p. 563.) " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' " (*Gonzales and Soliz*, *supra*, 52 Cal.4th at p. 303.) In determining whether there is sufficient evidence to corroborate the accomplice's testimony, we must view the evidence in a light most favorable to the judgment. (*People v. Garrison* (1989) 47 Cal.3d 746, 774.)

Here, there was ample corroborating evidence connecting Garcia to the crime, independent of Austin's testimony. Garcia's DNA was found on five latex gloves recovered from Harinder and Raveesh's kitchen. Garcia's cell phone was in the vicinity of Harinder and Raveesh's residence at the time of the robbery. Fritz testified about Austin's statement that his "partner" from Ghost Town was joining in the crime. Austin did not testify about any of these subjects, and thus this evidence is independent of his testimony.

Moreover, we are not persuaded by Garcia's arguments that the DNA and cell phone evidence were rendered insubstantial by Garcia's purportedly "reasonable and plausible explanation for this circumstantial evidence placing him at the crime scene." In support of this point, Garcia relies principally upon *People v. Robinson* (1964) 61 Cal.2d 373. In *Robinson*, the Supreme Court rejected the contention that Robinson's fingerprints in his cousin's car constituted sufficient corroboration to render the failure to give an

71

accomplice instruction harmless.  The Supreme Court stated, "[t]o hold that the presence of those prints connects him with the commission of the crime is tantamount to saying that the fingerprints of any relative of a person known to have committed a crime, found on the automobile of such person, tends to connect the relative with the crime, even though it is known that the relative has had the opportunity to be in and out of that car on various occasions other than during the commission of the crime." (*Id*. at p. 399.)  As this passage makes clear, *Robinson* does not stand for the proposition advanced by Garcia that any plausible exculpatory explanation for incriminating evidence vitiates its corroborative effect.  In contrast to fingerprints found in a relative's car with whom one socializes frequently (*id*. at p. 398), Garcia's DNA and phone were at or near a house located in a city that, according to his own testimony, Garcia had never visited.  Under those circumstances, *Robinson* does not counsel that we should ignore this independent evidence as corroborative of Austin's testimony.[47]

Viewing the evidence in the light most favorable to the judgment, the record supports a reasonable inference that Garcia was at Harinder and Raveesh's residence and participated in the commission of the crime.  There is sufficient corroboration of Garcia's guilt independent of Austin's testimony.  (See *People v. Williams* (2013) 56 Cal.4th 630, 679.)  Accordingly, we conclude that any error in failing to instruct with CALCRIM No. 335 regarding Austin's testimony was harmless.[48]

---

[47] We are also skeptical that the jury found Garcia's exculpatory explanation "reasonable and plausible."  Garcia testified that his cell phone was at Harinder and Raveesh's house because his cousin Rodriguez had committed the robbery and had borrowed Garcia's phone because Rodriguez's phone was not working.  However, none of Rodriguez's DNA was found at the scene of the robbery, and the records of Garcia's cell phone showed two calls to Rodriguez's phone on the night of the robbery.

[48] We also reject Garcia's claim that the trial court's failure to include Austin in CALCRIM No. 335 amounted to a violation of his federal due process rights.  Under federal law "the use of accomplice testimony is not catalogued with constitutional restrictions." (*United States v. Augenblick* (1969) 393 U.S. 348, 352; see also *Cummings*

## II.  CLAIMS OF INSTRUCTIONAL ERROR

In this section we address three issues raised by Garcia:  the trial court erred by failing to instruct the jury on the lesser included offenses of second degree implied malice murder and involuntary manslaughter; the trial court erred by instructing the jury with CALCRIM No. 361 on the failure to explain or deny adverse evidence; and CALCRIM No. 372 improperly allowed an irrational inference regarding Garcia's flight from the crime scene.

A.  *Garcia's Challenge to the Lack of Instruction on Second Degree Implied Malice Murder and Involuntary Manslaughter*

Garcia contends that the trial court erred by failing to instruct the jury sua sponte on second degree implied malice murder and involuntary manslaughter as lesser included offenses of the murder charged in count 1.

1.  Background

Although the information generally alleged in count 1 that, "[o]n or about November 30, 2012 . . . the crime of MURDER, in violation of PENAL CODE SECTION 187, a Felony, was committed by JAVIER RUBEN RODRIGUEZ GARCIA AND DEANGELO JOSEPH AUSTIN who did unlawfully and with malice aforethought, kill Raveesh [K.], a human being," the jury was instructed only as to felony murder for this count.[49]  For count 1, the trial court instructed the jury on two theories of robbery-

_____

*v. Sirmons* (10th Cir. 2007) 506 F.3d 1211, 1237.)  Further, because any error in failing to instruct is harmless under state law, there is no federal due process violation here.  (See *People v. Frye* (1998) 18 Cal.4th 894, 966, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 420.)

[49] In response to a jury question about the murder charge, the trial court instructed the jury "[b]oth defendants are charged with violating Penal Code [section] 187, under a theory defined by Penal Code [section] 189, which is covered in instructions 540A & 540C.  I have given you new verdict forms for Count 1 to make this more clear."

73

felony murder under section 189,[50] using CALCRIM No. 540A (for situations where the defendant allegedly committed the fatal act) and CALCRIM No. 540C (for situations where a person other than the defendant committed the act that resulted in the death).[51] The parties stipulated to the jury instructions.

The jury found Garcia guilty of murder in violation of "Penal Code Section 187/189" but could not reach a verdict on the special circumstance allegation against him.

### 2. Legal Principles

"A trial court has a sua sponte duty to 'instruct on a lesser offense necessarily included in the charged offense if there is substantial evidence the defendant is guilty only of the lesser.' [Citation.] Substantial evidence in this context is evidence from which a reasonable jury could conclude that the defendant committed the lesser, *but not the greater*, offense." (*People v. Shockley* (2013) 58 Cal.4th 400, 403, italics added.) In reviewing the sufficiency of the evidence for this purpose, we resolve any doubts in defendant's favor. (*People v. Tufunga* (1999) 21 Cal.4th 935, 944.)

Regarding second degree murder, "a finding of implied malice requires only an 'intent to do an act dangerous to human life with conscious disregard of its danger.' " (*People v. Landry* (2016) 2 Cal.5th 52, 96.) For involuntary manslaughter, a person commits the crime "either by committing 'an unlawful act, not amounting to a felony' or by committing 'a lawful act which might produce death, in an unlawful manner, or without due caution and circumspection.' (§ 192, subd. (b).)" (*People v. Cook* (2006) 39 Cal.4th 566, 596.) Generally, involuntary manslaughter is a lesser included offense of murder. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1145.)

---

[50] The version of section 189 in effect at the time of the crime stated in pertinent part, "All murder . . . which is committed in the perpetration of, or attempt to perpetrate, . . . robbery, . . . is murder of the first degree. All other kinds of murders are of the second degree." (Former § 189.)

[51] The trial court also instructed the jury on aiding and abetting liability (CALCRIM Nos. 400–402), and coconspirator liability (CALCRIM Nos. 416–418).

We review independently whether the trial court improperly failed to instruct on a lesser included offense. (*People v. Banks* (2014) 59 Cal.4th 1113, 1160 (*Banks*), overruled on other grounds by *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

### 3. Analysis

Garcia argues that there is sufficient evidence for second degree implied malice murder, because reasonable jurors could have concluded that Raveesh's death was unintentional and resulted from reckless disregard for life based on the manner he was taped and restrained, particularly given that Harinder warned the perpetrators of his heart condition and potential for death. In addition, Garcia claims that there was sufficient evidence of involuntary manslaughter, because reasonable jurors could have determined that Raveesh's death was accidental and "occurred more proximately during the false imprisonment"—a noninherently dangerous felony—rather than the robbery. Garcia contends that the failure to instruct on these lesser offenses violated his constitutional rights to due process and a fair trial, and was prejudicial under the standards of *Chapman*, *supra*, 386 U.S. at pp. 23–24, and *People v. Watson* (1956) 46 Cal.2d 818, 837–838.

The Attorney General concedes that, under the accusatory pleading test, the trial court here would have been required to instruct the jury sua sponte on second degree implied malice murder as a lesser included offense had such a finding been supported by substantial evidence.[52] The Attorney General asserts, however, that the evidence does

---

[52] " 'For purposes of determining a trial court's instructional duties, . . . "a lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading, include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." ' " [Citation.] "When applying the accusatory pleading test, '[t]he trial court need only examine the accusatory pleading.' [Citation.] '[S]o long as the prosecution has chosen to allege a way of committing the greater offense that necessarily subsumes a lesser offense, and so long as there is substantial evidence that the defendant committed the lesser offense without also committing the greater, the trial court must instruct on the lesser included offense.' " (*Banks*, *supra*, 59 Cal.4th at p. 1160, italics omitted.)

not show that Garcia committed the lesser offenses instead of the greater offenses. We agree with the Attorney General.

Turning first to Garcia's claim that the jury should have been instructed on second degree murder, we find no evidence that Garcia committed only the lesser offense of second degree murder rather than first degree felony murder. (*People v. Smith* (2013) 57 Cal.4th 232, 245.) Although Garcia was charged with malice murder, he was tried solely under a theory of first degree felony murder.

"When the evidence points indisputably to a homicide committed in the course of a felony listed in section 189 of the Penal Code, the court is justified in advising the jury that the defendant is either innocent or guilty of first degree murder." (*People v. Turner* (1984) 37 Cal.3d 302, 327, overruled on other grounds in *People v. Anderson* (1987) 43 Cal.3d 1104, 1115; *People v. Rupp* (1953) 41 Cal.2d 371, 382.) To find Garcia guilty only of second degree murder, the jury would have had to reject the prosecution's evidence and argument that Raveesh died in the course of a robbery, a crime listed in section 189, committed by Garcia. However, there was no evidence from which the jury could find that Garcia committed an act dangerous to human life in Raveesh and Harinder's house but did not also commit a robbery.

Turning next to Garcia's contention that the jury should have been instructed on involuntary manslaughter, Garcia rests this argument on the theory that the jury may have found that Raveesh's death occurred accidentally during the course of the non-violent felony of false imprisonment but not during the commission of felony robbery. We find no evidence in the record from which the jury could have concluded that Raveesh died during Garcia's commission of false imprisonment but not of robbery. The jury was instructed that robbery "continues until a defendant has reached a place of temporary safety." There is no evidence from which the jury could find that Garcia committed the crime of false imprisonment but not robbery, or that Raveesh died in the course of the

false imprisonment but not the robbery, as there was no dispute that the false imprisonment took place entirely within the robbery.

That the jury did not reach a verdict on the robbery-murder special circumstance for Garcia does not suggest (as Garcia contends) that some jurors concluded that Raveesh's death "occurred in connection with the false imprisonment as opposed to the robbery." The jury was instructed regarding count 1 only on the theory of robbery-felony murder. Furthermore, the special circumstance instruction required the jury to make an additional finding beyond that for felony murder—that is, either an intent to kill or major participation in the crime with reckless indifference to human life. (CALCRIM No. 703.) The prosecutor argued that Garcia was liable for the special circumstance only on the latter ground of major participation with reckless indifference.

Garcia also argues that that the jury should have been instructed on involuntary manslaughter as a lesser included offense because the jury could have concluded that Raveesh's death was accidental. However, this point is legally irrelevant to the question of lesser included offenses because neither involuntary manslaughter nor felony murder requires an intent to kill. " 'The felony-murder doctrine, whose ostensible purpose is to deter those engaged in felonies from killing negligently or accidentally, operates to posit the existence of that crucial mental state–and thereby to render irrelevant evidence of actual malice or the lack thereof–when the killer is engaged in a felony whose inherent danger to human life renders logical an imputation of malice on the part of all who commit it.' " (*People v. Patterson* (1989) 49 Cal.3d 615, 626.)

Garcia's testimony was that his cousin, carrying Garcia's phones and gloves, committed the robbery resulting in Raveesh's death. Garcia did not argue (and the evidence did not support) that Garcia was present at the house in Monte Sereno but committed some lesser crime there. Under these circumstances, we conclude that no reasonable jury could have found that Garcia did an act that resulted in Raveesh's death but did not also commit first degree felony murder. (See *Taylor*, *supra*, 48 Cal.4th at

77

p. 624.)  The trial court therefore was not required to instruct the jury on second degree murder or involuntary manslaughter.

      B.  *Garcia's Challenge to CALCRIM No. 361*

      Garcia claims that the trial court erred by instructing the jury with CALCRIM No. 361 regarding his possible failure to explain or deny evidence against him.[53]  Garcia argues that, during his testimony, he did not fail to explain or deny any matters that were within his personal knowledge, as is required for this instruction.  The Attorney General responds that Garcia's claim of error is forfeited by his failure to object at trial and otherwise lacks merit and is harmless.  Garcia counters that the alleged erroneous instruction affected his substantial rights and presents a purely legal issue that should be reviewed on appeal irrespective of the failure to object.

      A defendant does not forfeit a claim of instructional error when the defendant's substantial rights have been affected by the error.  (§ 1259.)  We will consider Garcia's argument on its merits here because "[a]scertaining whether claimed instructional error affected the substantial rights of the defendant necessarily requires an examination of the merits of the claim—at least to the extent of ascertaining whether the asserted error would result in prejudice if error it was." (*People v. Andersen* (1994) 26 Cal.App.4th 1241, 1249.)

      Garcia's claim of instructional error is subject to our independent review.  (*People v. Posey* (2004) 32 Cal.4th 193, 218; *People v. Vega* (2015) 236 Cal.App.4th 484, 495 (*Vega*).)  " '[T]he correctness of jury instructions is to be determined from the entire charge of the court . . . .' " (*People v. Castillo* (1997) 16 Cal.4th 1009, 1016.)

---

[53] The instruction reads as follows:  "If the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew, you may consider his failure to explain or deny in evaluating that evidence.  Any such failure is not enough by itself to prove guilt.  The People must still prove the defendant guilty beyond a reasonable doubt.  [¶]  If the defendant failed to explain or deny, it is up to you to decide the meaning and importance of that failure."

CALCRIM No. 361 is properly given "only when a defendant completely fails to explain or deny incriminating evidence, or claims to lack knowledge and it appears from the evidence that the defendant could reasonably be expected to have that knowledge." (*People v. Cortez* (2016) 63 Cal.4th 101, 117.)  "Even if the defendant's testimony conflicts with other evidence or may be characterized as improbable, incredible, unbelievable, or bizarre, it is not . . . 'the functional equivalent of no explanation at all.' " (*Ibid.*)  "[T]he focus of CALCRIM No. 361, as its language indicates, is not on the defendant's credibility as a witness, but on the role of a testifying defendant's failure to explain or deny incriminating evidence in how jurors 'evaluat[e] that evidence,' i.e., the evidence the defendant has failed to explain or deny." (*Id.* at p. 118.)

The parties dispute whether Garcia failed to explain why Rodriguez—who allegedly borrowed Garcia's phone—would have used that phone to call his own phone that "was messing up that day," why Rodriguez would not have notified others that he was reachable on Garcia's phone, and why Garcia remained silent about Rodriguez's involvement during his police interview and thereafter.  Garcia argues that why Rodriguez would have acted in a certain way was not within his personal knowledge and calls for speculation.  Garcia also asserts that he was not directly asked by the prosecutor why he did not disclose Rodriguez's participation sooner, and that he in fact provided an explanation on direct examination for his actions.

We need not decide whether, in the face of these possible failures to explain, the trial court erred by instructing the jury regarding Garcia's testimony with CALCRIM No. 361.  Rather, we assume arguendo that there was error here and address whether that error was prejudicial.

We apply the *Watson* standard for prejudice.  (*People v. Saddler* (1979) 24 Cal.3d 671, 682–683 (*Saddler*) [applying *Watson* to a similar instruction, CALJIC No. 2.62]; see also *People v. Rodriguez* (2009) 170 Cal.App.4th 1062, 1067.)  Although Garcia's credibility was important to his defense that he did not participate in the crimes, in light

of the entire record, Garcia's account of events strained credulity. In addition to hearing evidence about Garcia's DNA on the five latex gloves, the proximity of his cell phone to the crime scene, and calls between Garcia's phone and Rodriguez's allegedly defective phone, the jury heard about Austin's statements to Fritz linking Garcia to the crimes.

Further, any impact of CALCRIM No. 361 was mitigated both by the language of the instruction itself and the jury instructions as a whole. If the jury found Garcia's testimony about Rodriguez's actions to be credible, the instruction on its own terms would be irrelevant, as it applied only "[i]f the defendant failed in his testimony to explain or deny evidence against him, and if he could reasonably be expected to have done so based on what he knew . . . ."[54] In addition, CALCRIM No. 361 did not direct the jury to draw an inference adverse to Garcia. Rather, it instructed that the failure to explain or deny can be considered for its "meaning and importance" as decided by the jury, but it is "not enough by itself to prove guilt" and the People still had to prove guilt beyond a reasonable doubt. (See *Vega*, *supra*, 236 Cal.App.4th at pp. 502–503; *People v. Lamer* (2003) 110 Cal.App.4th 1463, 1472; *Saddler*, *supra*, 24 Cal.3d at p. 684.)

For these reasons, we conclude it is not reasonably probable that a result more favorable to Garcia would have been reached by the jury had CALCRIM No. 361 not been given.[55]

---

[54] CALCRIM No. 200 told the jury that they could disregard factually inapplicable instructions: "Some of these instructions may not apply, depending on your findings about the facts of the case. Do not assume just because I give a particular instruction that I am suggesting anything about the facts. After you have decided what the facts are, follow the instructions that do apply to the facts as you find them." Jurors are presumed able to understand and correlate instructions and are further presumed to have followed the court's instructions. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 915.)

[55] We also note that our conclusion regarding prejudice would be the same under *Strickland*, *supra*, 466 U.S. at p. 694, had we addressed the alleged instructional error through a claim of ineffective assistance of counsel. (See *People v. Ocegueda* (2016) 247 Cal.App.4th 1393, 1407, fn. 4 ["the *Watson* standard . . . is substantially the same as the prejudice prong of *Strickland*"].)

C.  *Garcia's Challenge to the Flight Instruction (CALCRIM No. 372)*

Garcia contends that the flight instruction provided to the jurors violated his right to due process because it allowed the jurors to draw an "irrational permissive inference" of guilt from flight.  Garcia does not question the relevance of the flight instruction in this case or argue that the instruction should not have been given at all.

The flight instruction here provided:  "If the defendant fled immediately after the crime was committed, that conduct may show that he was aware of his guilt.  If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct.  However, evidence that the defendant fled cannot prove guilt by itself." (CALCRIM No. 372.)

As Garcia acknowledges, our Supreme Court rejected challenges to the predecessor of CALCRIM No. 372, CALJIC No. 2.52.  (See, e.g., *People v. Mendoza* (2000) 24 Cal.4th 130, 180–181, superseded by statute on other grounds as stated by *People v. Brooks* (2017) 3 Cal.5th 1, 62–63; *Taylor*, *supra*, 48 Cal.4th at p. 630.)  Garcia also acknowledges that the challenge he raises to CALCRIM No. 372 was rejected by the Fifth District Court of Appeal in *People v. Hernández Ríos* (2007) 151 Cal.App.4th 1154. The *Hernández Ríos* court found no significant difference between the language in CALJIC No. 2.52 and CALCRIM No. 372 and upheld the latter as constitutional. (*Hernández Ríos*, at pp. 1158–1159.)  We discern no compelling reason here to depart from the holding in *Hernández Ríos*.[56]

---

[56] Garcia's reliance on the Ninth Circuit's decision in *Turner v. Marshall* (9th Cir. 1995) 63 F.3d 807, 820, overruled on other grounds in *Tolbert v. Page* (9th Cir. 1999) 182 F.3d 677, 685, is unpersuasive.  In *Turner*, the court examined CALJIC No. 2.03 and said, "So long as the instruction does not state that inconsistent statements constitute evidence of guilt, but merely states that the jury may consider them as indicating a consciousness of guilt, the instruction would not violate constitutional rights."  (*Turner*, at p. 820.) CALCRIM No. 372 does not state that flight is "evidence of guilt."  It merely says that the jurors may consider evidence of flight regarding whether the defendant was "aware of his guilt," and that flight "cannot prove guilt by itself."  (CALCRIM No. 372.)

Accordingly, we conclude that the flight instruction was proper, and the trial court did not err by instructing the jury with it.

## III. GARCIA'S DUE PROCESS AND CONFRONTATION CLAUSE CLAIMS

In this section we address Garcia's contentions that his constitutional rights were violated by the trial court's refusal to strike Austin's testimony or grant a mistrial after permitting Austin to reopen his case and testify in his own defense. We also examine Garcia's challenge to his conviction for criminal threats.

A. *Motions to Strike Testimony and to Declare a Mistrial*

Garcia contends that the trial court erred when it denied his motion to strike Austin's testimony, or, in the alternative, to declare a mistrial based on Austin's refusal to identify his coperpetrators. Specifically, Garcia argues that the trial court's ruling violated his right to confront a witness against him and his due process right to present exculpatory evidence.

1. Background

Austin moved to reopen his case and testify in his own defense after Garcia had testified and both Garcia and the People had rested their cases. Garcia objected to Austin's motion, asserting that he would be denied his constitutional rights and prejudiced by Austin's belated testimony. Garcia's defense counsel claimed that he decided to call Garcia and not call a gang expert based on the state of the evidence presented up to that point. Counsel explained that his direct examination of Garcia was "catered . . . upon what the evidence was and what wasn't there"; he anticipated that Garcia may have to take the stand in rebuttal to Austin's testimony, which could look to the jury like Garcia had intentionally omitted information when he first testified; and he suggested that an in camera hearing on the issue might be necessary.

The trial court held an ex parte, in camera hearing with Austin and his defense counsel. Austin's counsel told the trial court that Austin was "prepared to testify and admit his involvement in the crime," but "[was] not going to name any other participant.

He wants to say, I don't know, I don't recall." Austin's counsel said that Austin would not talk about Garcia or his testimony. Counsel also stated that Austin would testify about his gang involvement but would not implicate Garcia as a gang member. Based on this proffer, the trial court allowed Austin to reopen his case, informing Garcia that Austin assured the court that his testimony would not implicate Garcia or contradict Garcia's testimony.

Early in his testimony Austin was asked whether he would tell the jury who else participated in the crime. Austin responded, "I don't recall who was there. I'm going to speak on my actions in the situation." After an unrecorded discussion at the bench, the trial court advised Austin that if he refused to testify about who else committed the crime, the court would stop and strike his testimony entirely. Austin reiterated that he was "not going to answer any questions [about] who was there. I don't recall who was there." The court told Austin that it did not believe him.

Austin's defense counsel argued that Austin was not refusing to answer questions; rather, he only was refusing to identify the other perpetrators. Garcia's defense counsel argued that Austin's alleged lack of recall was invalid and, thus, Austin's refusal to answer meant that he was not subjecting himself to cross-examination and his testimony should be stricken. The prosecutor, on the other hand, withdrew his initial request to strike Austin's testimony, stating his belief that a lack of recall was not the same as a refusal to answer questions.

Garcia's defense counsel then moved for a mistrial based on "the untimeliness of [Austin's] testimony[,] [his] previous objections to said testimony, and the so far result of [Austin's] testimony." The trial court denied Garcia's motion, reiterating its earlier ruling about the propriety of allowing Austin to reopen his case and noting its belief that Austin's testimony would not prejudice Garcia. In response, Garcia reasserted that his confrontation right would be denied by Austin's continuing testimony and argued that the jury would infer that Austin was not identifying the other perpetrators because Garcia

83

was one of them. The trial court again declined to strike Austin's testimony or grant a mistrial, stating that it would preclude any subsequent argument by counsel that Austin was covering for Garcia and it did not believe the jury would automatically infer Austin was covering for Garcia. The trial court also said it would instruct the jury not to consider any testimony by Austin regarding Garcia's involvement.[57]

During his testimony, Austin answered the questions posed to him on direct and cross-examination but maintained that he could not recall who was involved in the crime—other than that there were several males present. Regarding Garcia, Austin admitted to knowing him for about a month or so before the crime and acknowledged asking Fritz to look up Garcia in the county jail's online inmate locator. But Austin said that he had never hung out with Garcia and Drummer at the same time. Garcia did not cross-examine Austin.

When instructing the jurors, the trial court directed, "The fact that Mr. Austin testified that he does not remember who else was at the crime scene cannot be used in any way by you with regard to any of the issues regarding Mr. Garcia. Okay? You can't use that failure of recollection either for or against Mr. Garcia in any way."

### 2. Legal Principles

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, *Chambers v. Mississippi* [(1973) 410 U.S. 284], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.)

"The Confrontation Clause of the Sixth Amendment gives the accused the right 'to be confronted with the witnesses against him.' This has long been read as securing an

---

[57] Garcia's defense counsel also moved for a severance, asking that Garcia's case proceed before the present jury and Austin be given a new jury. The trial court denied the severance motion, and Garcia does not challenge that ruling in this appeal.

84

adequate opportunity to cross-examine adverse witnesses." (*United States v. Owens* (1988) 484 U.S. 554, 557.) "The Confrontation Clause includes no guarantee that every witness . . . will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion. To the contrary, the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination, thereby calling to the attention of the factfinder the reasons for giving scant weight to the witness' testimony." (*Delaware v. Fensterer* (1985) 474 U.S. 15, 21–22; see also *Crawford*, *supra*, 541 U.S. at pp. 61–62 [the confrontation clause "is a procedural rather than a substantive guarantee" and "commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination"]; *People v. Rodriguez* (2014) 58 Cal.4th 587, 632 ["As a practical matter, [the witness's] claim of total lack of recall limited defendant's ability to cross-examine her about her prior statements. But this circumstance does not implicate the confrontation clause."].)

A defendant also enjoys the right to take the witness stand and to testify in his or her own defense. "Essential to a fair trial is that the accused have the opportunity to exercise his fundamental, constitutional right to be heard in his own defense by testifying at trial." (*People v. Reynolds* (1984) 152 Cal.App.3d 42, 45 (*Reynolds*); see also *Rock v. Arkansas* (1987) 483 U.S. 44, 49.)

"[W]here a party is deprived of the benefits of cross-examination of a witness by refusal of the witness to answer, the trial court may strike out the direct examination." (3 Witkin, Cal. Evidence (5th ed. 2012) Presentation at Trial § 240, p. 349; see also *People v. Price* (1991) 1 Cal.4th 324, 421 (*Price*).) Striking a witness's entire testimony is a "drastic solution," (*Reynolds*, *supra*, 152 Cal.App.3d at p. 47) only to be employed "after less severe means are considered." (*Id.* at p. 48.) These alternatives include striking part of the testimony or allowing the trier of fact to consider the witness's failure to answer in evaluating his credibility. (*Ibid.*) In exercising its discretion, the trial court

should consider the witness's motive in refusing to answer and the materiality of the testimony he or she has refused to give. (*Ibid.*)

"A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions." (*People v. Haskett* (1982) 30 Cal.3d 841, 854.)

We review Garcia's due process and confrontation clause claims de novo, deferring to the trial court's determination of historical facts. (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 964.) We review the trial court's decision whether to strike Austin's testimony or grant a mistrial for an abuse of discretion. (*Price*, *supra*, 1 Cal.4th at p. 421 [decision to strike testimony]; *People v. Jenkins* (2000) 22 Cal.4th 900, 985–986 [ruling on motion for mistrial].)

### 3. Analysis

Garcia argues that he was "deprived of his right to cross-examination because Austin refused to respond in any meaningful way to the questions asked of him concerning the identity of those who participated with him in the [] robbery" and "insisted that he did not recollect the names of those who had joined him in the home invasion robbery." Garcia contends that Austin's feigned forgetfulness prevented "meaningful questioning about who his accomplices were" and created an inference that "Garcia was one of those Austin was seeking to protect." Garcia claims that Austin's availability for questioning regarding the details of the crime were "of little consequence to Garcia's defense" that he was not involved in the crime. In addition, Garcia argues that the trial court's limiting instruction failed to eliminate the prejudice flowing from Austin's refusal to identify his crime partners.

We reject Garcia's contentions. We conclude that Garcia's right to confront Austin was not denied, and the trial court properly exercised its discretion in refusing to

86

strike Austin's testimony or grant a mistrial. Garcia had the opportunity, but declined, to question Austin about any of his testimony. That Austin claimed he did not recall who committed the crime with him—even if insincere—does not amount, of itself, to a violation of Garcia's confrontation right. (*Giron-Chamul*, *supra*, 245 Cal.App.4th at p. 965; see also *People v. Homick* (2012) 55 Cal.4th 816, 861.) Moreover, we find unavailing the argument that Austin's unwillingness to answer questions about his accomplices deprived Garcia of a meaningful opportunity for cross-examination because it implicated the sole issue in dispute regarding Garcia (that is, whether he was one of the perpetrators) and suggested that Garcia was involved.

Austin's claimed lack of recollection did not deny Garcia a fair and full opportunity to test Austin's memory, knowledge, and credibility before the jury. Although Austin's refusal to answer certain questions gives rise to an inference that his testimony was not believable, it does not follow necessarily that the jury would infer from the refusal that Garcia himself was being protected by Austin.

The record suggests an equally if not more plausible inference the jury could have drawn from Austin's refusal to testify about his coperpetrators. The jury heard a number of pieces of evidence from which it could infer that Austin's refusal to testify about his coperpetrators was not because Austin was protecting Garcia but because Austin was a gang member. The gang expert testified that Oakland gangs do not allow their members to snitch on each other. Austin told the jury he would not testify about the names of the others involved because he "live[s] by a code of the Oakland streets in general." The prosecution's theory of the case was that Austin committed the crime with other gang members because they would refuse to cooperate with the police in any subsequent investigation. The jury found true all of the gang enhancements for Austin.

Other evidence demonstrated that multiple persons were involved in the crime, including ENT gang member Drummer. In addition, Garcia presented his own testimony that he was not involved in the crime and lent his phone to Rodriguez. It is speculative to

assert that the jury would include Garcia in the group of confederates simply because Austin would only speak to Austin's own involvement in the crime.

Finding no deprivation of Garcia's constitutional right to present a meaningful defense or confront witnesses, we also reject Garcia's arguments that the trial court should have struck Austin's testimony or granted a mistrial on due process grounds. The trial court appropriately balanced Austin's right to testify against Garcia's right to ask Austin questions and challenge his story. Although Garcia's defense counsel claimed that he tailored his presentation in light of Austin's decision to rest without presenting any evidence, counsel did not provide any specific support for this argument, and Garcia's testimony involved a blanket denial that he participated in the crime. Further, the trial court protected Garcia against any potential prejudice resulting from Austin's asserted lack of recollection by telling the jurors that they could not use the lack of recall either for or against Garcia. Thus, Garcia's right to a fair trial was not irreparably damaged by Austin's belated testimony. (See *People v. Johnson* (2018) 6 Cal.5th 541, 581.) We discern no abuse of discretion by the trial court in either failing to strike Austin's testimony or declining to grant a mistrial.

Moreover, even if we assume arguendo that Garcia's constitutional rights were violated here, any error was harmless beyond a reasonable doubt under *Chapman*, *supra*, 386 U.S. at p. 24. On the whole, the evidence against Garcia was substantial. As discussed above, Garcia's DNA was found on latex gloves at the crime scene, and his cell phone traveled to and was in the area of Harinder and Raveesh's house at the time of the robbery. Austin's DNA and cell phone, too, connected him to the crime scene, and Harinder identified Austin as her attacker. Fritz testified extensively about Austin's pre- and post-crime behavior and statements, including Austin's mention of his "partner" from Ghost Town and request that Fritz search for Garcia in the inmate locator. This evidence overwhelmed Garcia's denial of involvement in the robbery and his explanations for the presence of his DNA and cell phone at the crime scene. In addition, Austin's testimony

88

concerning Garcia was minimal, did not contradict Garcia's testimony, and was otherwise cumulative of independent evidence. Furthermore, the trial court abated any prejudice flowing from Austin's claimed lack of recollection by instructing the jury not to consider it when deciding the case.

For these reasons, we conclude that Garcia's constitutional rights to confront witnesses and present a defense were not violated by the trial court's rulings, and any error in that regard was not prejudicial.

B. *Constitutionality of Section 422*

Garcia claims that section 422 is unconstitutionally vague.[58] Specifically, Garcia argues that the statute impermissibly "calls upon law enforcement to evaluate the nature of threats and to determine, on a case by case basis, and under a myriad of circumstances, whether a threat is of the type that will result in great bodily injury or death." He further asserts that, "by linking the threat to a crime causing death or great bodily injury, it is unclear to the general public what type of threats are illegal, because of uncertainties as to what threatened crimes are of the type to result in death or great bodily injury."

"[T]he underpinning of a vagueness challenge is the due process concept of 'fair warning.' The rule of fair warning consists of 'the due process concepts of preventing arbitrary law enforcement and providing adequate notice to potential offenders,' protections that are 'embodied in the due process clauses of the federal and California Constitutions.' The vagueness doctrine ' "bars enforcement of a 'statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence

---

[58] Section 422 penalizes "[a]ny person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety . . . ." (§ 422, subd. (a).)

must necessarily guess at its meaning and differ as to its application.' " ' A vague law 'not only fails to provide adequate notice to those who must observe its strictures, but also "impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." ' " (*In re Sheena K.* (2007) 40 Cal.4th 875, 890, citations omitted.)

Our Supreme Court "has recognized 'the strong presumption that legislative enactments "must be upheld unless their unconstitutionality clearly, positively, and unmistakably appears. A statute . . . cannot be held void for uncertainty if any reasonable and practical construction can be given to its language." ' Therefore, 'a party must do more than identify some instances in which the application of the statute may be uncertain or ambiguous; he must demonstrate that "the law is impermissibly vague in all of its applications." ' Stated differently, ' "[a] statute is not void simply because there may be difficulty in determining whether some marginal or hypothetical act is covered by its language." ' " (*People v. Morgan* (2007) 42 Cal.4th 593, 605–606, citations and italics omitted.)

Garcia acknowledges that in *People v. Maciel* (2003) 113 Cal.App.4th 679, 686, the Second District Court of Appeal rejected a vagueness challenge to section 422. Garcia urges us to disregard *Maciel* in light of two Nebraska Supreme Court cases, *State v. Hamilton* (1983) 215 Neb. 694 [340 N.W.2d 397] and *State v. Schmailzl* (1993) 243 Neb. 734 [502 N.W.2d 463]. In the former case, the court struck down Nebraska's criminal threat statute as unconstitutionally vague; in the latter case, a revised statute was upheld. We decline Garcia's suggestion because, having reviewed these cases, nothing in them convinces us that *Maciel* was wrongly decided or that it inappropriately construed the Nebraska decisions. (See *Maciel*, at p. 686, fn. 3.) We decline to reverse established precedent in California by finding that section 422 is unconstitutional.

# IV. CLAIMS OF SENTENCING ERROR

We here address Garcia's and Austin's claims that the consecutive sentences imposed for certain counts should have been stayed. We also consider Garcia's contentions that his case should be remanded to permit him to generate a record for his eventual youth offender parole hearing and the one-year prior prison term enhancement to his sentence should be stricken.

Given our conclusion about the special circumstance finding, the trial court will necessarily have to resentence Austin. For the benefit of the trial court at that future resentencing, we address certain additional contentions Austin has made with respect to his sentence—namely that a remand is necessary to allow the trial court to exercise its discretion to strike Austin's prior serious felony convictions and the term imposed for a gang enhancement should be stricken. We do not address Austin's Eighth Amendment challenge to his sentence of life without the possibility of parole, which we have vacated in light of our conclusion on the special circumstance finding. We also do not address the errors in Austin's abstracts of judgment identified by the parties.

A. *Garcia's and Austin's Challenges to Their Sentences Under Section 654*

Garcia and Austin claim that the trial court erred under section 654 when it imposed consecutive sentences for various convictions they suffered. Specifically, Garcia claims that the consecutive sentences for his criminal threats conviction (count 4) and false imprisonment convictions (counts 5 and 6) violated section 654, because these crimes were committed to effectuate the robbery and consisted of "a continuing course of conduct motivated by a single larcenous animus to acquire as much of [Harinder and Raveesh's] property as possible." Austin similarly asserts that the trial court should have stayed the terms imposed for his assault (count 3), criminal threats (count 4) and false imprisonment (counts 5 and 6) convictions, because these crimes "were part of an indivisible course of conduct incident to a single objective"—i.e., "to prevent [Harinder and Raveesh] from interfering with the robbery."

91

### 1. Legal Principles

"Section 654 precludes multiple punishment for a single act or omission, or an indivisible course of conduct."[59] (*People v. Deloza* (1998) 18 Cal.4th 585, 591.) "The purpose of section 654 is to ensure that a defendant's punishment is commensurate with his culpability and that he is not punished more than once for what is essentially one criminal act." (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514.)

"Whether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry, because the statutory reference to an 'act or omission' may include not only a discrete physical act but also a course of conduct encompassing several acts pursued with a single objective. [Citations.] We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single ' "intent and objective" ' or multiple intents and objectives. [Citations.] At step one, courts examine the facts of the case to determine whether multiple convictions are based upon a single physical act. [Citation.] When those facts are undisputed . . . the application of section 654 raises a question of law we review de novo." (*People v. Corpening* (2016) 2 Cal.5th 307, 311–312.)

At step two, whether crimes arise from an indivisible course of conduct turns on the perpetrator's intent and objective, not the temporal proximity of the offenses. (*People v. Harrison* (1989) 48 Cal.3d 321, 335.) "If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one." (*Neal v. State of California* (1960) 55 Cal.2d 11, 19, overruled in part on

---

[59] Section 654, subdivision (a) provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision."

another ground in *People v. Correa* (2012) 54 Cal.4th 331, 341.) Whether a defendant harbored a single intent—and thus a single objective—is a factual question; the applicability of section 654 to settled facts is a question of law. (*Harrison*, *supra*, at p. 335.)

If a trial court erroneously fails to stay the execution of a sentence pursuant to section 654, the trial court has acted in excess of its jurisdiction, and a reviewing court must correct the error on appeal. (*People v. Scott* (1994) 9 Cal.4th 331, 354, fn. 17.)

### 2. Analysis

When sentencing Garcia, the trial court said it was "running each of these separate crimes consecutive due to the planning involved in these crimes and due to the defendant's prior criminal record," and that it was "imposing the indeterminate term of 25 years to life to run consecutive to the 12[-year determinate sentence] . . . based upon the fact that the murder is a separate act of violence from the robbery and the impact on [Harinder]." At Austin's sentencing, the trial court said that it selected "consecutive terms due to the planning, prior strike, the cruelty involved, and all being separate acts of violence."[60]

Here, there was substantial evidence to support the trial court's determination that Garcia and Austin maintained more than one intent and objective under the circumstances of the crime. It was reasonable for the trial court to infer that the threats to shoot and kill Harinder were made to keep her silent and avoid detection. Moreover, the trial court reasonably concluded that hitting Harinder was a separate and gratuitous act of violence against an unresisting victim, and that binding, gagging, and blindfolding Harinder and Raveesh were done in anticipation of flight post crime and to allow the perpetrators time to escape after ransacking the house. (See *People v. Nguyen* (1988) 204 Cal.App.3d 181,

---

[60] Although neither counsel for Garcia nor Austin objected under section 654 at sentencing, the "failure . . . to object on this basis in the trial court does not forfeit the issue." (*People v. McCoy* (2012) 208 Cal.App.4th 1333, 1338.)

193; *People v. Coleman* (1989) 48 Cal.3d 112, 162–163; *People v. Cleveland* (2001) 87 Cal.App.4th 263, 271–272.)

For these reasons, we conclude that the trial court properly imposed unstayed sentences under section 654 on counts 4, 5, and 6 for Garcia and counts 3, 4, 5, and 6 for Austin.

B. *Garcia's Request for a Franklin Hearing*

Garcia argues that his case should be remanded for the purpose of permitting him to generate a record for his eventual section 3051 youth offender parole hearing. In *People v. Franklin* (2016) 63 Cal.4th 261 (*Franklin*), the California Supreme Court addressed the constitutional and statutory implications of the enactment of sections 3051 and 4801, which require the Board of Parole Hearings to conduct a youth offender parole hearing for certain youthful offenders during their 25th year in prison. (See *Franklin*, at pp. 276–277.)

In *Franklin*, the California Supreme Court determined that the record was not clear "whether Franklin had sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) Referencing section 3051, the Supreme Court described relevant information as statements by " '[f]amily members, friends, school personnel, faith leaders, and representatives from community-based organizations with knowledge about the individual before the crime.' " (*Id*. at p. 283.) The court in *Franklin* noted that "[a]ssembling such statements 'about the individual before the crime' is typically a task more easily done at or near the time of the juvenile's offense rather than decades later when memories have faded, records may have been lost or destroyed, or family or community members may have relocated or passed away." (*Id*. at pp. 283–284.)

Because Franklin's sentencing hearing had occurred prior to key decisions of the United States and California Supreme Court related to the application of the Eighth

Amendment to youthful offenders and to the enactment of sections 3051 and 4801, the California Supreme Court ordered Franklin's case remanded to the trial court "for a determination of whether Franklin was afforded sufficient opportunity to make a record of information relevant to his eventual youth offender parole hearing." (*Franklin*, *supra*, 63 Cal.4th at p. 284.) The court further stated, "If the trial court determines that Franklin did not have sufficient opportunity, then the court may receive submissions and, if appropriate, testimony pursuant to procedures set forth in section 1204 and rule 4.437 of the California Rules of Court, and subject to the rules of evidence. Franklin may place on the record any documents, evaluations, or testimony (subject to cross-examination) that may be relevant at his eventual youth offender parole hearing, and the prosecution likewise may put on the record any evidence that demonstrates the juvenile offender's culpability or cognitive maturity, or otherwise bears on the influence of youth-related factors. The goal of any such proceeding is to provide an opportunity for the parties to make an accurate record of the juvenile offender's characteristics and circumstances at the time of the offense so that the Board, years later, may properly discharge its obligation to 'give great weight to' youth-related factors (§ 4801, subd. (c)) in determining whether the offender is 'fit to rejoin society' despite having committed a serious crime 'while he was a child in the eyes of the law.' " (*Ibid.*)

Between 2013 and January 1, 2016, "only persons under 18 at the time of their controlling offense[61] were entitled to a youth offender parole hearing. (Stats. 2013, ch. 312, § 4.)" (*People v. Costella* (2017) 11 Cal.App.5th 1, 8.) Effective January 1, 2016, the Legislature extended the right to a youth offender parole hearing under section 3051 to individuals who were 23 years old or younger when they committed the controlling offense. At the time of Garcia's sentencing section 3051 provided, "A person who was

---

[61] Section 3051 defines a " '[c]ontrolling offense' " as "the offense or enhancement for which any sentencing court imposed the longest term of imprisonment." (§ 3051, subd. (a)(2)(B).)

convicted of a controlling offense that was committed before the person had attained 23 years of age and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (Former § 3051, subd. (b)(3).)[62]

Garcia was 21 years of old when he committed the crimes here. The California Supreme Court issued *Franklin* on May 26, 2016 (*Franklin*, *supra*, 63 Cal.4th at p. 261), and the jury rendered its verdicts on June 6 and 7, 2016. The trial court sentenced Garcia on July 8, 2016.

Garcia argues that he is entitled to a remand to allow him to make a record relevant to his eventual youth offender parole hearing. Garcia acknowledges that his sentencing occurred approximately six weeks after the California Supreme Court issued its decision in *Franklin* and six months after the effective date of the amendment to section 3051 that extended the right to a youth offender parole hearing to him. Nevertheless, Garcia argues that this court should remand his case to the trial court because his trial counsel made "no attempt" to assemble a record in anticipation of a youth offender parole hearing, and no information relevant to such a hearing was placed in the record. The Attorney General argues that, unlike in *Franklin*, there is no indication that Garcia lacked an opportunity to put on the record information relevant at a youth offender parole hearing under sections 3051 and 4801.

---

[62] Effective January 1, 2018, this provision was amended to apply to offenders aged 25 or younger: "A person who was convicted of a controlling offense that was committed when the person was 25 years of age or younger and for which the sentence is a life term of 25 years to life shall be eligible for release on parole by the board during his or her 25th year of incarceration at a youth offender parole hearing, unless previously released or entitled to an earlier parole consideration hearing pursuant to other statutory provisions." (§ 3051, subd. (b)(3).)

Garcia counters that the right to a *Franklin* hearing for non-juveniles was not recognized by any Court of Appeal until August 1, 2016—that is, a few weeks after Garcia's sentencing. (See *People v. Perez* (2016) 3 Cal.App.5th 612.) In *Perez*, the Court of Appeal reviewed an appeal of a defendant who was 20 years old at the time he committed the crimes and found "the record establishes [the defendant] did not have a sufficient opportunity to put on the record the kinds of information that sections 3051 and 4801 deem relevant at a youth offender parole hearing." (*Id*. at p. 619.) The court in *Perez* ordered a remand "for the limited purpose of affording both parties the opportunity to make an accurate record of [the defendant]'s characteristics and circumstances at the time of the offense as set forth in *Franklin*." (*Id*. at pp. 619–620.)

Garcia further notes that the sentencing transcript makes clear that neither the trial court, the prosecutor, nor defense counsel considered the application of *Franklin* to him. Garcia states that the Attorney General's argument amounts to a contention that Garcia has forfeited any *Franklin* claim, and forfeiture should not apply where the law in a particular area is unsettled, as it was here with respect to *Franklin*'s application to non-juveniles.

The trial court record reveals scant information about Garcia's "characteristics and circumstances at the time of the offense." (*Franklin*, *supra*, 63 Cal.4th at p. 283.) Garcia testified in his own defense but provided little biographical information about himself, other than he was raised by his grandmother in east Oakland, his mother was "on crack," he did not graduate from high school, and his family members consisted of his grandmother, his brothers, cousins, a young child, and the mother of his child. In addition, Garcia testified that he was not a gang member but earned money from selling crack. Garcia also had a few certificates from a trade school.

The probation report submitted for Garcia's sentencing states that defense counsel "waived the interview with the defendant." The probation report cites Garcia's criminal history and states, "[d]eeper insight could not be gained to evaluate the defendant's

character and prospects as the interview was waived." With respect to considerations related to Garcia's age, the report states only "[d]espite being just 25-years-old, the defendant has continued to engage in criminal conduct and has spent a significant portion of his adult life incarcerated as a result."

The record does not indicate that Garcia's defense counsel submitted a sentencing memorandum to the trial court on his behalf. At Garcia's sentencing hearing, the prosecutor read a victim impact statement submitted by Harinder. No one addressed the trial court on Garcia's behalf, and Garcia's defense counsel did not make any statements regarding the appropriate sentence or about Garcia's circumstances.[63]

We agree with the Attorney General that the record provides no indication that the trial court prevented Garcia's defense counsel from introducing information relevant to Garcia's future youth offender parole hearing. Furthermore, the issuance of the decision in *Franklin* and the entry into force of the amendments to section 3051 should have put Garcia's counsel on notice of the importance of putting into the trial record evidence related to Garcia's characteristics and circumstances at the time of the offense, particularly with respect to his age. The record is equally clear, however, that Garcia's counsel did not do so.

The probation report likewise does not contain information relevant to the future youth offender parole hearing. Except with respect to the precise age of the defendant, the following observations apply equally to Garcia: "the [probation] report is largely bereft of information about appellant's character, cognitive ability, psychological functioning or maturity. It tells us very little about what kind of 16-year-old appellant is other than the fact he is the kind who commits this crime. Appellant should have the chance to provide a fuller picture than that. Indeed, the report essentially ignores the fact appellant was only 16 years old when his crimes occurred, and it offers no analysis or

---

[63] Garcia's trial counsel was not present at his sentencing hearing; another member of Garcia's defense counsel's office appeared with Garcia at his sentencing.

insight whatsoever as to how this factor may have affected his behavior." (*People v. Tran* (2018) 20 Cal.App.5th 561, 570.)

Garcia's situation, therefore, is not equivalent to that of other individuals for whom Courts of Appeal have denied *Franklin* remands due to the adequacy of facts in the record related to their personal circumstances. (See, e.g., *People v. Cornejo* (2016) 3 Cal.App.5th 36, 69 [citing 23 character reference letters submitted to the trial court]; *People v. Woods* (2018) 19 Cal.App.5th 1080, 1089 [observing defendant's "probation report included information regarding defendant's psychological and medical problems, along with a summary of [a doctor's] report. This summary included details of defendant's home life, education, psychiatric treatment, criminal history, and IQ test."].) No such information related to Garcia appears in the record developed in the trial court.

Considering both the importance of contemporaneous information about Garcia's circumstances to his eventual parole youth offender hearing and recognizing that the applicability of section 3051 to non-juveniles was relatively novel at the time of Garcia's sentencing, we decline to apply the doctrine of forfeiture. We also agree with Garcia that a remand is appropriate under these circumstances. This remand will allow the trial court to determine whether Garcia was afforded sufficient opportunity to make such a record and, if not, to conduct such a hearing in order that Garcia and the People may do so.

C. *Section 667.5, Subdivision (b) Enhancement to Garcia's Sentence*

In a supplemental brief, Garcia requests that we order the trial court to strike the one-year prior prison term enhancement imposed at his sentencing pursuant to section 667.5, subdivision (b) (section 667.5(b)). We afforded the Attorney General an opportunity to respond to Garcia's supplemental briefing, but he has not done so.

On October 8, 2019, the Governor signed Senate Bill No. 136. (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1.) Under the new law, the one-year prior prison term enhancement in section 667.5(b) applies only to a prior prison term served for a sexually violent offense as defined in Welfare and Institutions Code section 6600, subdivision (b).

99

(§ 667.5, subd. (b).)  The prior prison term enhancement imposed on Garcia was based on a felony conviction under Health and Safety Code section 11351.

Garcia argues that, because his case is not yet final, the new law should apply retroactively to him under the *Estrada*[64] rule.  We agree.  Under *Estrada*, "an amendatory statute lessening punishment is presumed to apply in all cases not yet reduced to final judgment as of the amendatory statute's effective date." (*People v. Floyd* (2003) 31 Cal.4th 179, 184; see also *In re Kirk* (1965) 63 Cal.2d 761, 762–763; *People v. Brown* (2012) 54 Cal.4th 314, 323–324.)  "The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' " (*People v. Buycks* (2018) 5 Cal.5th 857, 881.)

Nothing in Senate Bill No. 136 evinces a legislative intent that the amendment to section 667.5(b) applies prospectively only.  We thus conclude that, under *Estrada*, the amendment to section 667.5(b) applies to Garcia.  (See *People v. Jennings* (2019) 42 Cal.App.5th 664, 682; see also *People v. Lopez* (2019) 42 Cal.App.5th 337, 340–342.)  We have already determined that Garcia's case must be remanded to the trial court for it to consider whether to conduct a *Franklin* hearing.  We also order the trial court to strike the one-year enhancement and to resentence Garcia.

D.  *Section 667(a) Enhancements to Austin's Sentence*

The trial court found true Austin's prior serious felony conviction allegation. (§ 667, subd. (a) (section 667(a)).)  As part of Austin's sentence, the trial court imposed a consecutive five-year term for the prior serious felony on the determinate sentences for

---

[64] *In re Estrada* (1965) 63 Cal.2d 740.

counts 3, 4, 5, and 6 and also imposed five-year terms for the prior serious felony on each of the indeterminate sentences for counts 1 and 2.

Austin argues that Senate Bill No. 1393, effective January 1, 2019, gives the trial court discretion to strike the allegation under section 667(a)—an authority the trial court did not possess at the time it sentenced Austin—and therefore his case must be remanded to the trial court for it to consider whether to exercise its discretion to strike the enhancements pursuant to its authority under section 1385. (Stats. 2018, ch. 1013, §§ 1, 2; *People v. Jones* (2019) 32 Cal.App.5th 267, 272 (*Jones*); *People v. Rocha* (2019) 32 Cal.App.5th 352, 360 (*Rocha*).) The Attorney General agrees, as do we.

Senate Bill No. 1393's amendment to section 667(a) extends to "all defendants whose judgments are not final as of the amendment's effective date," and it therefore applies to Austin. (See *Jones*, *supra*, 32 Cal.App.5th at p. 273.) Nevertheless, "[w]e are not required to remand to allow the court to exercise its discretion if 'the record shows that the trial court clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the] . . . enhancement' even if it had the discretion." (*Ibid.*) Without a clear indication of the trial court's intent, remand is required. (*People v. Almanza* (2018) 24 Cal.App.5th 1104, 1110.)

We have reviewed the transcript of Austin's sentencing hearing. We do not believe that it clearly shows whether the trial court would have stricken the enhancements under section 667(a) if it had the discretion to do so. We therefore remand Austin's case to the trial court so that the trial court may hold a hearing to consider whether to exercise its independent discretion on whether to strike the prior conviction enhancements. (§ 667(a).) Austin, his counsel, and counsel for the People have the right to be present at the hearing. (See *Rocha*, *supra*, 32 Cal.App.5th at p. 360.) We express no opinion as to how the trial court should exercise its discretion.

101

E. *Imposition of a Gang Enhancement on Austin's Conviction for Count 1*

Austin argues, and the Attorney General concedes, that the trial court committed error when it imposed and stayed the punishment for the gang enhancement on count 1. The jury convicted Austin of count 1, a violation of sections 187/189, and also found true a gang enhancement under section 186.22, subdivision (b)(1)(C). The trial court sentenced Austin on count 1 to life imprisonment without the possibility of parole. The trial court stated that, as to "[t]he gang enhancement pursuant to [section] 186.22[, subd.] (b)(1)(c)[,] punishment for that enhancement of ten years will be stayed pursuant to *People versus Lopez* [(2005) 34 Cal.4th 1002 (*Lopez*)]."

Austin and the Attorney General maintain that, under *Lopez*, the trial court should have stricken the gang enhancement instead of staying it. We agree. (See *Lopez*, *supra*, 34 Cal.4th at p. 1011 [finding error in applying the 10-year gang enhancement to the defendant's first degree murder conviction and ordering the enhancement "delete[d]" from the sentence]; *People v. Arauz* (2012) 210 Cal.App.4th 1394, 1404 [striking the 10-year gang enhancements imposed on life terms].) We have already determined that Austin's sentence must be reversed and his case remanded for the trial court to exercise its independent discretion on whether to strike the prior conviction enhancements. On remand we also order the trial court to strike the 10-year gang enhancement on Austin's conviction for count 1 and resentence Austin. (*Lopez*, at p. 1011.)

F. *Corrections to Garcia's Minute Order*

We "may correct clerical errors at any time" to make the court's " 'records reflect the true facts.' " (*People v. Mitchell* (2001) 26 Cal.4th 181, 185.) Although the parties did not raise this error, we order the trial court to correct Garcia's minute order for June 7, 2016, which incorrectly states that the jury found true the gang allegation for count 1.[65]

---

[65] For the trial court's benefit at Garcia's resentencing, we note errors in the original abstracts of judgment and sentencing minute order. The abstract of judgment for the

# DISPOSITION

The judgment against Garcia is reversed and the matter remanded to the trial court. Garcia's convictions are affirmed. Upon remand, the trial court shall strike the sentence enhancement imposed under section 667.5, subdivision (b) and shall resentence Garcia accordingly. The matter is also remanded for the trial court to determine whether Garcia had an adequate opportunity to make a record of information that will be relevant to his eventual youth offender parole hearing, and, if not, to allow the parties the opportunity to make a record of such information pursuant to *Franklin*, *supra*, 63 Cal.4th 261. (Pen. Code, §§ 3051 & 4801.) After resentencing, the trial court is directed to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation. The trial court is also ordered to correct Garcia's minute order for June 7, 2016, to indicate that the jury found not true the gang allegation for count 1 in his case.

In Austin's case, we reverse the judgment imposing a sentence of life without the possibility of parole, vacate the special circumstance finding, and remand the case to the trial court so that the People may elect whether to retry Austin on the special circumstance allegation. Austin's convictions are otherwise affirmed.

At Austin's resentencing, the trial court should decide whether to exercise its discretion to strike any of the prior conviction enhancements under section 667(a) and shall also strike the 10-year gang enhancement (§ 186.22, subd. (b)(1)(C)) on count 1. After resentencing, the trial court is directed to forward an amended abstract of judgment to the Department of Corrections and Rehabilitation.

---

indeterminate term erroneously states that the crime of conviction for count 1 is "2nd degree murder" under section "187(a)." Similarly, Garcia's minute order for July 8, 2016 incorrectly states that Garcia was sentenced on count 1 to 25 years to life for a violation of second degree murder ("PC 187(A)/2nd"). Garcia, however, was convicted of and sentenced for first degree murder under sections 187 and 189. In addition, on Garcia's original abstract of judgment for the determinate terms, the box in item 7 should have been checked to indicate that he received an indeterminate term in addition to the determinate terms.

103

_____
                DANNER, J.



I CONCUR:




_____
GROVER, J.




**H043870 -** *The People v. Garcia*
**H044073 -** *The People v. Austin*

# Mihara, Acting P. J., Dissenting and Concurring.

While I agree that the judgment as to DeAngelo Joseph Austin must be reversed, my analysis differs from that of the majority opinion. In my view, the trial court prejudicially erred in instructing the jury on the actual killer theory with CALCRIM No. 730 because there was not substantial evidence that Austin was the actual killer of Mr. Raveesh Kumra and this instruction permitted the jury to rely on the prosecutor's legally invalid theory. In addition, while, like the majority opinion, I would reject Austin's challenges to the gang enhancement findings, I would not reach the merits of most of his challenges because he forfeited these claims by failing to obtain an express ruling on them from the trial court.[1] I also would not address any sentencing issues as to Austin since we are reversing the judgment. As to Javier Ruben Rodriguez Garcia, I agree that the judgment should be reversed and the matter remanded for resentencing and a *Franklin* hearing.

## I. Special Circumstance

### A. The Statute

"The penalty for a defendant who is found guilty of murder in the first degree is death or imprisonment in the state prison for life without the possibility of parole if one or more of the following special circumstances has been found under Section 190.4 to be true: [¶] . . . [¶] (17) The murder was committed while the defendant was engaged in, or was an accomplice in, the commission of, attempted commission of, or the immediate flight after committing, or attempting to commit, the following felonies: [¶]

---

[1] Although the Attorney General did not pursue a forfeiture argument, Austin addressed forfeiture in his opening brief. Consequently, the forfeiture issue has been briefed.

(A) Robbery in violation of Section 211 or 212.5. [¶] . . . [¶] (G) Burglary in the first or second degree in violation of Section 460." (Pen. Code, § 190.2, subd. (a)(17).[2]

Section 190.2 further provides: "(b) Unless an intent to kill is specifically required under subdivision (a) for a special circumstance enumerated therein, an *actual killer*, as to whom the special circumstance has been found to be true under Section 190.4, need not have had any intent to kill at the time of the commission of the offense which is the basis of the special circumstance in order to suffer death or confinement in the state prison for life without the possibility of parole. [¶] (c) Every person, not the actual killer, who, with the intent to kill, aids, abets, counsels, commands, induces, solicits, requests, or assists any actor in the commission of murder in the first degree shall be punished by death or imprisonment in the state prison for life without the possibility of parole if one or more of the special circumstances enumerated in subdivision (a) has been found to be true under Section 190.4. [¶] (d) Notwithstanding subdivision (c), every person, not the actual killer, who, with reckless indifference to human life and as a major participant, aids, abets, counsels, commands, induces, solicits, requests, or assists in the commission of a felony enumerated in paragraph (17) of subdivision (a) which results in the death of some person or persons, and who is found guilty of murder in the first degree therefor, shall be punished by death or imprisonment in the state prison for life without the possibility of parole if a special circumstance enumerated in paragraph (17) of subdivision (a) has been found to be true under Section 190.4." (§ 190.2, italics added.)

Thus, the robbery-murder or burglary-murder special circumstance may be found true under any of three theories. First, it may be found true as to the actual killer even if the actual killer did not have the intent to kill. Second, it may be found true as to a person who is not the actual killer but who, with the intent to kill, aids and abets the actual killer in a first degree murder. Third, it may be found true as to someone who was

---

[2] Subsequent statutory references are to the Penal Code unless otherwise specified.

not the actual killer and did not have the intent to kill if that person was an aider and abettor of the felony, was a major participant in the felony, and acted with reckless indifference to human life.  In this case, the prosecution pursued only the first and third theories.

## B.  The Evidence Presented At Trial

Austin's sister was a prostitute, and Mr. Kumra was her client for many years. She took Austin to Mr. Kumra's Monte Sereno home several times over the years. Although she saw Mr. Kumra frequently until the end of 2011, she was unaware that he had any "medical issue[s]."  At the end of November 2012, Austin queried his sister about Mr. Kumra, indicating that he planned to rob Mr. Kumra.  Austin drove by the Kumra home early on the day of the robbery.  Austin's sister made a sketch of the Kumra home to facilitate the robbery, and Austin picked up the sketch from her later that day while accompanied by two other men.

On the evening of the robbery, Austin called his sister and told her that Mr. Kumra was drinking.  She admonished him "not to do too much, to be careful . . . ."  When Austin entered the bedroom of Mr. Kumra's ex-wife, Mrs. Harinder Kumra, she woke up and started screaming.  Austin responded to her screaming by hitting her in the face with his cell phone, which cut her lip, and telling her to stop screaming.[3]  Austin threatened Mrs. Kumra, told her to go to the kitchen, and followed her to the kitchen, where Austin's compatriots were beating Mr. Kumra.  Mr. Kumra was "struggling" with his hands "tied" behind his back, and Mrs. Kumra saw him on the ground face down just before something was tied around her eyes to cover them.

Mrs. Kumra told a person who was "sitting in a chair" in the kitchen that Mr. Kumra "is a heart patient.  Don't do that.  He'll die.  And they didn't listen."

---

[3]   Mrs. Kumra needed stitches for the cut to her lip caused by Austin striking her face.

Mrs. Kumra's mouth was covered with tape, but she was still able to speak. Mrs. Kumra heard at least three men in the house while she was in the kitchen. After an hour or two, Mrs. Kumra became concerned that Mr. Kumra was not moving, and she mentioned her concern to the person in the chair. She heard him get up, and he then told her: "Don't worry. If needed, we'll call 911 or something like that." Eventually the men told her that they were leaving. Mrs. Kumra managed to free herself and discovered that all but one of the telephones had been disconnected. She used that phone to call 911. When the police arrived, Mr. Kumra had no pulse, was cold to the touch, and was unresponsive. He was "hogtied" and lying on his stomach. Duct tape was "wrapped around [Mr. Kumra's] head." "The tape had been wrapped around his head several times covering his mouth and almost up to his nasal passage." A police officer "tried to remove the tape from around his mouth" in an effort to "clear the airway," and he rolled Mr. Kumra over on his back. Mr. Kumra showed "[n]o signs of life." Mrs. Kumra asked the police to show her Mr. Kumra, and she saw that "it was so much mask on him that even his nose, everything was masked. His whole face was masked." His face and head had numerous abrasions, bruises, and lacerations, including lacerations on his inner lip. He had a bruise on his arm and an abrasion on his abdomen. The injuries to his head had been caused by blunt force trauma. Mr. Kumra's "cause of death was probable asphyxia due to suffocation due to duct tape over mouth." Other "contributory conditions" were "[s]leep apnea, deviated nasal septum, coronary artherosclerosis, and hypertensive cardiovascular disease."

A pair of tan sweatpants and a tape roll were found in the family room, which was adjacent to the kitchen where Mr. Kumra's body was found. The sweatpants were found on the family room floor, while the tape roll was found on the family room's fireplace

4

mantel.[4]  Austin's DNA was found on the edge of a piece of tape attached to these sweatpants and on the edges of the tape roll.  DNA possibly belonging to Mr. Kumra was also found on the edge of the piece of tape attached to the sweatpants.  DNA possibly belonging to both Mr. and Mrs. Kumra was found on the edges of the tape roll.  Marcellous Drummer's DNA was found on Mr. Kumra's hand.

The day after the robbery, Austin told his sister:  "Man, shit went crazy.  It was, like, somebody was hitting him.  [He] was trying to fight back.  His wife was screaming, saying that, whatever he owes, I'll pay it."  Austin told his sister that he "touched [Mr. Kumra]" and "thought that he was dead."  Drummer told Austin's sister that he "didn't do anything.  I was just, like, sitting, like, watching them."

Austin testified at trial and admitted that he was one of the men who committed the home invasion robbery of the Kumra home.  Austin admitted that his sister had told him to "be careful" because Mr. Kumra was old and asked Austin not to hurt Mr. Kumra.  He testified that he gave her his word that he "wasn't going to hurt nobody," and that he would "be careful with him."  His sister told him nothing about Mr. Kumra having any medical conditions.  Austin did not think that Mr. or Mrs. Kumra would resist the robbery; he thought it was "just going to be easy."  He told the other men "to be careful with the dude," and he also told them that there "was no need for no gun or no knife" because it was "going to be more like a piece of cake . . . ."  Austin did not know if any of the other men had ever killed anyone.

Austin knew when he arrived at the Kumra home that day that there were people present in the house.  He saw Mr. Kumra "swigging" alcohol before he entered the house.  One of the men had brought duct tape, but it was left in the car until one of them asked Austin to retrieve it.  He did so.  He handed it to one of the other men to bring into the

---

[4]    These were not the pants Mr. Kumra was wearing at the time of the robbery because his body was fully clothed, including shirt, pants, and shoes, when the autopsy began.

5

house.  After he retrieved the duct tape, Austin put on gloves and wore them throughout the rest of the robbery.  Austin knew that the other men were going to use the duct tape to tie up Mr. Kumra and that they were going to "cover his mouth" with duct tape.  Austin knew it was likely that Mr. Kumra would be physically touched and threatened during the robbery.  Austin told the other men:  "[T]his is going to be easy.  He's not going to fight back.  Just go over there and just get him.  And I'll go get the safe and we're out of here."

When they entered the house, Austin went immediately to the room where he expected to find the safe and instead encountered Mrs. Kumra.  He was surprised to find her there.  Austin admitted that he struck Mrs. Kumra, and he claimed that he did so because she "was grabbing on me" and "screaming belligerently."  He claimed that he was holding his phone in his left hand and struck her with his right "fist."  Immediately after striking her, he "felt bad" because he saw the injury to her lip.

When Austin brought Mrs. Kumra into the kitchen, one man was using duct tape on Mr. Kumra and the other man was holding Mr. Kumra.  Austin denied participating in the duct taping or binding of either Mr. or Mrs. Kumra.  Austin told the others to "be careful with her," and left the kitchen.  He did not hear Mrs. Kumra say anything at all at that point.  Austin testified that he "wasn't present" to see "what happened to Mr. Kumra."  When he left Mrs. Kumra in the kitchen, the other men were "holding" Mr. Kumra, and Mr. Kumra was "moving around" and "yelling."

Austin was aware that as the other men were "were putting the tape on him" they were "hitting him" in response to him fighting back.  He did not supervise the other men, did not intervene, and did not observe precisely where the duct tape was being applied.  At the end of the robbery, Austin returned to the "family room area" and saw Mr. and Mrs. Kumra.  Mrs. Kumra was "moving around and crying."  Mr. Kumra was not moving, and it was clear to Austin that the other men had hit Mr. Kumra and that he was dead.  He "got scared" and left the Kumra home.

## C. The Court's Instructions

The trial court's *felony-murder* instructions included a causation instruction identical to CALCRIM No. 240, which told the jury the meaning of "causes death." "An act causes death if the death is the direct natural and probable consequence of the act and the death would not have happened without the act. [¶] A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] There may be more than one cause of death. An act causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death."

The court's *special circumstance* instructions contained no causation instruction. CALCRIM No. 730, the special circumstance instruction concerning the "actual killer" theory, told the jury: "Each defendant is charged with a special circumstance of murder committed while engaged in the commission of a robbery in violation of Penal Code Section 190.2(a) (17). [¶] To prove that this special circumstance is true, the People must prove that: [¶] (1) The defendant committed or aided and abetted or was a member of a conspiracy to commit a robbery; [¶] (2) The defendant intended to commit or intended to aid and abet the perpetrator in committing or intended that one or more members of the conspiracy commit robbery and; [¶] (3) The defendant *did an act that caused the death of another person*." (Italics added.) CALCRIM No. 730 did not use the words "actual killer."

CALCRIM No. 703, the special circumstance instruction concerning the major participant/reckless indifference theory, told the jury: "If you decide that a defendant is guilty of first degree murder but was not the actual killer, then, when you consider the special circumstance, you must also decide whether the defendant acted either with the intent to kill or with reckless indifference to human life. [¶] In order to prove this special

7

circumstance for a defendant who is not the actual killer who is guilty of first degree murder as an aider and abettor or a member of a conspiracy, the People must prove either that the defendant intended to kill or the People must prove all of the following: [¶] (1) The defendant's participation in the crime began before or during the killing; [¶] (2) The defendant was a major participant in the crime and; [¶] (3) When the defendant participated in the crime, he acted with a reckless indifference to human life. A person acts with reckless indifference to human life when he knowingly engages in criminal activity that he knows involves a grave risk of death. The People do not have to prove that the actual killer acted with the intent to kill or with a reckless indifference of human life in order for the special circumstance to be true. [¶] . . . [¶] If the defendant was not the actual killer, then the People have the burden of proving beyond a reasonable doubt that he acted either with the intent to kill or with reckless indifference to human life and was a major participant in the crime for the special circumstance to be true. If the People have not met this burden, you must find the special circumstance has not been proved true."

## D. Arguments To The Jury

The prosecutor argued to the jury regarding the murder count: "And so when you tape him up and you cover his mouth and you cover his nose, these are substantial factors in his death. In fact, these are what caused his death. They are more than just substantial factors. It's what caused his death."

In arguing to the jury regarding the special circumstance, the prosecutor told the jury to "[s]tart by looking at 730." "To prove it's true, there are two ways. 730 is the first one. Committed robbery or was in the conspiracy or aided and abetted, intended to commit robbery, and the defendant did an act that caused the death of another person. This is the instruction you use to find DeAngelo Austin guilty. I'm sorry, to find the special circumstance true, that he did an act that caused the death of another person. At

8

the minimum, at his minimizing level of his guilt, he gave the duct tape which was the instrumentality of death."

The prosecutor also told that the jury that it could consider "a second version. . . . If you don't believe that 730 applies to Mr. Austin or if you don't believe it applies to Mr. Garcia, which I would argue I have not proved that Mr. Garcia engaged in the acts that caused the death. So this is what you would use for Mr. Garcia. There's no evidence that he handed over the tape." "I do not have to prove the actual killer acted with an intent to kill." "[If] [y]ou can't agree whether they're the actual killers, what I'm telling you to do. If 730 doesn't apply to Garcia, go to 703. In order to find it true, either acted with an intent to kill. There's no evidence of that. [¶] Or find that he acted with a reckless indifference and was a major participant in the crime."

After urging the jury to apply CALCRIM No. 703 to Garcia, the prosecutor told the jury that "of course, you can use all this for Mr. Austin as well, except he has so many more yes answers [regarding the factors to consider in making a determination on the reckless indifference issue] based on his own planning and involvement." "Mr. Austin told you he was told that he instructed he's old and don't hurt, but he did no supervision of the people he had brought. He didn't care what happened to Mr. Kumra or Mrs. Kumra. That's what his actions tell you. Mr. Kumra's on the floor after being beaten, which wasn't supposed to happen. No one was to get hurt. [¶] So does he stay there to honor the promise to his sister? No."

Austin's trial counsel limited his closing argument to the special circumstance and the gang allegations. He argued: "The actual killer, that is, the people that applied the tape to Mr. Kumra, hit Mr. Kumra, and killed him are actual killers. Kevin Smith [(the prosecutor)], as I will demonstrate to you, is glossing over this. And, . . . he is dead wrong on this issue." "[The prosecutor] argued to you . . . that you could find DeAngelo Austin to be the actual killer because he brought the tape and gave the tape to someone. No. That's dead wrong. That's not the law. And if you carefully study the two jury

9

instructions that are in play here, 703, 730, which applies to the actual killer special circumstance and 703, which I'll go through with you, clearly, Mr. Austin is not the actual killer. [¶] 730, which applies to the actual killer says as part of the instruction that the actual killer is a person that did an act that caused the death of another by definition did the deadly attack, [not] did provide the equipment, provide the tools, but did the deadly act. It's not DeAngelo Austin. Mr. Kevin Smith knows that. He can't prove who did the deadly act of beating and binding Mr. Kumra. [¶] And instruction 703, which talks about the potential liability for the special circumstance of someone who is not the actual killer, but participated, 703, the actual instruction, talks about the actual killer again and again and again. [¶] So the law distinguishes between the actual killer, the person who commits the deadly act, and someone who facilitates it such as by giving the tape to the actual killers."

"Mr. Kevin Smith cannot suggest to you that bringing the tape which facilitated the actual killer's conduct makes DeAngelo Austin the actual killer. He's not. So his liability and his conduct must be judged by the instruction 703 . . . ." "Again, when Kevin Smith, if he tries it again, if he gets up here again and says you can find the special circumstance to be true against DeAngelo Austin because he provided the tape, you must shake your head and say, No, you're wrong about that. We paid attention to these instructions. He was not the actual killer." Austin's trial counsel conceded that Austin "was a major participant in the crime. Of course he was. It was his idea." But he argued at length that Austin did not act with reckless indifference.

The prosecutor's closing argument returned to his contention that CALCRIM No. 730 applied to Austin because "he handed over the tape, which was a lethal instrument and that's good. [¶] But in reality, he did so much more." "Tape does not ordinarily kill people . . . but in this case . . . the tape did kill." "This wasn't the simple let's just put a piece of tape on someone's mouth and we're done. They taped it around and around and around. Feet. Mouth. Nose. Head. And this tape was, in fact, lethal. [¶] The

10

defendant did an act that caused the death of another person either by handing over the tape [to] who used the tape or by taping it himself.  How else did his DNA get on the feet?[5]  Do you think that the tape around the legs on the tan pants was the first spot that Mr. Kumra was taped?  Or would it have been on his mouth?  Or his eyes?  Or his hands?  [¶]  The only explanation could be it just so happened the first piece of tape that they used was on that front surface.  Picture a round tape roll, that little bit.  What's that circumference of the circle in that one layer of tape.  That would have had to have been how it got there."  The prosecutor also argued that Austin had acted with reckless indifference:  "Well, in this case, the lethal weapon is not a gun or a knife.  It's tape.  He handed it over."

### E.  My Disagreement With the Majority Opinion

I cannot concur in the majority opinion's analysis of the special circumstance issue, even though I agree that the trial court prejudicially erred with respect to the special circumstance, because I disagree with the majority opinion's conclusion that

---

[5]  This was inaccurate.  Austin's DNA was not found on Mr. Kumra's "feet."  Some of the prosecutor's arguments about Austin's DNA were reasonable inferences from the evidence, but others were not.  The prosecutor argued that Austin's DNA was "on that tape that was used to kill Raveesh Kumra," which was true only in the sense that Austin's DNA was on the tape roll, and tape from the tape roll was used to kill Mr. Kumra.  The prosecutor accurately argued that "Mr. Austin's DNA is on the tape with Mr. Kumra's;" both of the spots where Austin's DNA was found also possibly had Mr. Kumra's DNA.  But the prosecutor also claimed that Austin's DNA was "on three separate spots" including "the tape on the body," and that "Mr. Austin's [DNA] was found on the hand of Mr. Kumra."  Austin's DNA was found on only the tape roll and the edge of a piece of tape on the tan pants.  These pants were not on Mr. Kumra, but were instead lying on the family room floor.  There was no evidence that Austin's DNA was found anywhere on Mr. Kumra's body.  The prosecutor's misrepresentations about the DNA evidence were consistent with his inaccurate opening statement claim that the evidence would show that there was "duct tape removed from Ravi Kumra's body that had DNA from DeAngelo Austin on it."  However, because Austin's trial counsel did not object to any of these misrepresentations and Austin does not contend on appeal that the prosecutor engaged in misconduct by making these remarks, there is no need to address them further.

11

substantial evidence supported the trial court's instruction of the jury with CALCRIM No. 730.

The majority opinion concludes that there was sufficient evidence presented at trial to support an actual killer theory on the special circumstance because, based on reasonable inferences, the jury could have concluded beyond a reasonable doubt that "Austin himself placed tape on [Mr. Kumra's] face, resulting in [Mr. Kumra's] asphyxiation." (Maj. opn., *ante*, at p. 22.)  The majority opinion reasons that "DNA evidence suggested" that Austin "participated in taping" Mr. Kumra. (Maj. opn., *ante*, at p. 22.) Yet no evidence that the majority opinion identifies could support a finding beyond a reasonable doubt that *Austin himself placed the tape over Mr. Kumra's mouth*.

I agree with the majority opinion that the evidence demonstrated that Austin "personally handled the roll of duct tape," that he testified that he put on gloves after doing so, and that no evidence was presented concerning any DNA found on the tape on Mr. Kumra's mouth.  (Maj. opn., *ante*, at p. 22.)  I do not agree that reasonable inferences based on these facts may support a finding beyond a reasonable doubt that Austin put the tape on Mr. Kumra's mouth.  The majority opinion reaches this conclusion by stacking a series of inferences.  One, since there was no evidence presented at trial that perpetrator DNA was found on the tape on Mr. Kumra's mouth, there must not have been any DNA on that tape.  Two, since there was no DNA on that tape, whoever put that tape on Mr. Kumra's mouth wore gloves.  Three, because Austin testified he wore gloves, he was present in the kitchen before Mr. Kumra was taped, he was the planner of the robbery, and Mrs. Kumra's eyes were covered so that she could not see who placed tape on Mr. Kumra's mouth, a jury could reasonably conclude beyond a reasonable doubt that Austin placed the tape on Mr. Kumra's mouth.

Substantial evidence is "evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)

12

"'[A] reasonable inference . . . "may not be based on suspicion alone, or on imagination, speculation, supposition, surmise, conjecture, or guess work. [¶] . . . A finding of fact must be an inference drawn from evidence rather than . . . a mere speculation as to probabilities without evidence." [Citation.]'" (*People v. Davis* (2013) 57 Cal.4th 353, 360.)

The prosecution's *failure* to prove that any perpetrator's DNA was on the tape over Mr. Kumra's mouth coupled with Austin's (and his coperpetrators') use of gloves plus the *absence* of any other evidence that Austin, rather than one of his coperpetrators, placed tape on Mr. Kumra's mouth, is an evidentiary void, not a solid and credible basis for a reasonable inference. It is true, of course, that the evidence was not inconsistent with the possibility that Austin was the person who put the tape over Mr. Kumra's mouth, but that is merely a basis for speculation. A reasonable inference cannot support a finding beyond a reasonable doubt when it is based on the *nonexistence* of evidence, rather than the *existence* of evidence. For a reasonable inference to support a finding beyond a reasonable doubt, the evidence upon which the inference is based must be "solid" and "credible," not mere speculation. Here, the majority opinion draws inferences that are based on speculation, not *evidence*. As I explain below, I would find insufficient evidence to support an actual killer theory.

### F. My Analysis
#### 1. CALCRIM No. 730: Instruction on Actual Killer Theory

Austin claims that the trial court prejudicially erred by instructing the jury on the actual killer theory with CALCRIM No. 730 without including CALCRIM No. 240, which defines causation, because CALCRIM No. 730 by itself permitted the prosecutor to argue a *legally invalid* theory—that Austin's conduct in handing the duct tape to others was alone sufficient to make him the actual killer. He contends: "CALCRIM 730 was susceptible to the prosecutor's argument because the trial court failed to accompany it

13

with instruction on causation, (CALCRIM 240), so that the jury was not informed that an act causes death if death 'is the direct, natural, and probable consequence of the act.' As a result the jury was not equipped with the guidance necessary to determine the truth of the special circumstances enhancement provided by CALCRIM 730." Austin contends that this was "classic instructional error on a legally invalid theory . . . ." He argues that this error was prejudicial because "[t]he foreseeability of the death that occurred was a key issue in this case" and "the prosecutor argued an invalid legal theory" when he told the jury that the fact that Austin "gave the duct tape" was sufficient to establish that he caused Mr. Kumra's death. Austin asserts that there was insufficient evidence to support the actual killer theory.

The Attorney General contends that the prosecutor's theory that Austin was the actual killer based on his act of handing the tape to another was not invalid. He argues that this act could "properly" be found to have "proximately caused the death because there was no superseding or intervening cause of death." Even if the actual killer theory argued by the prosecutor was invalid on the facts of this case, the Attorney General argues that any error was harmless because the same fact—Austin handing the duct tape to his accomplices—necessarily established reckless indifference. He also argues that the actual killer theory was at worst a factually inadequate theory rather than a legally inadequate theory.

Austin's attack on the trial court's instructions proceeds in part on an invalid premise—that the trial court failed to give CALCRIM No. 240 or its equivalent in connection with the special circumstance instruction.[6] The court *did* instruct with the

_____

[6] The California Supreme Court has declined to decide whether the term "actual killer" should be defined and coupled with a causation instruction in connection with a special circumstance. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 932 (*Covarrubias*).) In that case, the standard instruction used the words "defendant actually killed a human being." (CALJIC No. 8.80.1.) The court held that any error was harmless under *People v. Watson* (1956) 46 Cal.2d 818 (*Watson*). (*Covarrubias*, at p. 932.)

14

precise content of CALCRIM No. 240 as part of the court's instructions on first degree felony murder.[7] Austin does not claim that the court's instructions would in any way have suggested to the jury that the causation instruction applied *only* to felony murder but *not* to the special circumstance.[8] And he expressly disclaims that he is making any claim of prosecutorial misconduct on appeal. (See fn. 5, *ante*.) What remains is his argument that the trial court erred in giving CALCRIM No. 730 because the evidence was insufficient to support instruction on the actual killer theory and this instruction permitted the jury to embrace the prosecutor's legally invalid theory that Austin could be found to have been the actual killer based solely on his act of handing the duct tape roll to one of his confederates.

### a. Error in Instructing Jury on Actual Killer Theory

Section 190.2, subdivision (b) does not define "actual killer." (§ 190.2, subd. (b).) CALCRIM No. 730, the pattern instruction that the trial court utilized, does not use the words "actual killer." Instead, CALCRIM No. 730 substitutes for "actual killer" the phrase "[t]he defendant did an act that caused the death of another person." The causation instruction given to the jury, which was identical to CALCRIM No. 240, defined what is meant by "act causes death." "An act causes death if the death is the

---

[7] CALCRIM No. 240 is a general instruction on causation: "An act [or omission] causes (injury/ <insert other description>) if the (injury/ <insert other description>) is the direct, natural, and probable consequence of the act [or omission] and the (injury/ <insert other description>) would not have happened without the act [or omission]. A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all the circumstances established by the evidence. [¶] <Give if multiple potential causes.> [¶] [There may be more than one cause of (injury/ <insert other description>). An act [or omission] causes (injury/ <insert other description>), only if it is a substantial factor in causing the (injury/ <insert other description>). A substantial factor is more than a trivial or remote factor. However, it does not have to be the only factor that causes the (injury/ <insert other description>).]" (CALCRIM No. 240.)

[8] The Attorney General also fails to observe that the trial court actually instructed the jury with precisely the content of CALCRIM No. 240.

direct natural and probable consequence of the act and the death would not have happened without the act." Austin claims that the trial court's instruction of the jury with CALCRIM No. 730 was erroneous because substantial evidence did not support the actual killer theory and, alternatively, the court should have used the phrase "actually killed" instead of the phrase "did an act that caused the death of another person."

Because there was not substantial evidence that Austin did any "act" of which the "direct natural and probable consequence" was Mr. Kumra's death within the meaning of section 190.2, subdivision (b), it is not necessary in this case to address Austin's claim that CALCRIM No. 730's language is erroneous. It was undisputed that Mr. Kumra's death was caused by the tape over his mouth: the direct consequence of the tape over his mouth was his death. No direct or circumstantial evidence was presented that Austin himself put the tape over Mr. Kumra's mouth or told anyone to do so. While the bringing of the duct tape into the Kumra home was part of the complete chain of events that led to Mr. Kumra's death, the same could be said for the decision to rob the Kumra home. The special circumstance is not intended to apply to all those who commit felony murder. (*Enmund v. Florida* (1982) 458 U.S. 782, 797 ["the death penalty . . . is an excessive penalty for the robber who, as such, does not take human life."].) The evidence in this case simply could not support a finding that Mr. Kumra's death was the "*direct* natural and *probable* consequence" of Austin's act of handing the duct tape to one of his compatriots.

Nor was there any other evidence that Mr. Kumra's death was the "*direct* natural and probable consequence" of any of Austin's other acts or a combination of those acts and the handing over of the duct tape. The evidence demonstrated that Austin planned the robbery, selected his compatriots, ensured that duct tape was brought into the Kumra home, knowing that his compatriots would use the duct tape to bind Mr. Kumra, including covering his mouth with duct tape, and was present when Mr. Kumra was initially restrained and when he was assaulted. However, there was no evidence that

16

Austin applied duct tape to Mr. Kumra's mouth or directed anyone to do so. The absence of such evidence eliminated the possibility that the actual killer theory could properly be applied to Austin under CALCRIM No. 730 and the causation instruction as given to the jury.

The Attorney General insists that the actual killer theory was supported by the evidence because the jury could have concluded that Austin "proximately caused the death." He relies on *People v. Pock* (1993) 19 Cal.App.4th 1263 (*Pock*). In *Pock*, the defendant and his compatriots carried guns during a series of home invasion robberies, and the defendant repeatedly threatened to shoot and kill the victims. (*Id*. at pp. 1267-1270.) During one of the robberies, the defendant shot the victim multiple times, and one of his compatriots also shot the same victim, who died. (*Id.* at p. 1270.) There was evidence that one of the defendant's shots, a wound to the chest through the heart, was the fatal wound, but there was also evidence that all of the wounds contributed to the victim's death. (*Id*. at p. 1271.) The prosecution's theory was that the defendant was the actual killer even if his bullet was not the fatal one. (*Id*. at p. 1272.)

The jury in *Pock* was instructed on the actual killer theory and told: " 'The term actual killer is defined as follows: Any person whose conduct proximately causes the death of another is an actual killer.' . . . 'There may be more than one proximate cause of the crime of murder. When the conduct of two or more persons contributes concurrently as a proximate cause of the death the conduct of each is a proximate cause of the murder if that conduct was also a substantial factor contributing to the result. A cause is concurrent if it was operative at the moment of the murder and acted with another cause to produce the death. [¶] If you find that the defendant's conduct was a proximate cause of death to another person, then it is no defense that the conduct of some other person contributed to the death.' " (*Pock*, *supra*, 19 Cal.App.4th at pp. 1272-1273.) On appeal, the defendant contended that the trial court had erred in giving this instruction. (*Id*. at pp. 1271-1272.) The Second District Court of Appeal concluded that "given the unique facts

17

present" in the case, the instruction "adequately informed the jury of the applicable law on liability with respect to a special circumstance finding." (*Id.* at p. 1274.) It also found that any error was harmless "under any standard" because the evidence established that the defendant shot the victim at least twice. (*Id.* at p. 1277.)

It is difficult to understand what proposition the Attorney General believes *Pock* stands for that is relevant to this case. The defendant in *Pock*, unlike Austin, personally inflicted a gunshot wound on the victim that was either *the* cause of death alone or a contributing cause of the death in combination with other gunshot wounds. The Second District could have therefore considered it appropriate for the trial court to have instructed the jury on multiple concurrent causes. This case is not remotely similar. Austin did not inflict a fatal wound or a potentially fatal wound that, in combination with other wounds, caused Mr. Kumra's death. This case did not involve the "unique facts" in *Pock* that brought into play the law concerning multiple concurrent causes. While the Attorney General seeks to rely on various snippets from *Pock*, that language is dicta and should be disregarded.

The Attorney General's reliance on *People v. Mejia* (2012) 211 Cal.App.4th 586 (*Mejia*) is also misplaced because *Mejia* did not concern an actual killer theory of liability for a felony-murder special circumstance. The special circumstance in *Mejia* was the gang-murder special circumstance (§ 190.2, subd. (a)(22)), which explicitly requires that "[t]he defendant intentionally killed the victim" and therefore is not subject to section 190.2, subdivision (b), which sets forth the actual killer requirement and applies only where the special circumstance does not require "intent to kill." (*Mejia*, at p. 612.) The Attorney General's other citations are equally inapt. *People v. Harris* (1975) 52 Cal.App.3d 419 was a vehicular manslaughter case that did not involve any special circumstance and therefore said nothing about the meaning of "actual killer." (*Id.* at p. 426.) *People v. Armitage* (1987) 194 Cal.App.3d 405 was a felony drunk boating with death case that also did not involve any special circumstance. (*Id.* at pp. 409-410.)

18

*People v. Fiu* (2008) 165 Cal.App.4th 360 was a second degree murder case that did not involve any special circumstance. (*Id.* at p. 367.)

"It is error to give an instruction which, while correctly stating a principle of law, has no application to the facts of the case." (*People v. Guiton* (1993) 4 Cal.4th 1116, 1129 (*Guiton*).) That is precisely what happened here. The trial court erred by instructing the jury on the actual killer theory because that theory was not supported by substantial evidence. The next question is whether this error was prejudicial.

### b. Prejudice

The determination of whether Austin was prejudiced by the trial court's error turns on whether this error resulted in the presentation to the jury of a *legally* inadequate theory or only in the presentation to the jury of a *factually* inadequate theory. The resolution of this question is critical because presentation of a legally inadequate theory to the jury "is subject to the rule generally requiring reversal," while presentation of a factually inadequate theory to the jury usually "does not require reversal if at least one valid theory remains." (*Guiton*, *supra*, 4 Cal.4th at p. 1128.) What is difficult is distinguishing between the two types of inadequate theories.

There are "two types of cases involving insufficient evidence: (a) those in which 'a particular theory of conviction . . . is contrary to law,' or, phrased slightly differently, cases involving a '*legally* inadequate theory'; and (b) those in which the jury has merely been 'left the option of relying upon a *factually* inadequate theory,' or, also phrased slightly differently, cases in which there was an 'insufficiency of proof.' [Citation.] . . . [A legally] inadequate theory 'fails to come within the statutory definition of the crime.'" (*Guiton*, *supra*, 4 Cal.4th at p. 1128.) "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the

19

applicable statute, as in *Green*[9], the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, at p. 1129.) "In determining whether a legally inadequate theory was conveyed to the jury here, we must ask whether there is a ' "reasonable likelihood" ' that the jury understood [the actual killer] theory in a legally impermissible manner. [Citations.] In doing so, we consider the instructions provided to the jury and counsel's argument to the jury. [Citation.]" (*People v. Canizales* (2019) 7 Cal.5th 591, 613 (*Canizales*).)

Our determination as to whether the actual killer theory presented to the jury was legally inadequate is informed by an examination of prior cases in which courts have considered whether a theory was legally inadequate. In *Green*, the California Supreme Court held that a legally inadequate theory was conveyed to the jury. (*Green*, *supra*, 27 Cal.3d at pp. 67-70.) The trial court's instructions concerning the asportation element of kidnapping stated that the victim had to be moved " 'a substantial distance, that is, a distance more than slight or trivial,' " but the instructions gave no "further guidance" as to what distance would be sufficient. The prosecutor argued that 90 feet was a substantial distance. (*Id.* at pp. 68-69.) The California Supreme Court held that 90 feet was inadequate as a matter of law to constitute the required substantial distance. (*Id.* at p. 68.) Although there were other theories presented to the jury to support the asportation element that were based on legally adequate distances, the California Supreme Court held that reversal was required because the record did not reflect which theory the jury had relied on. (*Id.* at pp. 68-70.) The court explained that "[t]he instructions permitted the jury to [rely on the 90-foot movement]; and the district attorney expressly urged such a verdict in his argument . . . ." (*Id.* at p. 71; accord *People v. Morgan* (2007) 42 Cal.4th 593, 612-613 [similar case involving " 'substantial distance' " instruction and prosecutor's argument that 37 feet was enough].) Thus, the California Supreme Court held in *Green*

---

9       *People v. Green* (1980) 27 Cal.3d 1 (*Green*).

20

that the error was a legally inadequate theory because the instructions "permitted the jury" to find that a 90-foot movement was sufficient to support a "substantial distance" finding, and the prosecutor urged them to do exactly that even though a 90-foot movement could not lawfully support such a finding.

In *Griffin v. United States* (1991) 502 U.S. 46 (*Griffin*), the indictment alleged, as to a single conspiracy count, that the object of the conspiracy was both to defraud the IRS and to defraud the DEA. There was no evidence at trial connecting the defendant to a conspiracy to defraud the DEA. (*Id*. at p. 48.) Nevertheless, the trial court's instructions "permit[ted]" the jury to convict the defendant of conspiracy "if it found her to have participated in *either one* of the two objects of the conspiracy." (*Ibid.*) The opinion in *Griffin* did not indicate that the prosecution had in any way argued to the jury that it should convict the defendant based on the defrauding-the-DEA theory of the conspiracy. The jury found the defendant guilty of this conspiracy count, and she challenged the conviction on due process grounds, arguing that a legally invalid theory had been presented to the jury. (*Id.* at pp. 47-48.)

The United States Supreme Court held that the trial court's error in instructing on the DEA theory was not a legally inadequate theory but merely a factually inadequate theory. (*Griffin*, *supra*, 502 U.S. at pp. 59-60.) "Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law—whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error. Quite the opposite is true, however, when they have been left the option of relying upon a factually inadequate theory, since jurors *are* well equipped to analyze the evidence . . . ." (*Id*. at p. 59.) The lack of evidence to support the DEA theory was merely factual, not legal, so the error did not violate the defendant's due process rights

21

because there was sufficient evidence to support the IRS theory. (*Id.* at pp. 59-60.) The takeaway from *Griffin* is that a trial court error in instructing on a theory for which there is a lack of evidence is not by itself instruction on a legally inadequate theory. One must look at whether the jurors were "equipped" to discern the inadequacy without guidance.

*Guiton* was a case in which the defendant was charged in a single count with selling or transporting cocaine. (*Guiton*, *supra*, 4 Cal.4th at p. 1119.) The selling theory was not supported by substantial evidence. The jury was instructed on both theories. "Although the district attorney briefly argued to the jury that defendant was guilty of selling cocaine, he concentrated on the transportation theory." (*Id.* at p. 1131, fn. omitted.) The jury returned a guilty verdict on this count. (*Id.* at p. 1120.) The Court of Appeal found that reversal was required under *Green*. The California Supreme Court granted review and disagreed. (*Guiton*, at pp. 1120-1121.)

Although the court noted that *Griffin* was "not binding on this court," it distinguished between cases governed by *Green* and cases governed by *Griffin* and harmonized the two rules. (*Guiton*, *supra*, 4 Cal.4th at pp. 1121-1126.) "If the inadequacy of proof is purely factual, of a kind the jury is fully equipped to detect, reversal is not required whenever a valid ground for the verdict remains, absent an affirmative indication in the record that the verdict actually did rest on the inadequate ground. But if the inadequacy is legal, not merely factual, that is, when the facts do not state a crime under the applicable statute, as in *Green,* the *Green* rule requiring reversal applies, absent a basis in the record to find that the verdict was actually based on a valid ground." (*Guiton*, at p. 1129.) Because the jury was "as well equipped as any court" to discern the absence of evidence to support the selling theory, the error in *Guiton* was deemed a factually inadequate theory rather than a legally inadequate theory, and therefore reversal was not required. (*Id*. at pp. 1130-1131.) The court noted that reversal might be required even in a case covered by *Griffin*. "We may, for example, hypothesize a case in which the district attorney stressed only the invalid ground in the jury argument,

22

and the jury asked the court questions during deliberations directed solely to the invalid ground. In that case, we might well find prejudice. The prejudice would not be assumed, but affirmatively demonstrated." (*Guiton*, at p. 1129.) What *Guiton* teaches us is that the mere fact that the prosecutor argued for the invalid theory does not take a case out of the *Griffin* paradigm. If the jury was "as well equipped as any court" to discern the inadequacy, the inadequacy is factual, not legal.

In *Canizales*, the defendants were charged with two counts of attempted murder, which requires a specific intent to kill. (*Canizales*, *supra*, 7 Cal.5th at p. 602.) These charges arose from a shooting during which the defendants targeted Pride. Bolden and Pride were together at the time of the shooting. Neither of them was hit by any of the shots, but a woman was fatally injured by one of the shots. (*Id.* at pp. 599-600.) The trial court gave a "kill zone" instruction, which provided "an additional, alternative ground by which to prove the requisite intent to kill" and permitted the jury to find that the defendants had the specific intent to kill if they "intended to kill everyone within the 'kill zone.'" The instructions defined "kill zone" as "a particular zone of harm." (*Id.* at pp. 597, 601, fn. 3, 603, 610.) "Beyond its reference to a 'particular zone of harm,' the instruction provided no further definition of the term 'kill zone.'" (*Id.* at p. 613.) Because the evidence "was not sufficient to support a reasonable inference that defendants intended to create a zone of fatal harm around a primary target," the trial court's "'kill zone'" instruction was not supported by substantial evidence. (*Id.* at p. 610.) Nevertheless, the prosecutor told the jury that the kill zone theory applied because "they're shooting at someone and people are within the zone that they *can* get killed" or "within the zone of fire." (*Id.* at p. 601, italics added.)

The issue before the California Supreme Court was whether the trial court had erred in instructing on the kill zone theory and whether that error was prejudicial as to the count charging attempted murder of Bolden. (*Canizales*, *supra*, 7 Cal.5th at pp. 597, 609.) The court was "troubl[ed]" by the "potential for misapplication" of the kill zone

23

theory. (*Id.* at p. 607.) It pointed out that "[t]he use or attempted use of force that merely *endangered* everyone in the area is insufficient to support a kill zone instruction." (*Id.* at p. 608.) Hence, the prosecutor's argument to the jury under the kill zone theory was inaccurate. The California Supreme Court stopped short of finding that the standard kill zone instruction given by the trial court did not correctly describe the kill zone theory, but it did hold that "the standard instruction should be revised to better describe the contours and limits of the kill zone theory." (*Id.* at p. 609.)

The prejudice issue turned on whether the court had instructed on a factually inadequate theory or a legally inadequate theory. The California Supreme Court described how this determination should be made: "In determining whether a legally inadequate theory was conveyed to the jury here, we must ask whether there is a '"reasonable likelihood"' that the jury understood the kill zone theory in a legally impermissible manner. [Citations.] In doing so, we consider the instructions provided to the jury and counsels' argument to the jury." (*Canizales*, *supra*, 7 Cal.5th at p. 613.) The court concluded that there was a reasonable likelihood that a legally inadequate theory had been conveyed to the jury. "The court's error in instructing on the factually unsupported kill zone theory, combined with the lack of any clear definition of the theory in the jury instruction as well as the prosecutor's misleading argument, could reasonably have led the jury to believe that it could find that defendants intended to kill Bolden based on a legally inaccurate version of the kill zone theory—that is, that defendants could be found guilty of the attempted murder of Bolden if [the shooter] shot at Pride knowing there was a substantial danger he would also hit Bolden." (*Id.* at p. 614.) Consequently, the error was subject to the *Green* standard of review rather than the *Griffin* standard of review. (*Canizales*, at p. 615.)

The most recent California Supreme Court case involving what the court now calls "alternative-theory error" was the court's recent decision in *People v. Aledamat* (2019) 8 Cal.5th 1 (*Aledamat*). (*Id*. at p. 9.) In *Aledamat*, the trial court had instructed the jury on

two theories under which it could find the box cutter used in an assault to be a deadly weapon. One theory was that the box cutter was an "inherently" deadly weapon. The other theory was that the box cutter had been "used" as a deadly weapon. (*Id*. at pp. 13-14.) The trial court's instruction did not define "inherently," which permitted the jury to consider the prosecution's theory that the box cutter was an "inherently" deadly weapon. That theory was legally invalid: a box cutter is not, as a matter of law, an *inherently* deadly weapon because its ordinary use is not as a weapon. (*Id.* at p. 14.) The California Supreme Court confirmed that the appropriate standard of harmless error review where there is "alternative-theory error" in presenting a legally invalid theory to the jury is harmless error review under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). The *Chapman* standard of review requires "the beneficiary of a constitutional error [(the Attorney General)] to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." (*Id*. at p. 24.)

The correct standard of harmless error review in this case is *Chapman* because the trial court's error in this case, like the errors in *Canizales* and *Aledamat*, was the presentation of a legally invalid theory to the jury. Here, the court instructed on a factually unsupported actual killer theory that *lacked a clear definition* of the nature of the connection between Austin's act and Mr. Kumra's death that would be sufficient for a true finding under that theory. And the prosecutor repeatedly argued the legally invalid theory that the act of "handing over" a "lethal instrument" to others was sufficient for the special circumstance to be found true under the actual killer theory, and he urged the jury to base its finding on the special circumstance as to Austin on this theory. "[Austin] gave the duct tape which was the instrumentality of death." "[H]e handed over the tape, which was a lethal instrument . . . ." The trial court's indefinite instructions and the prosecutor's legally inaccurate arguments necessitate the conclusion that there was a reasonable likelihood that the jury was led to believe that Austin's act of providing the "instrumentality of death" was "an act that caused the death of another person" and that

25

Kumra's "death [was] the direct natural and probable consequence of the act and the death would not have happened without the act." The question then is whether the Attorney General has met his burden of proving beyond a reasonable doubt that the jury relied solely on the reckless indifference theory in finding the special circumstance true.

The Attorney General contends that any error was harmless because "[a]ny juror who concluded that appellant gave the tape to an accomplice would necessarily have found that appellant supplied the lethal weapon and that it was used for the purpose for which it was intended against a resisting victim," which, in his view, would necessarily establish that Austin was "recklessly indifferent to the risk of death."

"Reckless indifference to human life 'requires the defendant be "*subjectively* aware that his or her participation in the felony involved *a grave risk of death*."'" (*People v. Banks* (2015) 61 Cal.4th 788, 807, italics added.) "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Id.* at p. 808.) Reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*People v. Clark* (2016) 63 Cal.4th 522, 617 (*Clark*).) It is not enough that the defendant "'simply had awareness [his] confederates were armed and [that] armed robberies carried a risk of death . . . [to establish] the requisite reckless indifference to human life.'" (*Id.* at p. 618.)

In *Clark*, the California Supreme Court identified five factors that "provide insight" in evaluating "the magnitude of the objective risk of lethal violence and a defendant's subjective awareness of that risk" in making a reckless indifference determination. (*Clark*, *supra*, 63 Cal.4th at p. 623.) One factor is the defendant's use of a lethal weapon or knowledge that lethal weapons will be used in the felony. A second factor is whether the defendant was physically present during the felony and had the opportunity to restrain his compatriots or offer aid to a victim. A third factor is the

26

duration of felony, since a longer duration increases the risk that the victims will be harmed. A fourth factor is whether the defendant knew that his compatriots were likely to kill. Finally, the fifth factor is whether the defendant took steps to minimize the risks of violence during the felony. (*Id*. at pp. 618-623.)

The simple fact that Austin handed the duct tape to his accomplices does not by itself establish that he subjectively acted with awareness of a grave risk of death. The prospect that duct tape may be used in a robbery does not ordinarily raise a grave risk of death. Thus, I cannot credit the Attorney General's claim that the presentation of the actual killer theory to the jury was harmless because any reliance by the jury on Austin's simple act of handing duct tape to a compatriot would necessarily establish reckless indifference.

Nor does the record as a whole persuade me beyond a reasonable doubt that the jury necessarily relied solely on the reckless indifference theory. Duct tape is not ordinarily considered a lethal weapon, and Austin had planned a robbery that did not involve the use of any lethal weapons. Austin was present during the robbery, which was lengthy, though it was disputed whether he was present when Mr. Kumra was taped up. No evidence was presented that Austin was aware that his compatriots were likely to kill.

As a whole, the record does not demonstrate beyond a reasonable doubt that the jury necessarily concluded that Austin was subjectively aware of the objective risk of lethal violence. While the prosecutor argued both the actual killer theory and the reckless indifference theory, the reckless indifference theory was based on a balancing of numerous factors, some of which depended on disputed evidence. The jury could have believed Austin's testimony and still found the special circumstance true on the legally erroneous actual killer theory even though it entertained a reasonable doubt about whether Austin had acted with reckless indifference to human life.

Due to the error in presenting the actual killer theory to the jury, the special circumstance finding cannot be upheld. The question of whether it may be retried

27

depends on the merit of Austin's claim that there was insufficient evidence to support the reckless indifference theory, which I turn to next.

## 2. Substantial Evidence of Reckless Indifference

The special circumstance may be found true even if the defendant was not the actual killer and did not harbor the intent to kill *if* the defendant was a major participant in the underlying felony and acted with "reckless indifference to human life" during his participation in the underlying felony. (§ 190.2, subd. (d).)

Austin concedes that he was a major participant in the robbery, but he argues that there was insufficient evidence that he acted with reckless indifference to human life. He does not contend that there was any flaw in the jury instructions on the reckless indifference theory. Indeed, his argument depends on the validity of those instructions.

As noted above, the factors relevant to determining whether Austin acted with reckless indifference to human life were disputed and mixed. A rational jury could have concluded beyond a reasonable doubt that Austin's actions in planning and carrying out the robbery demonstrated that he acted with reckless indifference. First, he planned a home invasion robbery at a time when he expected the Kumras to be home, thereby increasing the likelihood of a confrontation between the robbers and the Kumras. Second, when Austin initially encountered Mrs. Kumra during the robbery, he showed no hesitation in using force against her, inflicting a significant wound to her face, which demonstrated his willingness to inflict injury. Third, Austin was present throughout the very lengthy robbery and had the opportunity to restrain his compatriots. He saw that they had assaulted and were assaulting Mr. Kumra but did nothing to restrain them or offer aid to Mr. Kumra. The jury reasonably could have concluded that this evidence supported a finding that Austin was subjectively aware that the actions of himself and his compatriots objectively posed a grave risk of death to Mr. Kumra. As substantial evidence supported a finding of reckless indifference, the special circumstance allegation may be retried.

## II. Gang Enhancements

Austin challenges the sufficiency of the evidence to support the primary activities element of the gang enhancements and claims that the trial court prejudicially erred in admitting certain evidence related to the gang enhancements.

## A. Background

Austin did not deny that he was a member of ENT, an Oakland gang. ENT members commonly had "STUBBY" or "ENT" tattoos. When he was arrested a month after the crimes, Austin had two tattoos: "STUBBY" on one arm and "ENT" on the other arm. His friend and coparticipant, Drummer, also had two tattoos: one reading "ENT" and the other reading "MOET," which stood for money over everything. Austin admitted that he had founded ENT and had named it ENT to honor three of his dead friends, Edward Hampton, Nario Jackson, and Martin Flenaugh (who went by the moniker Taliban). Austin's coparticipant Garcia was a member of Ghost Town, another Oakland gang, which had been affiliated with ENT since at least 2010. Ghost Town's primary activities were homicides, shootings, robberies, home invasions, carjackings, and burglaries.

Oakland Police Officer Daniel Bruce testified as an expert on ENT.[10] When Bruce first started hearing about ENT, ENT had only about a dozen members, including Austin, Sean Hampton, Martin Flenaugh, and Ronny Flenaugh.[11] Bruce had made personal contact with Austin more than 20 times, beginning in 2008, and Austin was almost always with other ENT associates on those occasions. In 2011 and 2012, a subset of

---

[10] There were no objections to qualifying Bruce as a gang expert.
[11] Austin's trial counsel did not object to testimony that these individuals were members of ENT.

ENT using the name "Money Team" consisted of Austin, Sean Hampton, Tyrell Powell, Gregory Jefferson, and Frederick Manning.

Although Bruce did not join the Oakland "gang unit" until 2013, after the 2012 offenses at issue here, he had been working on ENT cases for several years before that.[12] He had gained extensive knowledge about ENT from his personal discussions with 20 admitted ENT members, and his experience "work[ing]" "dozens" of crimes "related to ENT" between 2010 and 2013, more than 50 such crimes in 2013, and "hundreds" since then. ENT's "image" "has been one of wealth, high-end luxury vehicles, high-end clothing, high-end jewelry, and the flashing of large amounts of currency."

The following colloquy occurred during the prosecutor's direct examination of Bruce without objection: "Q. What in your opinion is ENT's primary activities? [¶] A. The primary being at the moment of ENT is committing burglaries and home invasions as well as robberies and shootings or murders. [¶] Q. And when you say, 'burglaries,' are they specific types? [¶] A. Typically, ENT was known for doing burglaries of Asian and East Indian homes. [¶] Q. Those would be residential burglaries. Correct? [¶] A. Correct."

Bruce testified about "ENT videos" that had been found on YouTube and referred to ENT, large amounts of money, and duct tape. Bruce testified that, "based off all the investigations I've done where the ENT gang was the primary," it was his "opinion" that ENT had "engaged in a pattern of criminal activity." When asked to narrow his answer to ENT's activities "prior to 2013," he expressed the same opinion. He also expressed the opinion that Austin was a member of "the ENT criminal street gang" at the time of the November 2012 offenses. Bruce based this opinion on his "last six years" of

---

[12] During voir dire, Bruce testified that he was involved in a 2013 investigation of ENT. Austin's trial counsel's relevance objection to this voir dire testimony was overruled. Bruce testified without objection about things he had heard about ENT during his 2013 wiretap investigation. He also testified without objection that ENT had over a hundred members and that most of the original dozen members were in custody or dead.

experience with ENT and Austin.  Although Bruce had never met Drummer, he identified numerous social media postings associated with Drummer that concerned ENT and its members.  Bruce expressed the opinion, based on these social media posts, that Drummer was an ENT member.

Bruce also testified about the two predicate ENT offenses.  The June 2012 predicate was a home invasion robbery in concert with the use of a firearm committed by Ronny Flenaugh.  Bruce testified that he was "personally involved" in that case because he could identify the vehicle in that case as being associated with Ronny Flenaugh.  He testified that Ronny Flenaugh was an ENT member at that time based on "prior contacts" and his association with other ENT members.  Bruce had also investigated Ronny Flenaugh for other crimes.  Bruce also testified about a January 2012 predicate committed by Jefferson and Powell.  This offense was carrying a stolen, unregistered, concealed, and loaded firearm on the person and in a vehicle.  Bruce had personally participated in the arrest of Jefferson in that case.  He opined that Jefferson was an ENT member at that time based on "prior contacts," "prior investigations," and "observations on the street," all "done personally" by Bruce.  Bruce testified, on a similar basis, that Powell was also an ENT member at that time.

The prosecutor asked Bruce, based on a lengthy hypothetical that included most of the facts of these offenses, whether, in his opinion, these crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang.  Bruce said that it was his opinion that they were.  He gave the same opinion on the specific intent issue.

When Austin sought to reopen the case so that he could testify, Austin's trial counsel told the court that Austin was "going to admit ENT is a gang."  Austin testified that none of the proceeds from the robbery went to ENT.  He insisted he had committed the robbery for his own personal gain and so that he could use the proceeds of the robbery to provide for his family.  Austin admitted that he had previously been convicted

31

of residential burglary twice, including one in which the victim was an "Indian man," and felon in possession of a firearm, and that he had been released from prison for those offenses in August 2012. Austin insisted that all of his crimes were committed for himself and his family, not ENT. He otherwise supported himself by working as a pimp.

Austin admitted that he had formed ENT as a memorial for his friends, who he admitted were "violent criminals." He claimed: "It wasn't a gang when I formed it." When he "went away" (to prison), "younger people" who "looked up to" him "actually made it a gang." Still, he admitted that ENT members committed crimes in 2012, including possession of firearms, residential burglaries, and shootings. Austin admitted: "ENT's a gang. I mean, but ENT's a gang because based on the younger people make it - - the younger people that's younger than me, really make it a gang. But, me, myself, I didn't, I didn't look at it as a gang when it formed. . . . [A]t this point in time, in 2016, I definitely consider ENT a gang."

The trial court instructed the jury on the gang enhancement allegations: "If you find the defendant guilty in crimes charged in counts one, two, three, four, and five or the lesser offenses to count three, you must then decide whether for each crime the People have proved the additional allegation that the defendant committed that crime for the benefit of, at the direction of, or in association with a criminal street gang. You must decide whether the People have proved this allegation for each crime and return a separate finding for each crime. [¶] To prove this allegation, the People must prove that: [¶] (1) The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; and [¶] (2) The defendant intended to assist, further, or promote criminal conduct by gang members."

The trial court's instructions defined a criminal street gang as an "association, or group of three or more persons, whether formal or informal, that has a common name or common sign or symbol that has as one or more of its activities the commission of residential burglaries, robberies, auto burglaries, assaults with firearms, and murders; and

32

[¶] . . . [w]hose members, whether acting alone or together, engage in or have engaged in a pattern of criminal gang activity. In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the gang. [¶] Pattern of criminal activity used here means the commission of or conviction of any combination of two or more of the following crimes or two or more occurrences of one or more of the following crimes: Robbery, carrying a concealed firearm, carrying a loaded firearm, carjacking, auto burglary. At least one of those crimes was committed after September 6th, 1988; [¶] (3) The most recent crime occurred within three years of one of the earlier crimes; and [¶] (4) The crimes were committed on separate occasions or were personally committed by two or more persons. [¶] Crimes that establish a pattern of criminal gang activity need not be gang related. The People need not prove that the defendant is an active or current member of the alleged criminal street gang. [¶] If you find the defendant guilty of a crime in this case, you may consider that crime in deciding whether one of the group's primary activities was the commission of that crime and whether a pattern of criminal gang activity has been proved. You may not find that there was a pattern of gang activity unless all of you agree that two or more crimes that satisfy these requirements were committed, but you do not have to all agree on which crimes were committed."

Austin's trial counsel argued to the jury that it should find the gang allegations not true because Austin "committed this crime for his own personal benefit and no one directed him. He wasn't doing it in association with some kind of gang. . . . He was out to benefit himself." He also argued that the prosecution had failed to show that crimes were ENT's "primary activity" "rather than an occasional act committed by one or more persons who happen to be members of a gang." Austin's trial counsel argued that the predicates were "people unconnected to Austin, not even charged in most instances as gang-related offenses." The prosecutor argued in rebuttal "that this is the type of crime

33

that ENT would do.  ENT would bring the Ghost Town people to do it.  The motive would be money, nothing but money."  The jury found the gang enhancement allegations true as to Austin but not true as to Garcia.

## B.  The Majority Opinion's Approach

While I agree with the majority opinion that Austin's challenges to the gang enhancements should be rejected, my position is that most of Austin's challenges were forfeited due to his failure to obtain a ruling on his evidentiary objections from the trial court.  I disagree with the majority opinion's position that Austin's "general confrontation clause objections" were "sufficient to preserve" his evidentiary challenges for appellate review.  (Maj. opn., *ante*, at p. 52, fn. 39.)  I also conclude that Austin's substantial evidence challenge to the gang enhancements lacks merit.

## C.  My Analysis

### 1.  Substantial Evidence Challenge

Austin claims that the gang enhancements cannot be upheld because the record does not contain substantial evidence that ENT's "primary activities" at the time of the 2012 offenses were the commission of any of the statutorily enumerated crimes.  He concedes that his own testimony established that ENT members were committing enumerated crimes at that time, but he claims that this was insufficient to show that these offenses were ENT's primary activities.

A "'criminal street gang' means any ongoing organization, association, or group of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the criminal acts enumerated

in . . . subdivision (e)" of section 186.22.[13] (§ 186.22, subd. (f).) Subdivision (e) lists many offenses, but the jury instructions in this case limited primary activities to "residential burglaries, robberies, auto burglaries, assaults with firearms, and murders."

As the jury was instructed in this case, it could properly consider "the circumstances of the *present* or charged offense[s] in deciding whether the group has as one of its primary activities the commission of one or more of the statutorily listed crimes." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.) The "primary activities" must be "one of the group's 'chief' or 'principal' occupations" and cannot be merely "the occasional commission of those crimes by the group's members."[14] (*Ibid.*) "[E]vidence that the group's members *consistently and repeatedly*" committed such crimes is sufficient to establish the primary activities requirement as is "expert testimony" that the gang "was primarily engaged" in "statutorily enumerated felonies." (*Id.* at p. 324.)

Bruce testified that he had investigated "dozens" of crimes "related to ENT" between 2010 and 2013. Bruce was explicitly asked about ENT's primary activities: "Q. What in your opinion is ENT's primary activities? [¶] A. The primary being at the moment of ENT is committing burglaries and home invasions as well as robberies and shootings or murders. [¶] Q. And when you say, 'burglaries,' are they specific types? [¶] A. Typically, ENT was known for doing burglaries of Asian and East Indian homes. [¶] Q. Those would be residential burglaries. Correct? [¶] A. Correct."

---

13 The group's members also must have engaged in a pattern of criminal activity, which means two or more so-called "predicate" crimes. (§ 186.22, subds. (f) & (j)) Some of the offenses listed in section 186.22, subdivision (e) cannot be used to establish the requisite primary activities but only to establish predicate crimes. Those differences are not at issue here.

14 The jury in this case was instructed on this requirement: "In order to qualify as a primary activity, the crime must be one of the group's chief or principal activities rather than an occasional act committed by one or more persons who happen to be members of the gang."

Austin highlights the fact that Bruce used the present tense "is" and "at the moment" in his testimony and argues that Bruce's testimony therefore could not constitute substantial evidence of ENT's primary activities in 2012 but only evidence of ENT's primary activities at the time of Bruce's 2016 trial testimony. While this portion of Bruce's testimony was less than clear and might have been vulnerable to attack if it had stood alone, it was *not* the sole evidence of ENT's activities at the time of the 2012 offenses. Bruce also testified that he had investigated "dozens" of ENT crimes between 2010 and 2013, and Austin himself testified that ENT members were "committing residential burglaries" and shootings in 2011 and 2012. In addition, the prosecution introduced evidence that ENT member Ronny Flenaugh had committed a home invasion robbery in concert in June 2012. Furthermore, the jury was permitted to use the current offenses, a residential burglary and robbery, to support a primary activities finding.

The jury had before it substantial evidence that ENT's primary activities were statutorily enumerated crimes. The jury could have reasonably concluded that the "dozens" of crimes ENT members committed prior to the current offenses were of the same type as the burglaries and shootings that Austin admitted ENT gang members were committing in 2011 and 2012, the residential robbery that the prosecution proved was committed by an ENT gang member in 2012, and the current offenses of residential burglary and robbery in 2012. This evidence supported an inference that ENT's primary activities had not changed since 2012 and therefore that Bruce's testimony about ENT's primary activities was equally valid as to ENT's 2012 primary activities as it was as to ENT's subsequent primary activities.

Austin's reliance on *People v. Perez* (2004) 118 Cal.App.4th 151 (*Perez*) is misplaced. In *Perez*, the only evidence of the group's crimes was of a few scattered offenses, and no expert identified the group's primary activities at all. (*Id.* at p. 160.) *In re Alexander L.* (2007) 149 Cal.App.4th 605 is also distinguishable. In that case, the court found that the expert lacked foundation for his testimony about the group's

36

activities, which he did not explicitly identify as the group's primary activities. (*Id.* at pp. 611-612.) Here, in contrast, Bruce's long history of investigating ENT's crimes provided a solid foundation for his testimony, and he expressly identified statutorily enumerated crimes as ENT's primary activities. Moreover, the other evidence of ENT's activities corroborated and buttressed Bruce's testimony. The prosecution did not fail to establish that ENT was a criminal street gang under section 186.22.

## 2. "Failing to Limit Primary Activities"

Austin also seems to claim that there was some sort of error in failing to restrict the time period for ENT's primary activities so that the jury would not rely on post-crime primary activities. However, he does not clearly identify this error as a discernable instructional or evidentiary error or as prosecutorial misconduct. He generally refers to it only as a "due process" error. He contends that his right to due process was violated by the prosecution's introduction of evidence of ENT's activities after the present offenses. Since Austin does not claim that he *objected* on this ground to the admission of evidence or to the prosecutor's reliance on such evidence, any contention in that regard was forfeited.[15] (Evid. Code, § 353, subd. (a) [objection required to challenge alleged erroneous admission of evidence]; *People v. Bell* (1989) 49 Cal.3d 502, 535 [failure to object to prosecutorial misconduct waives issue].)

## 3. Challenges to the Admission of Evidence

Austin contends that the trial court erred in numerous respects in connection with the admission of evidence concerning the gang enhancements. However, these contentions were forfeited due to his failure to obtain an express ruling on any such objections in the trial court.

---

[15] Austin does not appear to argue that the trial court was obligated to give any type of limiting instruction telling the jury that it could not rely on ENT's activities after the present offenses. Such an argument would be unavailing since he failed to request a limiting instruction. (*People v. Sánchez* (2016) 63 Cal.4th 411, 460 [no sua sponte duty to give limiting instruction].)

37

"'A party desiring to preserve for appeal a challenge to the admission of evidence must comply with the provisions of Evidence Code section 353, which precludes reversal for erroneous admission of evidence unless: "There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated to make clear the specific ground of the objection or motion."' [Citations.] A properly directed motion *in limine* may satisfy the requirements of Evidence Code section 353 and preserve objections for appeal. [Citation.] However, the proponent *must secure an express ruling from the court*." (*People v. Ramos* (1997) 15 Cal.4th 1133, 1171, italics added.)

Garcia filed an in limine motion that Austin joined seeking a ruling that the gang experts should not be permitted to testify to hearsay. This motion explicitly cited *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). Garcia argued that a gang expert, at that time expected to be Officer Valle, should not be permitted to opine on Ghost Town's primary activities or its pattern of criminal activity. He claimed that Officer Valle lacked a foundation for such testimony because he had no personal knowledge of the Ghost Town gang. Garcia also argued that Valle should be precluded from "discussing the hearsay basis of his conclusions," that any hearsay evidence should not be admitted for its truth, and that a limiting instruction should be given. Garcia anticipated that the prosecution would use certified convictions to prove predicates, and he sought redaction of any gang enhancements shown on those documents as unduly prejudicial.

The prosecution filed a trial brief on gang issues. It noted that a pattern may be established based solely on the current charges if, as here, multiple gang members committed the current offenses. The prosecution argued that the gang expert could testify to the facts of a predicate based on police reports.

At the in limine hearing, Garcia's trial counsel mentioned to the court his motion "discuss[ing] gang limitations of experts." The court responded: "Okay. I have read that. And *I do not intend to make advance rulings with regard to the experts*. With

38

regard to what the experts can rely on, they certainly can rely on hearsay and to, for lack of a better term, admissible hearsay, when it comes to experts. [¶] We've already discussed the limitations of the *Crawford* case and how that's going to affect the gang expert's testimony with regard to -- or I shouldn't say the gang expert's testimony but the testimony with regard to the predicates that will be offered. And I'm confident that Mr. Smith [(the prosecutor)] is well aware of the evidentiary limitations that go along with *Crawford* and will act accordingly in proving the predicates." (Italics added.) Neither Austin nor Garcia pressed the court for a ruling on their in limine motion.[16] The court subsequently acknowledged, in ruling on an unrelated issue, that police reports about predicates reviewed by gang experts were barred under *Crawford* because they were testimonial hearsay. During Bruce's direct examination, the court, outside the presence of the jury, said "I would anticipate that there will be significant cross-examination." Austin's trial counsel responded: "No." Austin's trial counsel did not object to any of Bruce's testimony or to the admission of the documentary evidence of the predicates on any of the grounds that Austin now raises on appeal. Austin's trial counsel's cross-examination of Bruce was limited to a discussion of some photographs, most of which depicted Eddiebo Rodriguez.[17]

Austin failed to preserve for appeal any of his claims that the trial court erred in admitting evidence concerning the gang enhancements. While an in limine motion raised some of these issues, the court explicitly declined to rule in limine on those issues, and neither Austin nor Garcia pressed for a ruling or made any subsequent objections to the admission of any of the evidence that Austin now challenges. Nor could this forfeiture be considered ineffective assistance of counsel since it appears quite clear that Austin's trial counsel made a strategic decision to concede that Austin was a member of a criminal

---

[16]     Although Austin's trial counsel subsequently made a motion concerning gang expert testimony, that motion did not relate to any of the issues that he raises on appeal.
[17]     Rodriguez was Garcia's cousin. He died in January 2013.

street gang and to instead challenge the gang enhancement allegations on the ground that Austin had not intended to benefit ENT but only himself. Indeed, Austin's trial counsel told the trial court that Austin would "admit ENT is a gang." Consequently, review of Austin's evidentiary contentions is unwarranted.

## III. Conclusion

I would reverse the judgment as to Austin and remand for possible retrial of the special circumstance allegation. I agree that the judgment as to Garcia should be reversed and the matter remanded for resentencing and a *Franklin* hearing.


_____

Mihara, Acting P. J.

| Trial Court: | Santa Clara County Superior Court, Case No.: C1247403 |
|---|---|
| Trial Judge: | Hon. Ronald I. Toff |
| Attorney for Defendant/Appellant Javier Garcia: | Edward James Haggerty under appointment by the Court of Appeal |
| Attorney for Defendant/Appellant DeAngelo Austin: | Maribeth Halloran under appointment by the Court of Appeal |
| Attorneys for Plaintiff/Respondent The People: | Xavier Becerra Attorney General of California Gerald A. Engler Chief Assistant Attorney General Jeffrey M. Laurence Senior Assistant Attorney General Catherine A. Rivlin Supervising Deputy Attorney General Claudia Harvey Amaral Deputy Attorney General Allan Yannow Deputy Attorney General |

**H043870 -** *The People v. Garcia*
**H044073 -** *The People v. Austin*